**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JOHN J. CARNEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER, FOR HIGHVIEW POINT PARTNERS, LLC, MICHAEL KENWOOD GROUP, LLC, MK MASTER INVESTMENTS LP, MK INVESTMENTS, LTD., MK OIL VENTURES LLC, MICHAEL KENWOOD CAPITAL MANAGEMENT, LLC; MICHAEL KENWOOD ASSET MANAGEMENT, LLC; MK ENERGY AND INFRASTRUCTURE, LLC; MKEI SOLAR, LP; MK AUTOMOTIVE, LLC; MK TECHNOLOGY, LLC; MICHAEL KENWOOD CONSULTING, LLC; MK INTERNATIONAL ADVISORY SERVICES, LLC; MKG-ATLANTIC INVESTMENT, LLC; MICHAEL KENWOOD NUCLEAR ENERGY, LLC; MYTCART, LLC; TUOL, LLC; MKCM MERGER SUB, LLC; MK SPECIAL OPPORTUNITY FUND; MK VENEZUELA, LTD.; SHORT TERM LIQUIDITY FUND, I, LTD. | Civil Action No. |
| Plaintiff, | |
| v. | |
| JUAN S. MONTES, a.k.a. "BLACK," and MOVILWAY S.L., | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

John J. Carney, Esq. (the "Receiver"),[1] as Receiver to the Michael Kenwood Group LLC (the "MK Group") and certain affiliated entities (the "Receivership Entities")[2] in *Securities and Exchange Commission v. Illarramendi*, *Michael Kenwood Capital Management, LLC et al.*, C.A. No. 3:11-cv-00078 (JBA), (the "SEC Action") by and through his undersigned counsel, alleges the following:

## SUMMARY OF CLAIMS

1.      This lawsuit is part of the Receiver's continuing efforts to trace, recapture and return investor proceeds stolen from investment funds managed and operated as a Ponzi scheme by Francisco Illarramendi ("Illarramendi") and other individuals affiliated with the MK Group and Highview Point Partners, LLC ("HVP Partners").  Through this complaint, the Receiver seeks the return of bribes and other fraudulent transfers totaling $35,744,651 (collectively, the "Transfers"), as set forth in Exhibit A attached hereto.  Illarramendi made these bribe payments, directly or indirectly, to defendant Juan S. Montes ("Montes" or "Defendant"), a senior pension fund investment manager and official at Petróleos de Venezuela, S.A. ("PDVSA").  As described in further detail below, Defendant Montes received these bribes in exchange for his approval of certain bond-swap transactions PDVSA's pension funds entered into with Receivership Entities.

---

[1] Unless otherwise explicitly defined herein, the Receiver adopts for purposes of this complaint the defined terms as set forth in the Amended Receiver Order dated January 4, 2012 (Docket #423).

[2] The Receivership Entities include: Highview Point Partners, LLC; MK Master Investments LP; MK Investments, Ltd.; MK Oil Ventures LLC; The Michael Kenwood Group, LLC; Michael Kenwood Capital Management, LLC; Michael Kenwood Asset Management, LLC; MK Energy and Infrastructure, LLC; MKEI Solar, LP; MK Automotive, LLC; MK Technology, LLC; Michael Kenwood Consulting, LLC; MK International Advisory Services, LLC; MKG-Atlantic Investment, LLC; Michael Kenwood Nuclear Energy, LLC; MyTcart, LLC; TUOL, LLC; MKCM Merger Sub, LLC; MK Special Opportunity Fund; MK Venezuela, Ltd.; Short Term Liquidity Fund, I, Ltd.

2.      In an attempt to conceal the true nature of the bribes to Montes, Illarramendi falsely described these payments variously as investments or payments for professional fees.  In addition, Illarramendi transferred $5,080,161 for the benefit of Montes to Movilway S.L. ("Movilway," collectively with Montes "Defendants").  This transfer to Movilway represented a kickback to Montes made with money misappropriated from the MK Group and HVP Partners.  The Defendants benefitted, either directly or indirectly, from the fraudulent transfers alleged herein.

3.      Montes managed and controlled the investment portfolios of at least three of PDVSA's pension funds.  Illarramendi made these bribe payments and other fraudulent transfers to Montes for the opportunity to have PDVSA's pension funds participate in various bond-swap transactions.  These transactions gave Illarramendi temporary financial liquidity he needed to sustain the Ponzi scheme and continue to conceal massive losses.

4.      These illicit payments, despite their excessive and unreasonable amount, were, for Illarramendi, a cost of doing business.  The deals struck by Illarramendi with PDVSA, or those deals in which he sought to participate, could not go forward without the necessary bribe payments to individuals like Montes who made investment decisions on behalf of PDVSA's pension funds.  It was a measure of Illarramendi's desperation to maintain and conceal his fraud, and his fanciful belief that a financial windfall was right around the corner, that he was willing to pay exorbitant amounts in bribes and kickbacks to ensure that he was able to attract investments from and participate in transactions with PDVSA's pension funds.  Illarramendi also made the bribe payments in order to hinder, delay or defraud his creditors as the transactions PDVSA participated in helped to keep the Ponzi scheme undetected.

5.      The Defendants received the Transfers in exchange for nothing of value.  The Transfers represent monies properly belonging to the Receivership Estate, and ultimately to investors and victims of the fraud.  The bribe payments were made for the improper benefit of the Defendants with no value returned to the Receivership Entities or to investors.  The Receiver seeks the return of these bribe payments and other illicit transfers from Defendants.

## RELEVANT RECEIVERSHIP ENTITIES

6.      HVP Partners is a Delaware limited liability company organized on August 27, 2004.  HVP Partners was founded by Illarramendi and two other individuals and managed the Highview Point Master Fund (the "Master Fund") and two feeder funds, Highview Point Offshore, Ltd. (the "Offshore Fund") and Highview Point LP.

7.      MK Group was formed on January 26, 2007 as a Connecticut limited liability company and served as the holding company for MK Consulting, Michael Kenwood Capital Management, LLC ("MK Capital") and other MK Entities.

8.      MK Capital is a Delaware limited liability company organized on December 19, 2006, and served as an unregistered investment adviser for several hedge funds, including the MK Special Opportunities Fund Ltd. ("SOF"), the Short Term Liquidity Fund I, Ltd.  ("STLF"), and the MK Venezuela Fund Ltd. ("MKV") (collectively the "MK Funds").  The investors in the MK Funds were primarily offshore individuals and entities, including employee pension funds for PDVSA.

9.      SOF is a fund registered in the Cayman Islands.  SOF was formed on September 12, 2007, with the purported purpose of operating a fund of funds while "making direct investments on an opportunistic basis."

10.     STLF is a fund registered in the Cayman Islands and was formed in or about June 2008.

4

11.    MKV is a fund registered in the Cayman Islands.  MKV was formed in or about August 2008.

12.    Michael Kenwood Asset Management, LLC ("MKAM") is a Delaware limited liability company organized on December 19, 2006.  MKAM is a wholly-owned subsidiary of the MK Group and its principal place of business is located in Stamford, Connecticut.

## THE DEFENDANTS

### Juan S. Montes

13.    Montes, also known as "Black," was the corporate manager of finance, investments, and property insurance at PDVSA and its pension funds, as well as a member of PDVSA's investment committee.  Upon information and belief, Montes was personally involved and was responsible for negotiating, recommending and approving numerous financial transactions amongst PDVSA's pension funds and the Receivership Entities in exchange for millions of dollars in bribe payments.

14.    Upon information and belief, Montes resigned from his position at PDVSA and the PDVSA pension funds in August 2010.  Montes currently resides in Sunny Isles Beach, Florida.

15.    On January 24, 2012, Montes appeared for a deposition taken by the Receiver's counsel.   At his deposition, Montes asserted his Fifth Amendment right against self-incrimination and refused to answer questions about his relationship with Illarramendi, his role and responsibilities at PDVSA and its pension funds or whether he received any bribe payments.

### Movilway S.L.

16.    Movilway S.L. ("Movilway") is a *sociedad limitada* formed under the laws of Spain and has its corporate headquarters in Madrid, Spain.  It maintains a corporate office in

Miami, Florida.  Movilway is a company that specializes in enabling electronic transactions through the use of cellular phones and is a subsidiary of Celistics Group, a company chaired by Moris Beracha ("Beracha").  Beracha, a close business associate of Illarramendi, also formerly served as the president of Movilway.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1367 in that this is an action brought by the Receiver appointed by this Court concerning property under this Court's exclusive jurisdiction. *See SEC v. Illarramendi*, C.A. No. 3:11-cv-00078 (JBA), Amended Order Appointing Receiver (June 22, 2011) (Docket #279).

18.     This Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. §§ 754 and 1692.

19.     The District of Connecticut is the appropriate venue for any claims brought by the Receiver pursuant to 28 U.S.C. § 754 as the acts and transfers alleged herein occurred in the District.

## RECEIVER'S STANDING

20.     On January 14, 2011, the Securities and Exchange Commission ("SEC") commenced a civil enforcement action against Illarramendi, MK Capital, and various relief defendants (the "SEC Defendants").  The SEC's complaint alleges that Illarramendi and others misappropriated investor assets in violation of Section 206(1), (2) and (4) of the Investment Advisers Act of 1940 and Rule 206(4)-(8) thereunder. The SEC also sought equitable relief, including injunctions against future violations of the securities laws, disgorgement, prejudgment interest, and civil monetary penalties.

21.     Simultaneously with the filing of its complaint, the SEC sought emergency relief, including a preliminary injunction, in the form of an order freezing the assets of the SEC Defendants.  The SEC also sought the appointment of a receiver over those assets.

22.     On February 3, 2011, the Court appointed Plaintiff John J. Carney, Esq. as Receiver over all assets "under the direct or indirect control" of Defendant MK Capital and various relief defendants.  A motion to expand the scope and duties of the Receivership was filed on March 1, 2011, and the Amended Receiver Order was entered on March 1, 2011, expanding both the duties of the Receiver and the definition of the Receivership Estate to include the MK Funds, namely SOF, MKV and STLF.

23.     On June 22, 2011, the Court entered a second Amended Receiver Order, which, *inter alia*, expanded the scope of the Receivership Estate to include HVP Partners as a Receivership Entity.  By additional order of the Court, the Receivership was again expanded on July 5, 2011, to include MK Master Investments LP, MK Investments, Ltd. and MK Oil Ventures LLC.  On January 4, 2012, the Court entered another modified Receiver Order to include additional reporting requirements.  On February 2, 2012, the Receiver filed a Motion to Expand the Receivership to include the HVP funds; this Motion is currently pending before this Court.

24.     Pursuant to the Court's Amended Order Appointing Receiver of January 4, 2012 ("Amended Receiver Order"), the Receiver has the duty of, among other things, identifying and recovering property of the Receivership Entities to ensure the maximum distribution to the Receivership Entities' defrauded creditors and to maximize the pool of assets available for distribution.  To accomplish this goal, the Receiver must take control of all assets owned by or

traceable to the Receivership Estate, including any funds that were stolen, misappropriated, or fraudulently transferred as alleged herein.

25.     The Receiver has standing to bring these claims pursuant to, among other things, Connecticut Uniform Fraudulent Transfer Act ("CUFTA"), CONN. GEN. STAT. § 55-552, CONN. and Connecticut common law.

26.     The Receiver has standing to bring claims that the Receivership Entities could have brought on their own behalf.  As alleged herein, Illarramendi freely commingled proceeds between and among the Receivership Entities such that the Receivership Entities, including the MK Funds, are creditors of one another.  Accordingly, the Receiver has standing to recover the fraudulent transfers made to the Defendants.  The Receiver also has standing to bring common law claims on behalf of the Receivership Entities.

## THE FRAUDULENT SCHEME

## I.      ILLARRAMENDI'S NETWORK OF ENTITIES AND FUNDS

27.     The Ponzi scheme at the center of this action involves the misappropriation and misuse of investor assets by Illarramendi through his management and control of HVP Partners and MK Capital.

28.     From at least 2005 through the fall of 2010, Illarramendi caused HVP Partners, the MK Group, the MK Funds, and the HVP Funds to engage in scores of extraordinarily complex and multi-layered transactions as part of a fraudulent scheme (the "Fraudulent Scheme") to conceal investment losses and the misappropriation of investor assets.  Illarramendi conducted the fraud using the HVP Funds and the MK Funds in tandem, engaging in many related transactions between the two groups, which included purported loans and investments, and extensive undocumented transfers of cash between them for the purpose of concealing

massive losses in order to hinder, delay or defraud the investors and creditors of the Receivership Entities and HVP Funds.

29.     To perpetrate and prolong his fraud, Illarramendi fabricated entire transactions and misrepresented the profitability of actual transactions in an effort to conceal his scheme and defraud creditors.  To obfuscate his ever-growing shortfall, Illarramendi played a shell game with the remaining investor funds, constantly shuffling funds from one entity or fund to the next. Any separation between the MK Funds and the HVP Funds was a legal fiction, as Illarramendi freely and indiscriminately commingled, misappropriated, and looted investor proceeds.

30.     On or about March 7, 2011, the United States Attorney's Office for the District of Connecticut ("USAO") filed a criminal Information against Illarramendi alleging that Illarramendi, with others, had engaged in a massive Ponzi scheme involving hundreds of millions of dollars of money supplied primarily by foreign institutional and individual investors.

31.     According to the Information, Illarramendi engaged in or caused multiple acts in furtherance of the Ponzi scheme, including but not limited to: (1) making false statements to investors, creditors and employees of the Receivership Entities, the SEC, and others to conceal and continue the scheme; (2) creating or causing fraudulent documents to be created; (3) engaging in multiple transactions without documentation in an effort to conceal and continue the scheme; (4) transferring millions of dollars of assets across the Receivership Entities and other entities he controlled to make investments in private equity companies; and (5) commingling assets across the Receivership Entities and other affiliated entities.  On March 7, 2011, Illarramendi pleaded guilty to a much larger fraud than was originally pleaded in the Commission's complaint.  He pleaded guilty to felony violations of wire fraud (18 U.S.C. §

1343), securities fraud (15 U.S.C. §§ 78j(b) and 78ff), investment adviser fraud (15 U.S.C. §§ 80b-6 and 80b-17) and conspiracy to obstruct justice (18 U.S.C. § 371).

32.     As Illarramendi publicly acknowledged during his plea allocution, he began engaging in this scheme as years earlier to hide from investors and creditors the losses he had incurred and the massive discrepancy that existed between the commingled assets and liabilities and the funds.

## II.     THE GENESIS OF THE FRAUD

33.      In August 2004, Illarramendi and two others formed HVP Partners as a Delaware limited liability company, each holding a one-third ownership share.  According to the LLC agreement, the stated purpose of HVP Partners was to act as the investment manager of the Offshore Fund, a hedge fund to be nominally based in the Cayman Islands (in fact, the fund was completely dominated and controlled from its inception by HVP Partners) and for engaging in any other lawful act or activity for which a limited liability company may be formed under the Delaware Limited Liability Company Act.

34.     By January 2006, with over $72 million of assets in the Offshore Fund under the exclusive control of HVP Partners, the hedge fund's structure was changed to a "master-feeder" structure by creating the Master Fund, turning the Offshore Fund into an offshore feeder fund, and creating another entity called Highview Point L.P., as a domestic feeder fund.  As part of this change in structure, the Master Fund was incorporated in the Cayman Islands in January 2006. Again absolute investment and contracting powers over the fund were handed to HVP Partners.

35.     In October of 2005, Illarramendi brokered a deal on behalf of the Offshore Fund and others to purchase and then immediately sell at a profit a Credit Lyonnais bond ("Calyon Bond").   The Calyon Bond deal went awry from the beginning and generated losses which should have been disclosed to and recognized by the investors.  Rather than disclose these losses,

Illarramendi decided to conceal them fraudulently.  Despite the fact that the Calyon Bond transaction resulted in a loss, Illarramendi caused proceeds received in the transaction to be transferred to each investor, other than the Offshore Fund, in amounts greater than each investor's initial investment.  These transfers made it fraudulently appear that those investors had received profits from the transaction rather than sustaining a significant loss.  This caused a substantial cash shortfall that was absorbed by the Offshore Fund and fraudulently concealed on the fund's books and records along with falsely reported fictitious profits to the Offshore Fund from the deal.  The difference between the actual proceeds distributed to the Offshore Fund and what was fraudulently recorded on the funds' books and records was approximately $5.2 million and was the beginning of the "hole."   At the end of October 2005, this $5.2 million hole constituted roughly ten percent of the $52 million net asset value reported in the falsified books and records of the Offshore Fund.

36.      To cover up the $5.2 million shortfall, Illarramendi instructed GlobeOp, the HVP Funds' administrator, to record entries in the books and records of the Offshore Fund falsely reflecting that approximately $5.2 million in funds had been transferred to, and invested in Ontime Overseas Inc. ("Ontime"), an entity controlled by Illarramendi's brother-in-law, Rufino Gonzalez-Miranda.  These falsifications of the books and records of the Offshore Fund made it appear that the Offshore Fund actually received a profit and caused the Offshore Fund's books and records to be fraudulently misstated.  In reality, no proceeds of the Calyon Bond transaction were transferred to Ontime.

37.      This initial fraudulent concealment of the $5.2 million hole did not buy Illarramendi enough time to replace the missing funds.  In order to ensure that the fraudulent transaction was removed from the books before the year-end audit, on or about December 15,

2005, Illarramendi arranged for Ontime to transfer $7.4 million to HVP Offshore to make it appear that the falsely recorded phony investment in Ontime was being "redeemed." In fact, no such investment had been made, and Ontime was merely serving as a shell to move funds at Illarramendi's command.

38.     To fund the fraudulent transfer from Ontime, which made it falsely appear that a redemption had occurred, Illarramendi, disregarding corporate form or conflicts of interest, transferred $5.5 million to Ontime from the Wachovia bank account of HVP Partners in several transactions in November and December. Further disregarding corporate form, and failing to conduct business at arm's length, HVP Partners funded these fraudulent transfers primarily through a loan from BCT Bank International ("BCT Bank") to HVP Partners. The use of money provided by others to conceal the hole, for the most part enlarged it, as others required compensation for the use of the funds. Thus began a series of convoluted transactions over the next five years designed to hide the "hole."

39.     The Fraudulent Scheme was overarching in nature and involved the massive commingling of funds and the operation and use of the HVP Funds and their bank accounts to facilitate the fraud. Corporate formalities were ignored and the monies invested in the HVP Funds, along with money from others, were used to engage in a huge Ponzi scheme. The Ponzi scheme culminated in fraudulent losses of more than $300 million.

40.     In order to fraudulently conceal the hole, perpetuate the Ponzi scheme, and engage in transactions that were not recorded in the books and records of HVP Funds and the MK Funds, Illarramendi used various bank accounts, including accounts in the names of shell companies such as Naproad Finance S.A., ("Naproad") and HPA, Inc. ("HPA"). As described further below,

Illarramendi used the HPA and Naproad bank accounts to make bribe payments and fraudulent transfers to Defendants.

41.     At all relevant times, those bank accounts were under the control of Illarramendi and HVP Partners and contained commingled funds from the Receivership Entities, the HVP Funds and other third party entities.

42.     HPA was incorporated in Panama in July 2005 and was dissolved in May 2008. In August 2005, HVP Partners was provided with full power of attorney over HPA. In 2007, HPA filed documents to effect a corporate name change from HPA to HIGHVIEWPOINT CST, INC.  Bank statements for accounts opened in the name of HPA (the "HPA Account") were addressed to the HVP Partners' office in Stamford, Connecticut.  In order to effectuate transactions using the HPA Account, Illarramendi repeatedly sent wire instructions, on HVP Partners letterhead, to the bank.  In these wire authorization letters, Illarramendi referred to the HPA Account as "our" (i.e. HVP Partners) bank account.  Thus, the HPA Account was, in reality, an HVP Partners bank account opened under a false name.

43.     Naproad was incorporated in Panama in July 2005 and was dissolved in May 2008.  In September 2005, HVP Partners was provided with full power of attorney over Naproad.  In 2007, Naproad filed documents to effect a corporate name change from Naproad to HPP INTERNATIONAL S.A.  Bank statements for accounts opened in the name of Naproad (the "Naproad Account") were addressed to the HVP Partners' office in Stamford, Connecticut.  In order to effectuate transactions using the Naproad Account, Illarramendi repeatedly sent wire instructions, on HVP Partners letterhead, to the bank.  In these wire authorization letters, Illarramendi referred to the Naproad Account as "our" (i.e. HVP Partners) bank account.  Thus, the Naproad Account was, in reality, an HVP Partners bank account opened under a false name.

44.     As described below and detailed on Exhibit A, Illarramendi used the HPA Account and the Naproad Account to make bribes and other fraudulent payments to the Defendants.

## V.     THE "PERMUTA" MARKET

45.     Upon information and belief, Illarramendi used the "permuta market" or "swap market"—a type of currency exchange market in operation in Venezuela at all relevant times—to engage in a complicated series of transactions with PDVSA's pension funds.  Upon information and belief, Montes arranged these permuta transactions with Illarramendi on behalf of PDVSA's pension funds in return for bribe payments.  Upon information and belief, Illarramendi relied on access to the permuta market to assist in his operation of the Ponzi scheme.  The permuta market functioned as an unofficial currency exchange market that operated in parallel to the official government currency exchange in which Venezuelan government bonds could be bought in Bolivars and then sold for U.S. dollars.  Upon information and belief, it was possible to purchase a Bolivar-denominated bond through Venezuelan brokerage firms, swap it for a dollar-denominated bond (clearable through Euroclear), and then sell it to receive U.S. currency offshore from Venezuela. As a result, the relation between the prices of the two bonds became a proxy for the quasi-free market currency exchange rate.

46.     Upon information and belief, this market was abolished by the Venezuelan government in or about May 2010.  In its place, Venezuelan authorities created the Sistema de Transacciones con Titulos en Moneda Extranjera (SITME), essentially a bond-trading system run by the Central Bank, which sells dollars at a fixed exchange rate.

47.     As described more fully below, Illarramendi raised dollars through the Receivership Entities and other third parties, and used these dollars in transactions with local

Venezuelan permuta brokers to purchase Bolivar-denominated securities which were then transferred to PDVSA pension funds.  The PDVSA pension funds, in turn, would exchange these bonds for dollar-denominated bonds at the official exchange rate.  Typically, Illarramendi then used HPA to sell the dollar-denominated bonds on the open market.

48.     Such permuta transactions could quickly achieve profits by leveraging Venezuelan investors' thirst for dollars rather than Bolivars, and the difference between the "official" dollar/Bolivar exchange rate and the rate that could be found on the unofficial permuta market.

## ILLARRAMENDI AND PDVSA

### I.     ILLARRAMENDI'S HISTORY WITH PDVSA

49.     In or around 1994, Illarramendi went to work for an investment bank as a financial analyst where he worked on corporate transactions on behalf of PDVSA Finance, an SEC-regulated financing vehicle for PDVSA.

50.     In 2004, Illarramendi took a leave of absence from the investment bank to work as an independent consultant for PDVSA's U.S. affiliate, PDV-USA, in New York.  Around this time, PDVSA hired Illarramendi to assist in retiring various note offerings issued by PDVSA Finance.  Illarramendi and his team, which included future MKG principal Odo Habeck and Highview Point Chief Financial Officer Victor Chong, came to PDV-USA under the auspices of Jose Rojas ("Jose Rojas"), former Minister of Finance for Venezuela.  However, Illarramendi's time working for PDV-USA was short-lived.  Not long after Illarramendi and his team arrived and set up the New York office for PDV-USA, they were dismissed from their positions.  Upon information and belief, after his termination from PDV-USA, Illarramendi's reputation at PDVSA was severely tarnished, partly due to his affiliation with Jose Rojas, a controversial figure at PDVSA.

51.     After Illarramendi's position with PDV-USA was terminated, Illarramendi and two business partners formed HVP Partners, which began operations in or about May 2005. Illarramendi sought to capitalize on his work for PDVSA and knowledge of PDVSA's financing activities and organizational structure.  Illarramendi understood that PDVSA's pension funds held hundreds of millions of dollars available for investment.  Specifically, these pension funds included: APJ International, Ltd. ("APJ International"), Asociación Civil Administradora de los Fondos de Pensíones de los Jubilados de Petróleos de Venezuela, S.A. y sus Filiales ("APJ-PDV") and Fondo de Previsión de los Trabajodores de Petróleos de Venezuela S.A. y sus Filiales (the "Worker's Fund;" and collectively with APJ-PDV and APJ International, the "Pension Funds").  Upon information and belief, though these subsidiaries are separate legal entities, they operate at the direction of PDVSA, and share overlapping officers and directors.  Defendant Montes was a member of this overlapping leadership group.

52.     Illarramendi made it his goal to attract investments from the Pension Funds. However, as a result of the circumstances of his termination from PDVSA, Illarramendi found it difficult to directly seek business opportunities with PDVSA.  Consequently, Illarramendi relied on introductions by middlemen, strategic bribes, kickbacks, personal relationships and deceptive tactics to further financial transactions with PDVSA entities.

53.     Upon information and belief, Illarramendi was initially cautious not to use his real identity in correspondence between HVP Partners and PDVSA.  In or around November 2006, Illarramendi created an alternate identity named "Tony Olson" ("Olson") (aka Tomasino Olson) for use on such correspondence.  Illarramendi, as Olson, frequently corresponded with Montes and other PDVSA Pension Fund employees for purposes of discussing trades between HVP Partners and the Pension Funds as well as making investments in the MK Funds.  However, upon

information and belief, Montes became aware of the charade and knew that Olson was really Illarramendi.  Upon information and belief, in order to conceal his contacts with Illarramendi, Montes often communicated with him about transactions with the Pension Funds using his personal email accounts, rather than his business email account at PDVSA.

54.     Montes often went by the nickname "Black" in his email correspondence with business associates, including Illarramendi. In addition, Illarramendi kept spreadsheets for the allocation of profits and payments among participants in various transactions involving the Pension Funds.  In these spreadsheets, Illarramendi listed bribe payments to Montes under the name "Black."

55.     Upon information and belief, Illarramendi attempted to conceal his communications with Montes regarding bribe payments.  For example, in 2010, in connection with an investment made by the Pension Funds in SOF, Illarramendi created fictitious names and web-based email accounts for the purpose of making arrangements for the payment of bribes to Montes and other PDVSA officials.  Specifically, Illarramendi used the names "Carmelo Luizo" and "Lisandro Cuevas" to open up Yahoo! email accounts.   In or around May of 2010, Illarramendi and Montes used these fictitious names and email accounts to exchange various emails written in Spanish regarding specific bribe payments and bank account routing instructions.  These bribes were intended to pay off Montes and other PDVSA officials for their approval of the Pension Funds' investment in SOF.

56.     In addition to the use of false identities and covert email addresses, Illarramendi also relied on middlemen to gain access to and arrange transactions with the Pension Funds.  One such strategic relationship Illarramendi developed was with Beracha, a Venezuelan businessman and financier.   Upon information and belief, Beracha had deep connections within the

Venezuelan finance community as well to PDVSA officials, including Montes.  By working with and through Beracha, Illarramendi secured various transactions with the Pension Funds.

57.     Upon information and belief, Beracha arranged numerous transactions between HVP Partners and the MK Funds and Pension Funds and two other PDVSA subsidiaries, PDV Insurance Company, Ltd. ("PDVIC") and PDVSA Institucion Fondo de Ahorros ("IFA").  The price for Beracha's assistance in arranging these transactions was steep and required exorbitant payments to Beracha as well as to PDVSA officials such as Montes.  Illarramendi repeatedly caused HVP Partners and other Receivership Entities to transfer funds to entities controlled by Beracha in order to pay these kickbacks and bribes.

58.     Upon information and belief, Montes received, directly or indirectly, the lion's share of these bribes, totaling approximately $36 million.

## THE TRANSACTIONS

## I.     MONTES RECEIVES BRIBES FOR APPROVING PERMUTA TRANSACTIONS

### A.     Montes Receives Multiple Payments from the First Permuta Transaction

59.     In or around November of 2006, Illarramendi, Montes and Beracha set the stage for the first permuta transaction involving the Pension Funds by arranging for the Pension Funds to purchase dollar-denominated notes issued by the Export Development Corporation of Canada ("EDC") from HPA (the "First Permuta Transaction").  The Pension Funds ultimately sold the EDC Notes back to HPA for Bolivar-denominated bonds.  Upon information and belief, Montes received bribe payments on both the purchase and the exchange of the notes.

60.     Upon information and belief, Montes was integrally involved in the First Permuta Transaction wherein he approved the purchase and sale of the EDC Notes on behalf of the Pension Funds.

61.     On or about November 29, 2006, Illarramendi caused HPA to purchase medium term EDC notes (the "EDC Notes") for approximately $56,036,640.   The EDC Notes had a nominal value of approximately $63,678,000.

62.     On or about the same day, the Pension Funds purchased the EDC Notes from HPA for a total of approximately $63,678,000.    Specifically the Worker's Fund paid approximately $5,179,000, APJ-PDV paid approximately $37,656,000, and APJ International paid approximately $20,843,000.

63.     From the proceeds of the sale of the EDC Notes to the Pension Funds, Illarramendi made transfers to offshore financial institutions, including Davos International Bank ("Davos") and Vaduz Financial Corp. ("Vaduz"), which, upon information and belief, were intended as bribe payments to Montes.   On December 8, 2006, Illarramendi directed a transfer from the HPA Account to Davos Bank in the amount of $126,000.   The reference for this transfer was for "Professional Fees" but failed to indicate an ultimate recipient.   On the same day, Illarramendi directed a transfer of $2,241,548 from the HPA account to Vaduz, indicating that it was a "Highview Point Private Equity Investment."   This transfer again failed to name an ultimate beneficiary and the Receiver has been unable to locate any such private equity investment.

64.     Upon information and belief, Beracha arranged the Davos Bank and Vaduz transfers to conceal bribes paid by Illarramendi to Montes.

65.     When asked about these transfers to Davos and Vaduz at his deposition, Montes invoked his Fifth Amendment right against self-incrimination and refused to answer these questions.

66.     On or about March 7, 2007, the Pension Funds sold the EDC Notes back to HPA in exchange for Bolivar-denominated notes worth a total of $66,900,000, converted at the official rate, thus completing the First Permuta Transaction.

67.     On the same day as the Pension Funds' sale of the EDC Notes to HPA, Montes and Illarramendi sent each other several emails written in Spanish regarding the final terms of this transaction.  In the email string, Montes, using his personal email address and not his official PDVSA email address, asked Illarramendi, in substance and in part not to speak to anyone about him and not to acknowledge that they know each other.

68.     In connection with this second part of the First Permuta transaction, Illarramendi made several transfers from the Naproad Account to entities controlled by Beracha, which, upon information and belief, were intended to pay bribes to Montes.  These transfers were made on or about March 22, 2007 and include $1,445,183 to Dobson Management Corp., $2,632,534 to Northwestern International, Ltd., and $7,658,383 to East Coast Consultants, Corp.

69.     The bribes paid out of the Naproad Account consisted of monies extensively commingled from the MK and HVP Funds and funds that were otherwise misappropriated from the Receivership Estate.

70.     Therefore, upon information and belief, Montes received payments totaling $11,736,100 in connection with the second part of the First Permuta Transaction.  In turn, Montes insured that the Pension Funds participated in the transactions which provided Illarramendi with the liquidity he desperately needed to sustain the Ponzi scheme.  Montes received payments to personally enrich himself and his assistance came at a multi-million dollar price tag for Illarramendi.

71.     In an email exchange originally written in Spanish, dated March 9, 2007, Beracha and Illarramendi discussed in substance and in part, the exact amount owed to "Black" from this transaction, specifically discussing whether he was owed $11,736,100—the exact amount transferred to Beracha's entities as described above.   In addition, Illarramendi drafted a spreadsheet calculating allocations of profit from the First Permuta Transactions, which included a proposed distribution for "Black."

72.     When asked about these transfers at his deposition, Montes invoked his Fifth Amendment right and refused to answer these questions.

73.     Montes provided nothing of value for receipt of transfers totaling $14,103,648 made in connection with the First Permuta Transaction.   Montes provided no value, services, or other consideration to HVP Partners in return for these fraudulent transfers that unjustly enriched Montes.   Montes knew or should have known that receiving transfers for essentially no work, services, or value, was not indicative of Illarramendi's operation of a legitimate hedge fund. Montes' receipt of bribes, which removed most of the profits that were earned from the transaction by Illarramendi, put him on notice that Illarramendi was not engaged in legitimate business but instead operated a fraud.

**B.      Montes Receives a Payment from a Second Permuta Transaction**

74.     Desperate to cover the growing "hole" with further liquidity provided by the Pension Funds, Illarramendi engaged in a second permuta transaction.   Upon information and belief, entities owned and controlled by Beracha performed a second bond swap transaction in or around October 2007 with the Pension Funds (the "Second Permuta Transaction").   These entities received approximately $38,000,000 raised from the Master Fund and other sources to engage in a permuta transaction.   This $38 million was used to purchase approximately $89,500,000 in Bolivar-denominated Venezuelan government bonds, converted at the official

rate, for the Pension Funds.  The Pension Funds, in turn, transferred $47,599,687 in dollar-denominated PDVSA bonds to HPA as payment for the Bolivar-denominated Venezuelan bonds.

76.     Again, Montes' approval and assistance of this transaction came at a very steep price.  Upon information and belief, Illarramendi paid Montes $7,296,716 for his approval of the Second Permuta Transaction.

75.     Upon information and belief, Montes reviewed and approved these transactions in his capacity as the senior investment fund manager for the Pension Funds.

77.     This payout represented nothing more than a bribe to personally enrich Montes for steering the investment to Illarramendi.  Of course these funds originating from the HPA Account consisted of commingled and misappropriated property of the Receivership Entities.

78.     In an email chain originally written in Spanish, dated October 23, 2007, Illarramendi and Beracha discussed this payment to Montes, who they again referred to as "black," in connection with the Second Permuta Transaction.  Beracha told Illarramendi, in substance and in part, that Illarramendi has "$7,296,716.50" which belongs to "black" and that Beracha will send Illarramendi instructions for a new bank account that Beracha is opening up on behalf of "black" at HSBC.  In the same email, Illarramendi noted that Beracha had an additional $1,548,415 in his possession for "black."

79.     On or around November 6, 2007, Illarramendi transferred $7,296,716 from the HPA Account to an account at HSBC Private Bank (Switzerland) S.A. (the "HSBC Account").  In the instructions, Illarramendi identified the beneficiary of the HSBC Account as Hermitage Consultants Inc. ("Hermitage").  Hermitage is a Panamanian company which, upon information and belief, is affiliated with and controlled by Beracha.  Upon information and belief, Hermitage is a company used by Beracha to receive and conceal bribes paid by Illarramendi to Montes.

Illarramendi's transfer request referenced an "HPA Purchase of Venezuelan Securities to be DFP[3] subsequently."  Needless to say, the Receiver has found no evidence of such purchase of Venezuelan securities on behalf of HPA.  This characterization disguised the true nature of this payment which was an illegal kickback paid from property belonging to the Receivership.  Upon information and belief, Montes received all of this $7,296,716 transfer.

80.      In addition, Illarramendi drafted a spreadsheet calculating allocations of profit from the Second Permuta Transaction, which included a proposed distribution for "Black" which matched the $7,296,716 transfer.

81.      Montes provided nothing of value for receipt of the transfer totaling $7,296,716 made in connection with the Second Permuta Transaction.  Montes provided no value, services, or other consideration to HVP Partners in return for this fraudulent transfer that unjustly enriched him.  Montes knew or should have known that receiving a payment for essentially no work, services, or value, was not indicative of Illarramendi's operation of a legitimate hedge fund. Montes' receipt of this bribe, which removed most of the profits that were earned from the transaction by Illarramendi, put him on notice that Illarramendi was not engaged in legitimate business but instead operated a fraud.

82.      When asked at his deposition whether he received anything of value in connection with the Second Permuta Transaction, Montes invoked his Fifth Amendment right and refused to answer the questions.

---

[3] Upon information and belief, "DFP" is an acronym for Delivery Free of Payment, a common method for delivering securities without a payment in return.

**C.     Montes Receives Multiple Payments from Third Permuta Transaction**

83.     In or around late October 2007, Illarramendi, Beracha and Montes orchestrated a third permuta transaction involving APJ-PDV, Worker's Fund and IFA (the "Third Permuta Transaction").

84.     On or about October 18 and 19, 2007, entities owned and controlled by Beracha received approximately $46,000,000 from HPA and the Master Fund.  The transfer from HPA was directed by Illarramendi on HVP Partners letterhead and again referred to "our account"— completely blurring any line of distinction between HPA and HVP Partners.

85.     Beracha's entities then used approximately $45,500,000 (keeping the remaining $500,000) to engage in permuta transactions to obtain Bolivar-denominated Venezuelan government bonds in the amount of $116,404,854, converted at the official rate, which it provided to APJ-PDV, Worker's Fund and IFA.  In turn, on or around October 25, 2007, APJ-PDV, Worker's Fund and IFA transferred approximately $60,900,000 million in dollar-denominated PDVSA bonds to HPA as payment for the Bolivar-denominated Venezuelan government bonds.

86.     Upon information and belief, Illarramendi again needed to pay Montes a kickback for arranging the Third Permuta Transaction.  Therefore, on or about November 13, 2007, Illarramendi transferred approximately $2,500,000 from the HPA Account to an account at Davos Bank.  In an email originally written in Spanish, dated November 2, 2007, Beracha explained to Illarramendi that the profit for the Third Permuta Transaction was reduced by a "peaje" (Spanish for "toll") in the amount of $2,500,000.  Upon information and belief, this was a code word used to describe kickbacks to be paid to Montes.  Furthermore, in an email originally written in Spanish, dated November 6, 2007, Beracha sent Illarramendi instructions for sending a $2,500,000 transfer to Davos Bank with a reference to a "harbord inv."   Upon

information and belief, this explanation purportedly refers to a specific investment.  However, the Receiver has not identified any such investment and this was again a thinly veiled attempt to conceal what was really a kickback to Montes for approving and facilitating the transaction. Upon information and belief, this transfer was in fact intended to pay off Montes.

87.     In addition, on or about December 6, 2007, SOF transferred $6,764,126 to the Hermitage account at HSBC— the same HSBC Account that Beracha had previously directed Illarramendi to send payments for the benefit of Montes.  Upon information and belief, this was an additional kickback meant for Montes for facilitating the Third Permuta Transaction.

88.     When Montes was asked at his deposition whether he received anything of value in connection with the Third Permuta Transaction, Montes invoked his Fifth Amendment right and refused to answer the questions.

89.     Montes receipt of these transfers totaling $9,264,126 was in exchange for absolutely nothing of value.  Montes provided no value, services, or other consideration to HVP Partners or SOF in return for these fraudulent transfers that unjustly enriched Montes and Davos Bank.  Montes knew or should have known that receiving transfers for essentially no work, services, or value, was not indicative of Illarramendi's operation of a legitimate hedge fund. Montes' receipt of bribe payments, which removed most of the profits that were earned from the transaction by Illarramendi, put him on notice that Illarramendi was not engaged in legitimate business but instead operated a fraud.

**Movilway Payment**

90.     On or about July 21, 2010, Illarramendi caused STLF to transfer $5,080,161 to Movilway.  Illarramendi falsely identified this transfer as a capital contribution in Movilway. Upon information and belief, Movilway is an entity controlled by Beracha.  The Receiver has

found no evidence of such an investment and upon information and belief, this purported investment was actually another kickback to Montes paid through another entity to conceal its true nature.

91. Montes and Movilway's receipt of this payment was in exchange for absolutely nothing of value. Montes and Movilway provided no value, services, or other consideration to STLF in return for this fraudulent transfer that unjustly enriched Montes and Movilway. STLF received no interest in Movilway in exchange for its supposed investment.

92. Montes knew or should have known that receiving a payment for essentially no work, services, or value, was not indicative of Illarramendi's operation of a legitimate hedge fund. Montes' receipt of bribe payments, which removed most of the profits that were earned from transactions put together by Illarramendi, put him on notice that Illarramendi was not engaged in legitimate business but instead operated a fraud.

93. When asked about Movilway at his deposition, Montes invoked his Fifth Amendment rights and refused to answer the questions.

### THE NATURE OF THE CAUSES OF ACTION AGAINST DEFENDANTS

94. At all times relevant hereto, the Receivership Entities were insolvent in that (i) their liabilities exceeded the value of their assets by millions of dollars; (ii) they could not meet their obligations as they came due; and/or (iii) at the time of the Transfers to Defendants described herein, the Receivership Entities were left with insufficient capital to pay their investors and/or creditors.

95. This action is being brought to recover misappropriated property of the Receivership Entities that was spent on bribes and other fraudulent transfers made to Defendants, as well as damages for conversion and unjust enrichment, so that these funds can be returned and equitably distributed among the investors and creditors of the Receivership Entities.

96.     Without regard to the extent to which he knew of Illarramendi's Fraudulent Scheme, Montes knew or should have known that he was not entitled to these kickbacks or anything else of value.  Montes did not provide Illarramendi or the Receivership Entities with any independent value for the kickbacks he received.  Furthermore, the illicit payments he sought from Illarramendi substantially reduced the profitability of the transactions Illarramendi hoped would get him out of the "hole."

97.     At all relevant times, Illarramendi was involved in a Ponzi scheme with the transfers he made, including the bribes paid to Montes, designed to hinder, delay or defraud creditors and continue to conceal his fraudulent conduct.

98.     The Receiver was only able to discover the fraudulent nature of the above-referenced Transfers after Illarramendi and his accomplices were removed from control of the Receivership Entities and after a time-consuming and extensive review of thousands upon thousands of paper and electronic documents relating to the Receivership Entities.  The Receiver's investigation is still ongoing.  No amount of reasonable diligence by the Receiver could have detected the fraudulent transfers sooner.  As a result, there may be evidence of other assets belonging to the Receivership Estate or other fraudulent transfers of funds that the Receiver has yet to discover.  If such transfers or assets are later discovered, the Receiver will seek to amend this Complaint to assert claims regarding such transfers or assets.

99.     To the extent that any of the recovery counts below may be inconsistent with each other, they are to be treated as pleaded in the alternative.

## FIRST CAUSE OF ACTION

## <u>CUFTA SECTION 52-552e(a)(1) (ACTUAL FRAUD)</u>
*As To All Defendants*

100.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

101.     The Transfers were (a) made on or within four years before the date of this action or (b) were discovered within one year of when the fraudulent transfers could have been reasonably discovered by the Receiver.

102.     At the time of each of the Transfers, one or more of the Receivership Entities were each "creditors" within the meaning of section 52-552(b)(4) of CUFTA.

103.     Each of the Transfers constitutes a transfer of an interest of property of the Receivership Entities within the meaning of section 52-552(b)(12) of CUFTA.   All of the Transfers occurred during the course of a Ponzi scheme, when investor money was commingled and all Receivership Entities were insolvent.   Accordingly, multiple Receivership Entities are creditors within the meaning of section 52-552(b)(4) of CUFTA for the various Transfers alleged herein.

104.     Each of the Transfers was to, or for the benefit of, the Defendants.

105.     Each of the Transfers was made with money misappropriated from Receivership Entities.   At all relevant times herein, the Receivership Entities had a claim to the funds used for the Transfers.

106.     Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants.

107.    Each of the Transfers were made by Illarramendi and others to further the Ponzi scheme and were made with the actual intent to hinder, delay or defraud some or all of the Receivership Entities' then-existing creditors.

108.    The Transfers constitute fraudulent transfers avoidable by the Receiver pursuant to section 52-552e(a)(1) of CUFTA and recoverable from the Defendants pursuant to section 52-552h of CUFTA.

109.    As a result of the foregoing, pursuant to sections 52-552e(a)(1) and 52-552h of CUFTA, the Receiver is entitled to a judgment: (i) avoiding and preserving the Transfers; and (ii) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

## SECOND CAUSE OF ACTION

## CUFTA SECTION 52-522e(a)(2) (CONSTRUCTIVE FRAUD)
*As To All Defendants*

110.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

111.    The Receiver seeks to avoid those Transfers that were made on or within four-years before the date of this action.

112.    Each of the Transfers constitutes a transfer of an interest of property of the Receivership Entities within the meaning of section 52-552(b)(12) of CUFTA.  All of the Transfers occurred during the course of a Ponzi scheme, when investor money was commingled and all Receivership Entities were insolvent.  Accordingly, multiple Receivership Entities are creditors within the meaning of section 52-552(b)(4) of CUFTA for the various Transfers alleged herein.

113.    Each of the Transfers was to, or for the benefit of, the Defendants.

114.    Each of the Transfers was made with money misappropriated from Receivership Entities.  At all relevant times herein, the Receivership Entities had a claim to the funds used for the Transfers.

115.    Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants.

116.    At the time of each of the Transfers, the Receivership Entities were insolvent, were engaged in a business or transaction, or was about to engage in a business or a transaction, for which any property remaining with the Receivership Entities was an unreasonably small capital.

117.    At the time of each of the Transfers, the Receivership Entities intended to incur, or believed that they would incur, debts that would be beyond its ability to pay as such debts matured.

118.    The Transfers were not made by the Receivership Entities in the ordinary course of business.

119.    The Transfers constitute fraudulent transfers avoidable by the Receiver pursuant to section 52-552e(a)(2) of CUFTA and recoverable from the Defendants pursuant to section 52-552h of CUFTA.

120.    As a result of the foregoing, pursuant to sections 52-552e(a)(2) and 52-552h of CUFTA, the Receiver is entitled to a judgment: (i) avoiding and preserving the Transfers made on or within four years before the date of this action; and (ii) recovering the Transfers made on or within four years before the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

### THIRD CAUSE OF ACTION

### CUFTA SECTION 52-522f(a) (CONSTRUCTIVE FRAUD)
*As To All Defendants*

121.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

122.    The Receiver seeks to avoid those Transfers that were made on or within four-years before the date of this action.

123.    Each of the Transfers constitutes a transfer of an interest of property of the Receivership Entities within the meaning of section 52-552(b)(12) of CUFTA.   All of the Transfers occurred during the course of a Ponzi scheme, when investor money was commingled and all Receivership Entities were insolvent.   Accordingly, multiple Receivership Entities are creditors within the meaning of section 52-552(b)(4) of CUFTA for the various Transfers alleged herein.

124.    Each of the Transfers was to, or for the benefit of, the Defendants.

125.    Each of the Transfers was made with money misappropriated from Receivership Entities.   At all relevant times herein, the Receivership Entities had a claim to the funds used for the Transfers.

126.    Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants.

127.    At the time of each of the Transfers, the Receivership Entities were insolvent, or became insolvent, as a result of the transfer in question.

128.    The Transfers constitute fraudulent transfers avoidable by the Receiver pursuant to section 52-552f(a) of CUFTA and recoverable from the Defendants pursuant to section 52-552h of CUFTA.

129.   As a result of the foregoing, pursuant to sections 52-552f(a) and 52-552h of CUFTA, the Receiver is entitled to a judgment: (i) avoiding and preserving the Transfers made on or within four years before the date of this action; and (ii) recovering the Transfers made on or within four years before the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

## FOURTH CAUSE OF ACTION

### COMMON LAW FRAUDULENT TRANSFER
*As To All Defendants*

130.   The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

131.   The Receiver seeks to recover those Transfers that were made on or within three years before the date of this action.

132.   At the time of each of the Transfers, one or more of the Receivership Entities were creditors.

133.   Each of the Transfers constitutes a transfer of an interest of property of Receivership Entities.  All of the Transfers occurred during the course of a Ponzi scheme, when investor money was commingled and all Receivership Entities were insolvent.  Accordingly, multiple Receivership Entities are creditors for the various Transfers alleged herein.

134.   Each of the Transfers was to, or for the benefit of, the Defendants.

135.   Each of the Transfers was made with money misappropriated from Receivership Entities.  At all relevant times herein, the Receivership Entities had a claim to the funds used for the Transfers.

136.   Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants.

137.    At the time of each of the Transfers, the Receivership Entities were insolvent, or became insolvent, as a result of the transfer in question.

138.    The Transfers constitute fraudulent transfers avoidable by the Receiver and recoverable from the Defendants.

139.    As a result of the foregoing, the Receiver is entitled to a judgment: (i) avoiding and preserving the Transfers made on or within three years before the date of this action; and (ii) recovering the Transfers made on or within three years before the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

### FIFTH CAUSE OF ACTION

### UNJUST ENRICHMENT
*As To All Defendants*

140.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

141.    The Defendants each benefited from the receipt of money from the Receivership Entities in the form of payments, bribes and other Transfers alleged herein which were the property of the Receivership Entities and their investors, and for which the Defendants did not adequately compensate the Receivership Entities or provide value.

142.    The Defendants unjustly failed to repay the Receivership Entities for the benefits they received from the Transfers.

143.    The enrichment was at the expense of the Receivership Entities and, ultimately, at the expense of the Receivership Entities.

144.    Equity and good conscience require full restitution of the monies received by Defendants from the Receivership Entities for distribution to the creditors.

145.   Montes' conscious, intentional, and willful tortious conduct alleged herein entitles the Receiver to recapture profits derived by the Defendants from utilizing monies they received from Receivership Entities.

146.   By reason of the above, the Receiver, on behalf of the Receivership Entities and its creditors, is entitled to an award in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### <u>CONVERSION</u>
*As To All Defendants*

147.   The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

148.   The Receivership Entities had a possessory right and interest to its assets.

149.   The Defendants converted the assets of Receivership Entities when they received money originating from Receivership Entities in the form of payments, bribes and other transfers.  These actions deprived the Receivership Entities and their creditors of the use of this money.

150.   As a direct and proximate result of this conduct, the Receivership Entities and their creditors have not had the use of the money converted by the Defendants.

151.   By reason of the above, the Receiver, on behalf of the Receivership Entities, is entitled to an award of compensatory damages in an amount to be determined at trial.

152.   Montes' conscious, willful, wanton, and malicious conduct entitles the Receiver, on behalf of the Receivership Entities and their creditors, to an award of punitive damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

## CONSTRUCTIVE TRUST
*As To All Defendants*

153.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

154.    As alleged herein, the assets of the Receivership Entities have been wrongfully diverted as a result of fraudulent transfers, unjust enrichment, conversion, and other wrongdoing by Defendants for the Defendants' individual interests and enrichment.

155.    The Receiver has no adequate remedy at law.

156.    Because of the past unjust enrichment and the fraudulent transfers made to the Defendants, the Receiver is entitled to the imposition of a constructive trust with respect to any transfer of funds, assets, or property from Receivership Entities, as well as to any profits received by the Defendants in the past or on a going forward basis from transfers derived from the Receivership Entities.

157.    The Receiver is entitled to and demands title, possession, use and/or enjoyment of the foregoing property for the benefit of the Receivership Estate.

## EIGHTH CAUSE OF ACTION

## ACCOUNTING
*As To All Defendants*

158.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

159.    As set forth above, the assets of the Receivership Entities have been wrongfully diverted as a result of fraudulent transfers, unjust enrichment, conversion, and other wrongdoing of the Defendants for their own individual interests and enrichment.

160.    The Receiver has no adequate remedy at law.

161.    To compensate the Receivership Entities for the amount of monies the Defendants diverted from Receivership Entities for their own benefit, it is necessary for the Defendants to provide an accounting of any transfer of funds, assets, or property received from the Receivership Entities, as well as to any profits in the past and on a going forward basis in connection with Receivership Entities.  Complete information regarding the amount of such transfers misused by the Defendants for their own benefit is within their possession, custody, and control.

**WHEREFORE**, the Receiver respectfully requests that this Court enter judgment in favor of the Receiver and against Defendants as follows:

i.      On the First Cause of Action; pursuant to sections 52-552e(a)(1) and 52-552h of the Connecticut Fraudulent Transfers Act: (i) avoiding and preserving the Transfers; and (ii) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the Receivership Estate;

ii.     On the Second Cause of Action; pursuant to sections 52-552e(a)(2) and 52-552h of the Connecticut Fraudulent Transfers Act: (i) avoiding and preserving the Transfers made on or within four years before the date of this action; and (ii) recovering the Transfers made on or within four years before the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate;

iii.    On the Third Cause of Action; pursuant to sections 52-552f(a) and 52-552h of the Connecticut Fraudulent Transfers Act: (i) avoiding and preserving the Transfers made on or within four years before the date of this action; and (ii) recovering the Transfers made on or

within four years before the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate;

iv.     On the Fourth Cause of Action; pursuant to Connecticut common law, (i) avoiding and preserving the Transfers made on or within three years before the date of this action; and (ii) recovering the Transfers made on or within three years before the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate;

v.      On the Fifth Cause of Action for unjust enrichment against each of the Defendants and for damages in an amount to be determined at trial;

vi.     On the Sixth Cause of Action against each of the Defendants for conversion, for damages in an amount to be determined at trial;

ix.     On the Seventh Cause of Action against each of the Defendants for imposition of a constructive trust upon any transfer of funds, assets, or property received from the Receivership Entities;

x.      On the Eighth Cause of Action against each of the Defendants for an accounting of any transfer of funds, assets, or property of the Receivership Entities;

xi.     On all Causes of Action, awarding the Receiver all applicable pre-judgment and post-judgment interest, costs, and disbursements of this action; and

xii.    On all Causes of Action, granting the Receiver such other, further, and different relief as the Court deems just, proper and equitable.

The Receiver respectfully requests a jury trial for all of the preceding causes of action.

Date:  February 3, 2012

/s/ Philip H. Bieler
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, NY 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
Philip H. Bieler
Email: pbieler@bakerlaw.com
Jonathan B. New
Email: jnew@bakerlaw.com

*Attorneys for Receiver John J. Carney, Esq.*