**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JOHN J. CARNEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER, FOR HIGHVIEW POINT PARTNERS, LLC, ET AL., | Case No. 12-CV-00183-SRU |
| Plaintiff, | |
| v. | **ORAL ARGUMENT REQUESTED** |
| JUAN S. MONTES, a.k.a. "BLACK," | November 16, 2012 |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

LEGAL STANDARD ..................................................................................................... 2

FACTUAL BACKGROUND ............................................................................................ 3

    I.       THE PERMUTA TRANSACTIONS ................................................. 4

    II.      THE HAREWOOD TRANSACTION ............................................. 5

    III.    MONTES TAKES THE FIFTH ..................................................... 7

LEGAL ARGUMENT ................................................................................................... 7

    I.       THE TRUSTEE HAS STANDING TO BRING ALL HIS CLAIMS
           AGAINST MONTES ON BEHALF OF THE RECEIVERSHIP
           ENTITIES ....................................................................................... 7

          A.     The Receiver Has Standing Under Article III of the United States
               Constitution to Bring His Claims ...................................................... 9

               1.     The Fraudulent Payments Harmed the Receivership Entities ...... 10

               2.     *Scholes* Is Instructive Here........................................................ 10

               3.     The "Net Effect" of the Fraudulent Payments Was the
                    Deepened Insolvency of the Receivership Entities ...................... 11

          B.     The Receiver Is Not Subject to Prudential Standing Limitations ........... 13

               1.     The Receiver Is the Proper Party to Bring this Action ............... 14

               2.     The *Wagoner* Rule Does Not Apply to Receiver's
                    Avoidance Action ...................................................................... 15

               3.     The *Wagoner* Rule Does Not Apply to Equity Receivers in
                    Connection with Common Law Claims Against Third
                    Parties......................................................................................... 17

               4.     In Any Event, the Receiver Prevails Under a *Wagoner*
                    Analysis...................................................................................... 21

                    a.     Connecticut's Adverse Interest Exception Applies
                           Here............................................................................. 21

                    b.     Montes Relies on Incomplete or Inapposite Law ........... 22

                    c.     Fact-Intensive Analyses Are Inappropriate at this
                           Stage of the Litigation................................................... 24

          C.     The Receiver Has Standing to Assert Claims Under CUFTA ................. 24

               1.     Because the Receivership Entities Are Creditors, the
                      Receiver Has Standing to Assert the CUFTA Claims on
                      Their Behalf ............................................................................... 24

# TABLE OF CONTENTS
### (continued)

**Page**

2.    The Receiver's Alter Ego Allegations Do Not Preclude the Receivership Entities' Creditor Status or Affect the Receiver's Standing ................................................................. 26

II.    THE CAUSES OF ACTION ARE TIMELY AND SUFFICIENTLY ALLEGED ................................................................................. 27

A.    The Receiver's CUFTA Claim Is Timely Based on the Discovery Rule ....................................................................................... 27

B.    The Complaint Sufficiently States a Claim for Aiding and Abetting Breach of Fiduciary Duty and Conspiracy to Breach Fiduciary Duty ......................................................................................... 31

1.    The Receiver Has Sufficiently Alleged Montes's Culpability for Participation in and Aiding and Abetting Breach of Fiduciary Duty ............................................. 32

2.    Conspiracy to Breach Fiduciary Duty Has Been Properly Alleged .................................................................. 34

C.    The Complaint Sufficiently States a Claim for Unjust Enrichment ........ 35

1.    The Unjust Enrichment Count Is Timely .................................... 35

2.    The Complaint States Sufficient Facts for a Cause of Action for Unjust Enrichment ...................................... 36

D.    The Complaint Sufficiently States a Claim for Money Had and Received, Constructive Trust and an Accounting ................................... 37

1.    Money Had and Received Is Timely and Sufficiently Alleged ............................................................................. 37

2.    Constructive Trust Is a Proper Cause of Action ......................... 38

3.    An Accounting Is a Proper Cause of Action .............................. 39

4.    A Constructive Trust and an Accounting Are at the Least Remedies ................................................................. 40

CONCLUSION ................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AKRO Investicni Spolecnost, A.S. v. A.B. Watley, Inc.*,
  No. 01 Civ. 7693, 2003 WL 1108135 (S.D.N.Y. Mar. 13, 2003) ..........................................21

*Armstrong v. Collins*,
  No. 01 Civ. 2437, 2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010) ........................11, 17, 24, 25

*Armstrong v. McAlpin*,
  699 F.2d 79 (2d Cir. 1983)............................................................................................30

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................................2, 3, 9

*Assegai v. Bloomfield*,
  308 F. Supp. 2d 65 (D. Conn. 2004) ...................................................................................32

*In re B.J. McAdams, Inc.*,
  66 F.3d 931 (8th Cir. 1995) ...............................................................................................27

*Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*,
  529 F.3d 432 (2d Cir. 2008)...............................................................................................21

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
  472 U.S. 299 (1985).........................................................................................................20

*Beach v. Beach Hotel Corp.*,
  117 Conn. 445 (1933) ......................................................................................................18

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................................2, 3

*Berry v. Gormley*,
  No. CV010383382, 2002 WL 31818247 (Conn. Super. Ct. Nov. 26, 2002).........................31

*Bloor v. Dansker (In re Investors Funding Corp. of N.Y. Sec. Litig.)*,
  523 F. Supp. 533 (S.D.N.Y. 1980) .....................................................................................12

*Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Grp., Inc.)*,
  336 F.3d 94 (2d Cir. 2003)................................................................................................16

*Buckley v. Deloitte & Touche USA LLP*,
  No. 06 Civ. 3291, 2007 WL 1491403 (S.D.N.Y. May 22, 2007).........................................20

*Buckwald v. Renco Grp., Inc. (In re Magnesium Corp. of Am.)*,
  399 B.R. 722 (Bankr. S.D.N.Y. 2009) ...............................................................................13

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*C.I.T. Corp. v. Cohen*,
   117 Conn. 159 (1933) ...................................................................................................18

*CarrAmerica Realty Corp. v. Nvidia Corp.*,
   302 Fed. Appx. 514 (9th Cir. 2008).............................................................................13

*Cendant Corp. v. Shelton*,
   474 F.Supp.2d 377 (D. Conn. 2007).............................................................................40

*Citibank, N.A. v. Nyland (CF8) Ltd.*,
   839 F.2d 93 (2d Cir. 1988)............................................................................................14

*Cobalt Multi-Family Investors I, LLC v. Shapiro*,
   No. 06 Civ. 6468, 2008 WL 833237 (S.D.N.Y. Mar. 28, 2008) ...........................21

*Cobalt Multifamily Investors I, LLC v. Shapiro*,
   857 F. Supp. 2d 419 (S.D.N.Y. 2012)..........................................................................23

*Colodonato v. Hanson*,
   No. CV044004755S, 2006 WL 2556349 (Conn. Super. Ct. Aug. 11, 2006) .........................39

*In re Colonial Realty Co.*,
   209 B.R. 819 (Bankr. D. Conn. 1997) .......................................................................12

*Conley v. Gibson*,
   355 U.S. 41 (1957)..........................................................................................................2

*Couldock & Bohan, Inc. v. Societe Generale Secs. Corp.*,
   93 F. Supp. 2d 220 (D. Conn. 2000).............................................................................20

*Craemer v. Mahmood*,
   No. CV075011991, 2010 WL 4226757 (Conn. Super. Ct. Sept. 21, 2010) .........................22

*Curtis v. Lewis*,
   74 Conn. 367 (1902) ......................................................................................................18

*Deming v. Nationwide Mut. Ins. Co.*,
   No. X02CV0301778827S, 2003 WL 21718378 (Conn. Super. Ct. July, 14, 2003)...............35

*In re Distrigas Corp.*,
   75 B.R. 770 (Bankr. D. Mass. 1987) ...........................................................................27

*Donell v. Kowell*,
   533 F.3d 762 (9th Cir. 2008) ........................................................................................26

*Donell v. Nixon Peabody LLP*,
   No. CV 12-04084, 2012 WL 3839402 (C.D. Cal. Sep. 5, 2012).........................21, 26

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Dowling v. Finley Assoc., Inc.,*
    248 Conn. 364 (1999) ................................................................................36

*Eberhard v. Marcu,*
    530 F.3d 122 (2d Cir. 2008)...............................................................14, 16, 17, 25

*Efthinmiou v. Smith,*
    268 Conn. 499 (2004) ................................................................................33

*FDIC v. O'Melveny & Myers,*
    61 F.3d 17 (9th Cir. 1995) ......................................................................13, 20

*Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.,*
    No. 04-CV-4971, 2011 WL 2414685 (E.D.N.Y. June 8, 2011) .................11, 16, 24

*Gagne v. Vaccaro,*
    255 Conn. 390 (2001) ................................................................................36

*Generation Partners, LP v. Mandell,*
    No. FSTCV095010537S, 2011 WL 3671966 (Conn. Super. Ct. July 22, 2011)....................35

*Gianetti v. Blue Cross & Blue Shield of Conn., Inc.,*
    No. 3:07cv01561, 2008 WL 1994895 (D. Conn. May 6, 2008) ...........................35

*Gibbs & Sterrett Mfg. Co. v. Brucker,*
    111 U.S. 597 (1884)..................................................................................12

*Global Crossing Estate Rep. v. Winnick,*
    No. 04 Civ. 2558, 2006 WL 2212776 (S.D.N.Y. Aug. 3, 2006) ......................19, 24

*Goldberg v. Chong,*
    No. 07-20931-CIV, 2007 WL 2028792 (S.D. Fla. July 11, 2007) .........................25

*Grant Thornton LLP v. FDIC,*
    435 Fed. Appx. 188 (4th Cir. 2011).................................................................20

*Harp v. King,*
    266 Conn. 747 (Conn. 2003)........................................................................23

*Hays v. Paul, Hastings, Janofsky & Walker LLP,*
    No. Civ.A. 106CV754-CAP, 2006 WL 4448809 (N.D. Ga. Sep. 14, 2006) ..........20

*Heimbrock v. Heimbrock,*
    No. CV085004975S, 2009 WL 1662469 (Conn. Super. Ct. 2009) ........................38

*Hernandez v. Clearview Construction,*
    No. CV085013763, 2011 WL 3587383 (Conn. Super. Ct. July 19, 2011).............27

**TABLE OF AUTHORITIES**
(continued)

<u>Page(s)</u>

*Hirsch v. Arthur Andersen & Co.*,
  72 F.3d 1085 (2d Cir. 1995)......................................................................16

*In re Initial Pub. Offering Secs. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)..........................................................9

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
  793 F. Supp. 2d 825 (N.D. Tex. 2011) ..............................................28, 29

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
  No. 11-10704, 2012 WL 5207460 (5th Cir. Oct. 23, 2012) ...............18, 29

*Jones v. Wells Fargo Bank, N.A.*,
  666 F.3d 955 (5th Cir. 2012) ...............................................................15, 20

*Joslin v. Grossman*,
  107 F. Supp. 2d 150 (D. Conn. 2000)........................................................29

*Katcher v. 3V Capital Partners LP*,
  No. X05CV085008383S, 2011 WL 1105724 (Conn. Super. Ct. Feb. 1, 2011) ...............32, 34

*Kirschner v. KPMG LLP*,
  15 N.Y.3d 446, 938 N.E.2d 941 (2010)....................................................23

*KITO Grp. Ltd. v. RF Int'l, Ltd.*,
  No. CV096000710S, 2011 WL 3338247 (Conn. Super. Ct. July 11, 2011)...........................39

*Klein v. Bratt*,
  No. FSTCV055000502S, 2009 WL 5184192 (Conn. Super. Ct. Nov. 25, 2009) .................39

*Koch Indus., Inc. v. Aktiengesellschaft*,
  727 F. Supp. 2d 199 (S.D.N.Y. 2010)........................................................20

*Koch v. Stop & Shop Co., Inc.*,
  No. CV020561277S, 2003 WL 553280 (Conn. Super. Ct. Feb. 11, 2003) ............................37

*Lank v. N.Y. Stock Exch.*,
  405 F. Supp. 2d 1031 (S.D.N.Y. 1975), *rev'd on other grounds*, 548 F.2d 61 (2d Cir. 1977) ..........................................................................18

*LaSala v. Bank of Cyprus Pub. Co. Ltd.*,
  510 F. Supp. 2d 246 (S.D.N.Y. 2007)........................................................13

*LaSala v. Lloyds TSB Bank, PLC*,
  514 F. Supp. 2d 447 (S.D.N.Y. 2007).................................................22, 23

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555 (1992)...................................................................................................9

*Macomber v. Travelers Prop. and Cas. Corp.,*
 277 Conn. 617 (Conn. 2006)...............................................................................34, 38

*Mahon v. Chi. Title Ins. Co.,*
 No. 3:09CV00690, 2012 WL 3544883 (D. Conn. Aug. 16, 2012)....................35, 37

*Mankert v. Elmatco Prods., Inc.,*
 84 Conn. App. 456 (Conn. App. 2004)..................................................................39

*McAward v. Kett, Inc.,*
 No. 3:10-cv-496, 2010 WL 4876155 (D. Conn. Nov. 22, 2010)...............................2

*McCandless v. Furland,*
 296 U.S. 140 (1935)................................................................................................17

*Mediators, Inc., v. Manney (In re Mediators, Inc.),*
 105 F.3d 822 (2d Cir. 1997)................................................................................16, 19

*Merck & Co., Inc. v. Reynolds,*
 130 S. Ct. 1784 (2010)............................................................................................29

*Michelsen v. Penney,*
 135 F. 2d 409 (2d Cir. 1943)..............................................................................28, 29

*Moratzka v. Morris (In re Senior Cottages of Amer., LLC),*
 482 F.3d 997 (8th Cir. 2007)..................................................................................13

*Mut. Assur. Co. v. Norwich Sav. Soc.,*
 128 Conn. 510 (1942) .............................................................................................22

*New Haven Secs., Inc. v. Drazen,*
 38 Conn. Supp. 578 (1982) .....................................................................................38

*O'Neil v. New England Road, Inc. (In re Neri Bros. Constr. Corp.),*
 323 B.R. 540 (Bankr. D. Conn. 2005) ....................................................................19

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,*
 267 F.3d 340 (3d Cir. 2001)....................................................................................19

*OneBeacon Prof'l Partners, Inc. v. Ironshore Holdings (U.S.), Inc.,*
 No. HHDX04CV085019642S, 2009 WL 765666 (Conn. Super. Ct. Feb. 27, 2009)..............34

*Piazza v. First Am. Title Ins. Co.,*
 Civ. No. 3:06CV00765, 2007 WL 988713 (D. Conn. Mar. 30, 2007) ....................36

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*Quilling v. Cristell,*
   No. Civ. A. 304CV252, 2006 WL 316981 (W.D.N.C Feb. 9, 2006) ......................................29

*Reider v. Arthur Andersen, LLP,*
   47 Conn.Supp. 202 (Conn. Super. Ct. 2001) ................................................... *passim*

*Resnik v. Morganstern,*
   100 Conn. 38 (1923) ........................................................................................22

*Romero v. Gewirtz,*
   No. FSTCV095013109S, 2011 WL 4953481 (Conn. Super. Ct. Sept. 28, 2011) ..................40

*Ross v. Bolton,*
   904 F.2d 819 (2d Cir. 1990)..............................................................................24

*Rossman v. Morasco,*
   115 Conn. App. 234 (Conn. App. Ct. 2009) ........................................................36

*Ryan v. Sullivan, Hill, Lewin, Rez, Engel & Labazzo,*
   316 B.R. 101 (D. Conn. 2004) ..........................................................................16

*Schacht v. Brown,*
   711 F.2d 1343 (7th Cir. 1983) .....................................................................12, 13

*Scholes v. Lehmann,*
   56 F.3d 750 (7th Cir. 1995) ....................................................................... *passim*

*SEC v. Am. Bd. Of Trade, Inc.,*
   830 F.2d 431 (2d Cir. 1987)..............................................................................14

*SEC v. Koenig,*
   469 F.2d 198 (2d Cir. 1972)........................................................................15, 21

*SEC v. Shiv,*
   379 F. Supp. 2d 609 (S.D.N.Y. 2005).....................................................14, 15, 17

*Sender v. Buchanan (In re Hedged-Inv. Assocs., Inc.),*
   84 F.3d 1281 (10th Cir. 1996) ..........................................................................19

*Shearson Lehman Hutton, Inc. v. Wagoner,*
   944 F.2d 114 (2d Cir. 1991)....................................................................... *passim*

*Short v. Conn. Comm. Bank N.A.,*
   N. 3:09-cv-1955, 2012 WL 1057302 (D. Conn. Mar. 28, 2012)..............................33

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,*
   884 F.2d 688 (2d Cir. 1989)..............................................................................15

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Stancil v. Kuhlor,*
No. CV054004890, 2007 WL 155159 (Conn. Super. Ct. Jan. 2, 2007) ................................38

*Those Certain Underwriters at Lloyd's, London v. Cooperman,*
No. X03CV034022302S, 2006 WL 3316847 (Conn. Super. Ct. Oct. 27, 2006)....................39

*Town of Stratford v. Castater,*
No. CV106011629S, 2011 WL 1288675 (Conn. Super. Ct. Mar.15, 2011).....................37, 38

*Warfield v. Byron,*
436 F.3d 551 (5th Cir. 2006) ..................................................................26

*Wight v. BankAmerica Corp.,*
219 F.3d 79 (2d Cir. 2000)......................................................................16

*Wing v. Dockstader,*
No. 2:08 cv 776, 2010 WL 5020959 (D. Utah Dec. 3, 2010).................................29

*Wing v. Hammons,*
No. 2:08-CV-00620, 2009 WL 1362389 (D. Utah May 14, 2009) .................................25, 26

*Zayed v. Buysse,*
No. 11-CV-1042, 2011 WL 2160276 (D. Minn. June 1, 2011).........................11, 25

**STATUTES**

11 U.S.C. § 541...............................................................................13, 18, 19

28 U.S.C. § 754 ............................................................................................17

Conn. Gen. Stat. § 52-522b.................................................................24

Conn. Gen. Stat. § 52-552(e)(a)(1) ............................................................28

Conn. Gen. Stat. § 52-552a........................................................................16

Conn. Gen. Stat. § 52-552j.......................................................................28

**RULES**

Fed. R. Civ. P. 12(b)(6).............................................................................2

**OTHER AUTHORITIES**

1 Am. Jur. 2d Accounts and Accounting § 52 (2012) ................................39

1 Clark on Receivers (3rd ed., 1959), §§ 35, 43 ..........................................17

John J. Carney, Esq. (the "Receiver"),[1] as Receiver to the Michael Kenwood Group (the "MK Group") and certain affiliated entities (collectively, the "Receivership Entities")[2] in *Securities and Exchange Commission v. Illarramendi,* No. 3:11-cv-00078 (JBA), (the "SEC Action") by and through his undersigned counsel, respectfully submits this memorandum of law in opposition to the Motion of Juan S. Montes, also known as "Black," ("Montes" or "Defendant") to Dismiss the Second Amended Complaint (the "Motion to Dismiss").

## PRELIMINARY STATEMENT

Defendant Montes, an affluent and politically connected former manager of finance and investments at Petròleos de Venezuela, S.A. ("PDVSA"), has moved to dismiss the Second Amended Complaint ("Complaint") on various grounds, including the Receiver's alleged lack of standing to bring his claims and the misconceived notion that the Receiver is barred from bringing his claims by a bankruptcy "rule" that is not applicable to equity receivers. Montes also argues that certain of the Receiver's claims are time barred while others fail to state a claim. Each argument proffered by Montes is without merit.

Montes fails to understand the fundamental nature and authority of an equity receiver appointed in an SEC enforcement proceeding. The Receiver brings this action, not just on behalf of one individual or one entity, but on behalf of all of the Receivership Entities that have been injured by the unlawful diversion of their property and assets. As such, the Receiver has the requisite standing to maintain the causes of action alleged in the Complaint. The Receivership

---

[1] Unless otherwise explicitly defined herein, capitalized terms shall have the meaning assigned to them in the Amended Order Appointing Receiver dated January 4, 2012. SEC Action, Dkt. 423.

[2] The Receivership Entities include: Highview Point Partners, LLC; MK Master Investments LP; MK Investments, Ltd.; MK Oil Ventures LLC; The Michael Kenwood Group, LLC; Michael Kenwood Capital Management, LLC; Michael Kenwood Asset Management, LLC; MK Energy and Infrastructure, LLC; MKEI Solar, LP; MK Automotive, LLC; MK Technology, LLC; Michael Kenwood Consulting, LLC; MK International Advisory Services, LLC; MKG-Atlantic Investment, LLC; Michael Kenwood Nuclear Energy, LLC; MyTcart, LLC; TUOL, LLC; MKCM Merger Sub, LLC; MK Special Opportunity Fund; MK Venezuela, Ltd.; Short Term Liquidity Fund, I, Ltd.

Entities are tort creditors of Francisco Illarramendi ("Illarramendi"), who has admitted to orchestrating the largest Ponzi scheme ever criminally prosecuted in Connecticut ("Fraudulent Scheme"), and his associates, who reaped the benefits of the Fraudulent Scheme and harmed the Receivership Entities.  Furthermore, Montes's reliance on the so called "*Wagoner* Rule" is misplaced because equity receivers are not imputed with the wrongdoing of the insolvent entities they represent.

The Complaint seeks to recover at least $30 million wrongfully paid to Montes at the expense of honest investors.  Montes, who benefitted handsomely from his dealings with Illarramendi, is attempting to prevent the Receiver from carrying out the duties this Court appointed him to perform.  However, Montes's arguments misconstrue the Complaint's allegations and well-settled legal principles.  The Motion to Dismiss should be denied in its entirety.

## **LEGAL STANDARD**

In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff.  *McAward v. Kett, Inc.*, No. 3:10-cv-496, 2010 WL 4876155, at *2 (D. Conn. Nov. 22, 2010).  To defeat such a motion, the plaintiff need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A complaint should not be dismissed for failure to state a claim when it contains sufficient factual matters that, when accepted as true, state a claim for relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570).  The allegations set forth in the Complaint

meet and exceed the standards articulated in *Twombly* and *Iqbal* and, as such, the causes of action are sufficiently pleaded.

## FACTUAL BACKGROUND

From 2006 through 2010, Montes, in his capacity as the corporate manager of finance and investments at PDVSA and its pension funds,[3] and as a member of PDVSA's investment committee, exploited his position with the PDVSA Pension Funds to, among other things, siphon off more than $30 million in bribe payments from the MK entities for himself and other pension fund officials. Compl. ¶¶ 13, 14, 66-107.[4] Montes misappropriated these funds by knowingly conspiring with and jointly participating in Illarramendi's breach of his fiduciary duties to a group of related entities under Illarramendi's domination and control, including the MK Group and Highview Point Partners, LLC ("HVP Partners"). *Id.* at ¶¶ 1, 135, 148. Through the establishment of an investment relationship between PDVSA and certain Michael Kenwood hedge funds and HVP Partners, Montes was able to loot the Receivership Entities for his own benefit while aiding and abetting Illarramendi's breaches of his fiduciary duties to the Receivership Entities. *Id.* at ¶ 34. By steering assets to entities controlled by Illarramendi in exchange for bribes and kickbacks, Montes allowed Illarramendi to use new investor money to pay old investors, and thus prolong the Fraudulent Scheme for their mutual benefit. *Id.*

Illarramendi admitted publicly that he began the Fraudulent Scheme, which encompasses the transactions orchestrated by Montes, to hide investor losses in the hedge funds he controlled. *Id.* at ¶ 38. Illarramendi owed these funds and their investors duties of care, loyalty, and good faith. *Id.* at ¶¶ 137-38. Illarramendi violated his duties by, among other things, looting,

---

[3] PDVSA's pension funds included: APJ International, Ltd., Asociaciòn Civil Administradora de los Fondos de Pensiones de los Jubilados de Petroleos de Venezuela, S.A. y sus Filiales and Fondo de Prevision de los Trabajadores de Petroleos de Venezuela S.A. y sus Filiales (collectively, the "Pension Funds"). Compl. ¶ 58.
[4] Although the Pension Funds were separate legal entities, they operated at the direction of PDVSA and shared overlapping officers and directors. Montes was a member of this overlapping leadership group. *Id.*

misappropriating, mismanaging, dissipating corporate assets, self-dealing, and engaging in other wrongful acts and failures to act. *Id*. at ¶ 139. This Fraudulent Scheme resulted in investor losses of hundreds of millions of dollars. *Id*. at ¶ 45.

## I.    THE PERMUTA TRANSACTIONS

Montes's position at PDVSA was a critical component of Illarramendi's use of the "permuta market" or "swap market," a type of currency exchange market in operation in Venezuela, to engage in certain types of financial transactions that Illarramendi used to create liquidity to maintain his Fraudulent Scheme. *Id*. at ¶¶ 52, 77. Illarramendi engaged in at least three permuta transactions (the "Permuta Transactions") with the Pension Funds between November 2006 and December 2007. *Id*. at ¶ 51, 66-96.[5] Although these Permuta Transactions were theoretically profitable, in practice they were not, because most, if not all, of the proceeds Illarramendi received went to pay bribes and kickbacks to Montes and other middlemen for facilitating the Permuta Transactions. *Id*. at ¶ 55. As a result, no profits were realized by the investors, while Montes himself received millions of dollars in illicit payments for facilitating the transactions between the Receivership Entities and the Pension Funds. *Id*. at ¶ 1.

In addition to his receipt of bribes, Montes's conduct in executing the Permuta Transactions proves that he knew or should have known that Illarramendi was engaged in fraudulent or illegal conduct and was breaching his fiduciary duties. First, around November 2006, Illarramendi created an alternate identity named "Tomasino Olson" ("Olson") and frequently corresponded with Montes using that name for purposes of discussing transactions

---

[5] As described in the Complaint, the permuta market functioned as an unofficial currency exchange market that operated in parallel to the official government currency exchange in which Venezuelan government bonds could be bought in Bolivars and then sold for U.S. dollars. Compl. ¶ 52. Illarramendi raised dollars through the Receivership Entities and other third parties, and used these dollars in transactions with local Venezuelan permuta brokers to purchase Bolivar-denominated securities which were then transferred to the Pension Funds. *Id*. The Pension Funds, in turn would exchange these bonds for dollar-denominated bonds at the official exchange rate. *Id*. Illarramendi then used an entity under his control to sell the dollar denominated bonds on the open market. *Id*.

between the Pension Funds and Receivership Entities.  *Id*. at ¶ 60.  On or around March 7, 2007, Montes and Illarramendi sent each other several emails regarding the final terms of the first Permuta Transaction.  *Id*. at ¶ 74.  As part of this exchange, Montes, warned Illarramendi not to speak to anyone about him and not to acknowledge that they even knew each other.  *Id*. at ¶ 74.  Furthermore, to conceal his contacts with Illarramendi, Montes often communicated with Illarramendi about transactions with the Pension Funds using his personal email accounts, rather than his PDVSA email account.  *Id*. at ¶ 60.  Illarramendi and his associates usually referred to Montes only as "Black" in emails related to the bribes and improper payments associated with these transactions.  *Id*. at ¶¶ 61, 78, 85, 87.  Such communications and behavior are not indicative of an honest business relationship, an unknowing participant, or a legitimate business transaction.

Montes also received other kickbacks in addition to the bribes he received for approving the Permuta Transactions.  On or about July 21, 2010, Illarramendi caused STLF to transfer $5,080,161 to Movilway S.L. ("Movilway" and "Movilway Transfer"), a technology and communications company headquartered in Spain, as a benefit to Montes.  *Id*. at ¶ 2.  According to a July 25, 2012 article in the Latin American Herald Tribune, Moris Beracha, a Movilway co-founder, explained that this transfer "was meant to be an investment in . . . Movilway on behalf of Juan Montes, but was *incorrectly* sent from one of Francisco Illarramendi's hedge funds in July 2011." (emphasis added).  *Id*.  This transfer to Movilway was not *incorrectly* sent to Montes.  It was intentionally sent to Movilway as an additional kickback to Montes from money misappropriated from the Receivership Entities.  *Id*.

## II.    THE HAREWOOD TRANSACTION

In 2010, Montes caused PDVSA to engage in another transaction with Illarramendi, and again used the opportunity to steal money from Illarramendi's investors.  Illarramendi negotiated

with Montes for the purchase of certain underperforming securities in the Harewood Fund ("Harewood"), which were held by the Pension Funds.  Compl. ¶ 97.  These securities had depreciated significantly in value and the Pension Funds had incurred substantial unrealized losses on their books.  *Id*.  Montes knew this, as did Illarramendi.  *Id.* at ¶¶ 97, 103. Nevertheless, Illarramendi agreed to purchase the securities for $35 million, fully knowing that the Harewood shares were worth far less, if anything at all, in return for a $100 million investment by the Pension Funds in MK Special Opportunities Fund ("SOF").  *Id*. at ¶ 97.  In addition, Illarramendi guaranteed the Pension Funds an eight percent return on the $100 million investment if the Pension Funds agreed not to withdraw these assets from SOF for one year.

Essentially, Illarramendi agreed to take the Harewood shares and the corresponding losses off of the Pension Funds' books, allowing them to realize a gain, while simultaneously promising the Pension Funds an eight percent return on their investment in SOF.  *Id*. Illarramendi would thus have the benefit of an additional $100 million to perpetrate his Fraudulent Scheme, but at the expense of deepening the insolvency of the Receivership Entities. Ultimately, the MK Short Term Liquidity Fund ("STLF") received $18 million for the redemption of the Harewood shares, taking a $17 million loss.  *Id*. at ¶ 100.  Adding to the damage inflicted upon the Receivership Entities and their investors, Montes negotiated a ten percent kickback for himself as part of the transaction.  *Id*. at ¶¶ 102, 103.

Here, just as with the Permuta Transactions, Montes's actions show that he knew or should have known that Illarramendi was engaging in illegal and tortious conduct and breaching his fiduciary duties.  Again, Montes and Illarramendi concealed their communications by using fictitious names.  In or around May of 2010, in connection with the Harewood Transaction, Illarramendi and Montes used pseudonyms to establish web-based email accounts for the

purpose of arranging payments of bribes to Montes and other PDVSA officials. *Id*. at ¶ 104. Specifically, Illarramendi used two completely fabricated names—"Carmelo Luizo" and "Lisandro Cuevas"—to open up Yahoo! email accounts. *Id*. Illarramendi and Montes used these fictitious names and email accounts to exchange various emails regarding specific bribe amounts and routing instructions to offshore banks. *Id*. These bribes were intended to pay off Montes and other PDVSA officials for their approval of the Pension Funds' purported $100 million investment in SOF in 2010. *Id*. Montes knew or should have known that engaging in bribery was not indicative of Illarramendi's operation of a legitimate hedge fund. *Id*. at ¶ 80.

## III.   MONTES TAKES THE FIFTH

On January 24, 2012, Montes appeared for a deposition taken by the Receiver's counsel. *Id*. at ¶ 16. At his deposition, Montes asserted his Fifth Amendment right against self-incrimination and refused to answer questions about his relationship with Illarramendi, his role and responsibilities at PDVSA and its pension funds or whether he received any of the specific bribe payments described above. *Id*.

## **LEGAL ARGUMENT**

## I.   THE TRUSTEE HAS STANDING TO BRING ALL HIS CLAIMS AGAINST MONTES ON BEHALF OF THE RECEIVERSHIP ENTITIES

The Receiver has standing to bring the claims alleged in the Complaint on behalf of the Receivership Entities for the ultimate benefit of those entities and their creditors. Montes's contentions to the contrary consist, in part, of recycled arguments, which have consistently failed in this Circuit and elsewhere, to divest receivers of standing to bring causes of action similar to the ones alleged in the Complaint. Montes's remaining arguments seek improperly to apply standing limitations from bankruptcy jurisprudence to the equity receivership context. However, the Receiver, unlike a bankruptcy trustee, is not constrained by a defined statutory scheme.

Instead, his standing to bring this action derives, in part, from equitable principles embedded in this Court's order appointing the Receiver.

All of Montes's arguments fail because they are grounded on the false legal premise that the Receiver's standing to bring this action in the name of the Receivership Entities is equivalent to Illarramendi's standing to do the same. In so arguing, Montes overlooks the elementary fact that the Receivership Entities and Illarramendi are each separate and distinct legal entities. *See*, *e.g.*, *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995) (in the context of standing, a Ponzi schemer and his corporate "robotic tools" are "in the eyes of the law separate legal entities with rights and duties"). Because Illarramendi manipulated and twisted the Receivership Entities in furtherance of his Fraudulent Scheme, his interests and those of the Receivership Entities were never aligned. To the contrary, the fraudulent payments that Illarramendi directed to Montes (the "Fraudulent Payments") looted the Receivership Entities of their lawful property ("Receivership Property")[6] and furthered Illarramendi's scheme, leaving the Receivership Entities hopelessly insolvent. Montes's contention that Illarramendi's wrongdoing must be imputed to the Receivership Entities based on agency principles is not only contradicted by the bulk of receivership case law, but also creates exactly the types of inequitable results that this Court appointed the Receiver to remedy. This Court should decline Montes's invitation to ratify Illarramendi's fraud for Montes's personal benefit at the expense of Illarramendi's victims, including the Receivership Entities themselves.

---

[6] Receivership Property includes, but is not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly. SEC Action, Amended Order Appointing Receiver dated January 4, 2012, Dkt. No. 423 at 5 (the "Order").

**A.     The Receiver Has Standing Under Article III of the United States Constitution to Bring His Claims**

Montes contends that the Receiver lacks constitutional standing because he has not pleaded that the Receivership Entities suffered an injury in fact.  Def. Br. at 21-23.  Montes is wrong.  The allegations in the Complaint make clear on their face that the Receivership Entities (i) suffered an injury in fact, (ii) that Montes's receipt of the Fraudulent Payments caused this injury, and (iii) that the Receiver brings his claims to redress this injury.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (articulating the standard for standing under Article III of the U.S. Constitution).  In particular, the Receiver alleges that Illarramendi orchestrated the Fraudulent Payments to Montes by looting the Receivership Entities of their corporate assets causing them to enter into financial transactions designed exclusively to maintain the illusion of solvency.  This allowed Illarramendi to continue to dupe investors and funnel payments back to himself and others, including Montes.

Black letter receivership law holds that an equity receiver has constitutional standing to bring claims owned by receivership entities in similar circumstances.  *See*, *e.g.*, *Scholes*, 56 F.3d at 753-55; *Reider v. Arthur Andersen, LLP*, 47 Conn.Supp. 202, 212 (Conn. Super. Ct. 2001).  To avoid this conclusion, Montes relies on inapposite case law and contends that, under *his* interpretation of the facts, the Fraudulent Payments benefited—rather than hurt—the Receivership Entities.  Montes's suggestion that certain allegations in the Complaint be viewed in a light most favorable to himself is contrary to the applicable legal standard.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  Montes's "alternative theories [of the facts] cannot defeat the pleading" and are not appropriate at this stage.  *See In re Initial Pub. Offering Secs. Litig.*, 241 F. Supp. 2d 281, 369 n.124 (S.D.N.Y. 2003).

### 1. The Fraudulent Payments Harmed the Receivership Entities

The Receiver has sufficiently pleaded that the Receivership Entities suffered an injury in fact and that the Fraudulent Payments caused their injury. For more than five years, Illarramendi preyed on the Receivership Entities and, indirectly, their creditors by orchestrating the largest investment fraud in Connecticut's history. On or about October 2005, after some unsuccessful trades, Illarramendi began operating the Receivership Entities as part of a growing Ponzi scheme. Compl. ¶¶ 30-38. To keep his scheme alive, and foster the Receivership Entities' illusion of solvency, Illarramendi caused the Receivership Entities to make Fraudulent Payments to Montes in exchange for access to new investment capital. *Id*. at ¶¶ 66-109. The Receiver alleges that these Fraudulent Payments provided the Receivership Entities with nothing of value—they benefitted only Illarramendi and Montes. *Id*. at ¶¶ 3-5. Because the Fraudulent Payments resulted in new investments that kept the Ponzi scheme undetected for years, they artificially prolonged the Receivership Entities' corporate lives, all to their stakeholders' detriment. In testimony before this Court, Illarramendi estimated his five-year scheme caused the Receivership Entities to incur over $300 million in creditor liability. *Id*. at ¶ 33.

### 2. *Scholes* Is Instructive Here

In analogous circumstances, courts have not hesitated to hold that corporate entities whose assets were diverted by former management in furtherance of a Ponzi scheme suffered an injury in fact that was redressable by an equity receiver's claims. For example, in the leading case of *Scholes v. Lehmann*, Judge Posner concluded that unlawful and fraudulent transfers of corporate assets by a Ponzi scheme operator injured the corporate instrumentalities that were used in furtherance of his fraud. 56 F.3d at 754.

In *Scholes*, the Ponzi scheme operator, Michael Douglas, created three corporations and caused them to make fraudulent transfers in furtherance of his Ponzi scheme. *Id.* at 752. After

discovery of the fraud, a receiver was appointed for the three corporations used to perpetuate Douglas's fraud.  In furtherance of his mandate, the receiver brought fraudulent transfer actions against certain recipients of these transfers.  *Id.* at 753.  Addressing the issue of harm, Judge Posner held that the even though the receivership entities were "Douglas's robotic tools" they suffered a harm because they were "separate legal entities with rights and duties" that were violated when Douglas unlawfully diverted their assets.  *Id.* at 754; *see also Zayed v. Buysse*, No. 11-CV-1042, 2011 WL 2160276, at *4 (D. Minn. June 1, 2011) (*Scholes* stands for the proposition that, "[i]n a Ponzi scheme, the entities used to further the fraud, in whatever corporate form, are instrumentalities of the scheme but they are also victims of the scheme.").

Judge Posner explained that "[t]he appointment of the receiver removed the wrongdoer from the scene" freeing the receivership entities from their "spell" and gave them legal title "to the return of the moneys—for the benefit not of Douglas but of innocent investors—that Douglas had made the corporations divert to unauthorized purposes."  *Scholes*, 56 F.3d at 754.  Similar to the receivership entities in *Scholes*, the Receivership Entities are no longer Illarramendi's "evil zombies," but are now free, through the Receiver, to bring this action to redress their harm. *Scholes*, 56 F.3d at 754.  Other courts in this Circuit have applied the reasoning in *Scholes* to hold that equity receivers have standing to bring claims similar to the ones alleged herein.  *See e.g.*, *Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, No. 04-CV-4971, 2011 WL 2414685, at *7 (E.D.N.Y. June 8, 2011) (applying *Scholes*); *Armstrong v. Collins*, No. 01 Civ. 2437, 2010 WL 1141158, at *20-22, 33 (S.D.N.Y. Mar. 24, 2010) (same).

> ### 3.    The "Net Effect" of the Fraudulent Payments Was the Deepened Insolvency of the Receivership Entities

Montes ignores *Scholes* and instead asks this Court to focus on the "net effect" of the Fraudulent Payments.  Def. Br. at 21-23.  Specifically, he argues that the Receivership Entities

did not suffer an injury in fact because the value of the bribes Montes received from Illarramendi was less than the value of the investments they generated, making the Fraudulent Payments "profitable." *Id.* at 22. But in the context of a Ponzi scheme, the Fraudulent Payments devastated the Receivership Entities because they deprived the Receivership Entities of more than $30 million while the new investments served only to prop up the Ponzi scheme so that Illarramendi and Montes could continue to loot them.[7] Compl. ¶¶ 3-5, 26, 106-12, 120, 148.

In Connecticut, transactions made to artificially prolong the corporate existence of insolvent companies for the personal gain of their looters amount to harm, not "profit." *See Reider*, 47 Conn. Supp. at 212 (insolvent corporate entity was harmed when third parties fed it with funds to continue to loot the company of its assets).[8] Simply put, transactions designed to maintain a scheme designed to loot insolvent companies, regardless of illusory profit, harm the insolvent companies and their creditors. These transactions allow the corporate looters—*i.e.*, Illarramendi and Montes—to continue to fleece the Receivership Entities and hide their fraudulent actions while subjecting them to increased creditor liability. Indeed, the Receivership Entities "derived no benefit from [their] continuing service as [Illarramendi and Montes's] private piggy bank," and, "if [Montes's] position were accepted, the possession of such 'friends' as [the Receivership Entities] had would certainly obviate the need for enemies." *Id.* (quoting

---

[7] Moreover, the Receiver alleges that the Fraudulent Payments received by Montes were, in fact, criminal bribes. It is an "elementary principle that one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction." *Gibbs & Sterrett Mfg. Co. v. Brucker*, 111 U.S. 597, 601 (1884) (citation omitted). Montes is estopped from maintaining that he gave substantial consideration for the Fraudulent Payments in an avoidance action. *In re Colonial Realty Co.*, 209 B.R. 819, 822-23 (Bankr. D. Conn. 1997) (transferee of criminal bribes cannot challenge the avoidance of those bribes by claiming he provided the transferor with value).

[8] *See also Schacht v. Brown*, 711 F.2d 1343, 1350 (7th Cir. 1983) (corporation "ineluctably damaged" by its "increased exposure to creditor liability"); *Bloor v. Dansker (In re Investors Funding Corp. of N.Y. Sec. Litig.)*, 523 F. Supp. 533, 541 (S.D.N.Y. 1980) ("[a] corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it.").

*Schacht v. Brown*, 711 F.2d 1343, 1348 (7th Cir. 1983)).   Accordingly, the Receiver has

sufficiently pleaded an injury in fact.[9]

### B.   The Receiver Is Not Subject to Prudential Standing Limitations

Montes next challenges the Receiver's standing to bring this action under prudential

limitations that are inapposite here.   Specifically, he contends that the so-called "*Wagoner*

Rule"—which converts the affirmative defense of *in pari delicto* into a standing limitation[10]—

disqualifies the Receiver from bringing *any* of the Receivership Entities' claims against Montes.

Def. Br. at 9-14 (citing *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991).

But the *Wagoner* Rule does not apply to equity receivers—it is a prudential standing doctrine

derived from the Bankruptcy Code and New York state law, not federal equity receivership law.

Unlike a bankruptcy trustee who legally succeeds to all of the infirmities a debtor brings into

bankruptcy, *see* 11 U.S.C. § 541, an equity receiver is a creature of equity and the appointing

court, who is generally not imputed with the wrongdoing of the insolvent corporate entities he or

she represents.   *See*, *e.g.*, *Scholes*, 56 F.3d 753-55; *FDIC v. O'Melveny & Myers*, 61 F.3d 17, 19

(9th Cir. 1995).   To expand the scope of *Wagoner* to equity receivers would result in an

unprecedented expansion of what is already an oft-criticized doctrine.[11]

---

[9] The cases Montes cites for support are not to the contrary.  *See* Def. Br. at 21-22.  Those cases did not consider the type of corporate looting that serves as the gravamen of the Receiver's action here.

[10] *See*, *e.g.*, *LaSala v. Bank of Cyprus Pub. Co. Ltd.*, 510 F. Supp. 2d 246, 278 (S.D.N.Y. 2007) (recognizing that the *Wagoner* Rule and the affirmative defense of *in pari delicto* are "very similar" and utilize identical imputation analyses).

[11] The *Wagoner* Rule is exclusively a doctrine of the Second Circuit and has been heavily criticized by other courts for providing third party aiders and abettors, like Montes here, with a "get out of jail free card" at the pleading stage. *See*, *e.g.*, *CarrAmerica Realty Corp. v. Nvidia Corp.*, 302 Fed. Appx. 514, 517 (9th Cir. 2008); *Moratzka v. Morris (In re Senior Cottages of Amer., LLC)*, 482 F.3d 997, 1002-04 (8th Cir. 2007).  Bankruptcy courts within this Circuit have also attacked the *Wagoner* Rule for bootstrapping what is essentially an affirmative defense into a prudential standing limitation. *See*, *e.g.*, *Buckwald v. Renco Grp., Inc.* (*In re Magnesium Corp. of Am.*), 399 B.R. 722, 764 (Bankr. S.D.N.Y. 2009) (stating that "if this Court were writing on a clean slate, it would not elevate *in pari delicto* concerns to matters of standing where the alleged injury is an injury to the corporation itself," and welcoming "guidance by the Circuit as to whether it continues to believe . . . that *Wagoner* . . . should continue to deny standing or apply *in pari delicto* when an innocent trustee has displaced wrongdoing management.").

Moreover, such an expansion would contravene the bedrock equitable principles of federal receivership law.  Equity receivers, like the Receiver, are agents of the court that exist, in part, to marshal the assets of the receivership entity and prevent their dissipation pending further action by the court.  *SEC v. Am. Bd. Of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987).  This is especially true where, as here, the Court appointed the Receiver, in part, to remedy violations of federal securities laws.  *See* the Order.

### 1.       The Receiver Is the Proper Party to Bring this Action

Receiverships are extraordinary remedies for situations where other legal or equitable remedies are considered inadequate.  *See Citibank, N.A. v. Nyland (CF8) Ltd.*, 839 F.2d 93, 97 (2d Cir. 1988).  In these situations, courts appoint equity receivers to operate the entity in receivership, marshal and preserve its assets, and distribute the proceeds to those legally entitled to them in the case of liquidation.  Equity receivers appointed at the request of the Securities and Exchange Commission ("SEC"), in particular, are equipped with a variety of tools designed to "restore to a defrauded entity or to defrauded persons that which was fraudulently diverted from its or their custody and control."  *SEC v. Shiv*, 379 F. Supp. 2d 609, 618 (S.D.N.Y. 2005); *see also Eberhard v. Marcu*, 530 F.3d 122, 131-32 (2d Cir. 2008).  Ultimately, because equity receivers are creatures of the courts that appoint them, their "authority is wholly determined by the order of the appointing court."  *Nyland*, 839 F.2d at 98.

Here, the Order expressly authorizes the Receiver to bring this action.  On February 3, 2011, this Court appointed the Receiver to, among other things, bring actions he deems "necessary or appropriate" to recover Receivership Property on behalf of the Receivership Entities for the benefit of their creditors.  Order at ¶ 14(I).  This broad mandate is necessary where, as here, the Court appointed the Receiver to oversee corporate entities whose assets were "improperly and illegally" transferred by corporate officers who are under investigation by the

SEC.  SEC Action, Dkt. No. 3, SEC's Memorandum in Support of Application for Emergency Relief, dated January 12, 2011, at 1.  In addition, the Order expressly contemplates and specifically authorizes the Receiver to bring avoidance actions to recover receivership assets for distribution to creditors.  Order at ¶ 48 ("[T]he Receiver may seek . . . avoidance of fraudulent transfers").

Even though the Receiver brings this action on behalf of the Receivership Entities, the recovery is for the ultimate benefit of their creditors and stakeholders because the Receiver, like all equity receivers, acts in a derivative capacity.[12]  *Shiv*, 379 F. Supp. 2d at 617.  To curb his ability to fulfill his court-appointed duties under the Order through prudential standing limitations—such as the *Wagoner* Rule—"would undermine one of the primary purposes of the receivership established in this case" and be contrary to the equitable principles the Receiver was appointed to further.  *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 966 (5th Cir. 2012).  Also, because the Receiver is an SEC receiver, he represents not only the Receivership Entities, but also, indirectly, the SEC's interest in providing members of the financial industry with efficient and fair markets.  *See SEC v. Koenig*, 469 F.2d 198, 202 (2d Cir. 1972).  Accordingly, in addition to the Receiver being uniquely situated to redress the Receivership Entities' harm, his action furthers public policy.

### 2.    The *Wagoner* Rule Does Not Apply to Receiver's Avoidance Action

Montes improperly seeks to disqualify the Receiver under the prudential standing limitation espoused in *Wagoner*.  As an initial matter, the Receiver's fraudulent transfer causes

---

[12] The derivative nature of the Receiver guarantees that any recoveries he obtains on behalf of the Receivership Entities will benefit all the creditors.  It is settled law in this Circuit that in this scenario, a representative of the insolvent companies, like the Receiver, is best suited to bring these claims.  *See St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) (harm that accrues to all creditors is best redressed by a representative of the insolvent company).  As Judge Posner wrote, this is the most "practical" scenario because the "alternative[]" would be for each individual creditor or stakeholder of the Receivership Entities to file "a series of individual suits . . . which, even if successful, would multiply litigation."  *Scholes*, 56 F.3d at 755.

of action (hereinafter, the "Fraudulent Transfer Action") are completely outside the scope of the *Wagoner* Rule. Indeed, Montes fails to cite to *any* case that applies the *Wagoner* Rule to state law avoidance actions. This is because *Wagoner* and its progeny, at most, apply to state law claims asserted by bankruptcy trustees that seek *damages* against third parties for aiding and abetting corporate insiders in carrying out a fraud.[13]

The *Wagoner* Rule does not apply to state law avoidance actions that seek only to recover the money that the corporate insider fraudulently transferred to third parties. The holding in *Ryan v. Sullivan, Hill, Lewin, Rez, Engel & Labazzo*, 316 B.R. 101 (D. Conn. 2004), is instructive on this point. There, the court refused to apply the *Wagoner* Rule to a bankruptcy trustee's avoidance actions under the Connecticut Fraudulent Transfer Act ("CUFTA").[14] *Id.* at 107-08. In so doing, the court explained that *Wagoner* and its progeny covered only state law actions for damages and noted that "[n]one of [the *Wagoner* Rule] decisions involved a claim for avoidance under a state fraudulent transfer law." *Id.* at 107 (distinguishing *Wagoner*, *Hirsch*, and *Mediators*). Similarly, the *Wagoner* Rule should not apply to the Receiver's avoidance actions under CUFTA here.

Significantly, the Receiver cannot locate a single case in this Circuit where a receiver brought avoidance actions under state law and a court considered, let alone applied, the *Wagoner* Rule in connection with the receiver's standing. *See Eberhard*, 530 F.3d at 129-35; *Olympia Mortg.* 2011 WL 2414685, at *7 (finding a receiver had standing to bring avoidance actions

---

[13] *See, e.g., Wagoner*, 944 F.2d at 119-20 (barring a bankruptcy trustee from bringing tort claims for breach of fiduciary duty against third parties); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094 (2d Cir. 1995) (barring a bankruptcy trustee from bringing legal malpractice claims against third parties); *Mediators, Inc., v. Manney* (*In re Mediators, Inc.*), 105 F.3d 822, 825-27 (2d Cir. 1997) (barring a bankruptcy trustee from bringing aiding and abetting breach of fiduciary duty claims against third parties); *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86-87 (2d Cir. 2000) (barring a bankruptcy liquidator from bringing claims predicated on aiding and abetting liability against third parties); *Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Grp., Inc.)*, 336 F.3d 94, 99-102 (2d Cir. 2003) (barring a bankruptcy trustee from bringing claims alleging malpractice, breach of fiduciary duty, and negligence against third parties).

[14] Conn. Gen. Stat. § 52-552a *et seq.*

under state law); *Collins*, 2010 WL 1141158, at *33 (same). This Court should decline Montes's invitation to be the first.

### 3.   The *Wagoner* Rule Does Not Apply to Equity Receivers in Connection with Common Law Claims Against Third Parties

Montes's application of the *Wagoner* Rule to equity receivers is incorrect. The *Wagoner* Rule divests bankruptcy trustees or debtors in possession of standing to bring common law claims because they are imputed with the bad acts of the bankrupt companies they represent. Montes argues that, like a bankruptcy trustee, the Receiver can only bring those claims that the Receivership Entities could have asserted pre-receivership. Def. Br. at 7-8 (citing *Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008)). This, he argues, means that the Receiver is necessarily imputed with the misconduct of the Receivership Entities' agents pre-receivership— *e.g.*, Illarramendi—and, therefore, subject to the *Wagoner* Rule. *Id.* at 12. Montes is wrong.

First, the Receiver, unlike a bankruptcy trustee, is not the successor in interest to the Receivership Entities. Rather, it is the Court that controls and possesses the Receivership Property—including claims belonging to the Receivership Entities—at all times. *See* 1 Clark on Receivers (3rd ed., 1959), §§ 35, 43; *see also* 28 U.S.C. § 754 (extending jurisdiction of the appointing court to any district of the United States where receivership property is located). The Receiver acts *only* as the Court's agent throughout the receivership. *See, e.g.*, *Shiv*, 379 F. Supp. 2d at 619. Accordingly, the Receiver's appointment did not cause him to be imputed with any of Illarramendi's bad acts such that he is subject to the *Wagoner* Rule or the affirmative defense of *in pari delicto*. He is not tainted by the bad acts of the Receivership Entities' principals and thus not *in delicto* with alleged third-party wrongdoers. *See Scholes*, 56 F.3d at 754-55 ("[T]he defense of *in pari delicto* loses its sting" when an insolvent company enters receivership) (citing *McCandless v. Furland*, 296 U.S. 140, 160 (1935)).

17

Second, courts have carved out certain exceptions to the general rule that an equity receiver stands in the shoes of the receivership entities. For over a century, Connecticut courts have held that a receiver of a company may, at times, seek legal relief otherwise unavailable to the corporation in the interest of equity and for the ultimate benefit of the creditors. *See, e.g.*, *C.I.T. Corp. v. Cohen*, 117 Conn. 159, 163 (1933) (receiver of a corporation could seek legal relief unavailable to receivership entity pre-receivership because the equitable nature of receivers means that a receiver also represents the interests of the creditors of the receivership entity); *Beach v. Beach Hotel Corp.*, 117 Conn. 445, 454 (1933) (same); *Curtis v. Lewis*, 74 Conn. 367, 373 (1902) (same).

Significantly, courts in and outside this Circuit have refused to impute a receiver with the wrongdoing of the corporate entity he represents under the doctrine of *in pari delicto*. *See, e.g.*, *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, No. 11-10704, 2012 WL 5207460, at *3 (5th Cir. Oct. 23, 2012) ("*Janvey II*") (equity receiver had standing to bring claims that the receivership entities themselves could not have brought pre-receivership because of the *in pari delicto* doctrine); *Lank v. N.Y. Stock Exch.*, 405 F. Supp. 2d 1031, 1037 (S.D.N.Y. 1975), *rev'd on other grounds*, 548 F.2d 61 (2d Cir. 1977) ("It is well settled . . . that where a corporation has transferred funds in fraud of its creditors, the receiver may maintain an action against persons to whom the transfers were made to enforce the rights of the corporation and its creditors and recover the funds even though the corporation could not do so.").

In this respect, equity receivers are materially different from bankruptcy trustees. Bankruptcy trustees are vulnerable to the *Wagoner* Rule—and the affirmative defense of *in pari delicto*—because Section 541 of the Bankruptcy Code expressly limits their claims to those that the bankrupt companies had before filing for bankruptcy. *See* 11 U.S.C. § 541; *see, e.g.*,

*Wagoner*, 944 F.2d at 118 (relying on Section 541); *Mediators*, 105 F.3d at 825-26 (same). Under this provision of the Bankruptcy Code—and unlike in equity receivership law—there are no equitable considerations that preclude the imputation of pre-petition conduct. *See* 11 U.S.C. § 541.  Once the Bankruptcy Code imputes a bankruptcy trustee with the wrongdoing of the corporate entity he represents, he will only have standing to bring state common law claims if he can show that state law exceptions to the *in pari delicto* doctrine apply. *See, e.g., O'Neil v. New England Road, Inc., (In re Neri Bros. Constr. Corp.)*, 323 B.R. 540, 542-44 (Bankr. D. Conn. 2005) (*Wagoner* Rule will not be invoked when "adverse interest exception" to *in pari delicto* applies).

Equity receivers, on the other hand, are not subject to the strictures of the Bankruptcy Code, or any other statutory limitation. *See, e.g., Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 358 (3d Cir. 2001) (noting that "unlike bankruptcy trustees, receivers are not subject to the limits of section 541"); *Sender v. Buchanan (In re Hedged-Inv. Assocs., Inc.)*, 84 F.3d 1281, 1285 (10th Cir. 1996) (finding that bankruptcy law, unlike the law of receivership, expressly prohibits the trustee from being found immune to a claim of *in pari delicto*); *Global Crossing Estate Rep. v. Winnick*, No. 04 Civ. 2558, 2006 WL 2212776, at *16 n.21 (S.D.N.Y. Aug. 3, 2006) (distinguishing bankruptcy trustees and receivers in the *Wagoner* context).

Rather, when considering whether to impute the bad acts of a receivership entity to its receiver, courts are free to consider post-receivership events, such as the appointment of the receiver and the removal of the corporate wrongdoers. *See Scholes*, 56 F.3d at 755 (the appointment of a receiver removes the wrongdoer from control, such that the company is now "controlled by a receiver whose only object is to maximize the value of the corporation[ ] for the

benefit of [its] investors and any creditors"); *O'Melveny & Myers*, 61 F.3d at 19 ("While a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on a . . . receiver . . . that steps into the party's shoes pursuant to court order or operation of law.").  Unsurprisingly, in the receivership context, courts routinely refuse to impute a corporate insider's bad acts to the company's receiver.  *See*, *e.g.*, *Jones*, 666 F.3d at 965-68; *Grant Thornton LLP v. FDIC*, 435 Fed. Appx. 188, 200-01 (4th Cir. 2011); *Scholes*, 56 F.3d at 755; *O'Melveny & Myers*, 61 F.3d at 19.  Accordingly, this Court should adopt this settled principle of federal receivership law and refuse to impute the Receiver with Illarramendi's bad acts.

Montes also ignores the fact that, under Connecticut law, courts are required to carefully examine the equities before imputing a litigant with the bad acts of his purported agent.  *See*, *e.g.*, *Couldock & Bohan, Inc. v. Societe Generale Secs. Corp.*, 93 F. Supp. 2d 220, 233 (D. Conn. 2000) (imputation under the analogous *in pari delicto* doctrine is an equitable determination).[15] Here, to subject the Receiver to prudential standing limitations based on Illarramendi's bad acts would allow Montes to keep the money he helped steal from the Receivership Entities and their creditors and investors.  *See Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 212-13 (S.D.N.Y. 2010) (refusing to apply *in pari delicto* where the outcome was inequitable and would encourage, rather than deter, fraudulent transactions); *Hays v. Paul, Hastings, Janofsky & Walker LLP*, No. Civ.A. 106CV754-CAP, 2006 WL 4448809, at *10 (N.D. Ga. Sep. 14, 2006) (noting in an analogous context that "[i]f the court were to apply the doctrine of *in pari delicto* in this case, the result would be the protection of the alleged wrongdoers and the punishment of the innocent victims").

---

[15] *See also Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985); *Buckley v. Deloitte & Touche USA LLP*, No. 06 Civ. 3291, 2007 WL 1491403, at *1, *8 (S.D.N.Y. May 22, 2007).

Additionally, because he is an SEC receiver, imputing the Receiver with Illarramendi's misconduct would contravene public policy. This Court appointed the Receiver, in part, to assist the SEC in its enforcement of regulations designed to rid the securities markets of fraudulent activity. *See Koenig*, 469 F.2d at 202 (SEC receivers advance the public interest). In similar circumstances, a Connecticut court refused to impute the receiver of an insurance company with the company's principals' bad acts in large part because the receiver was appointed by the state Insurance Commissioner to uphold the integrity of the insurance markets. *See Reider*, 47 Conn. Supp. at 214-18. Because there can be no imputation here, the *Wagoner* Rule does not apply. *See also Donell v. Nixon Peabody LLP*, No. CV 12-04084, 2012 WL 3839402, at *5 (C.D. Cal. Sep. 5, 2012) (refusing to engage in a *Wagoner* Rule analysis to determine the standing of an SEC receiver to bring state law claims against third parties).[16]

### 4.    In Any Event, the Receiver Prevails Under a *Wagoner* Analysis

#### a.    Connecticut's Adverse Interest Exception Applies Here

Even if the Receiver were imputed with Illarramendi's bad acts such that he were subject to the *Wagoner* Rule—which he is not—he has standing to bring all his claims because this action fits within the adverse interest exception to the *Wagoner* Rule. The *Wagoner* Rule, like the affirmative defense of *in pari delicto*, will not apply if the actions of the former corporate wrongdoers are deemed adverse to the interests of the bankrupt corporation. *See*, *e.g.*, *Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*, 529 F.3d 432, 449-53 (2d Cir. 2008);

---

[16] Montes cites to two non-binding, unreported opinions for the proposition that the *Wagoner* Rule applies equally to receivers as it does to trustees in bankruptcy. Def. Br. at 11 (citing *Cobalt Multi-Family Investors I, LLC v. Shapiro*, No. 06 Civ. 6468, 2008 WL 833237, at *3 (S.D.N.Y. Mar. 28, 2008) and *AKRO Investicni Spolecnost, A.S. v. A.B. Watley, Inc.*, No. 01 Civ. 7693, 2003 WL 1108135, at *7 (S.D.N.Y. Mar. 13, 2003)). Montes's reliance on *AKRO* is misplaced because that court found that the receiver lacked standing on other grounds. Montes's reliance on *Cobalt* is similarly undercut by the fact that the Court expressly noted that there was a "viable argument that the *Wagoner* rule's standing limitations may not be applicable to the Receiver." *Cobalt*, 2008 WL 833237 at *3 n.7. Whatever import these cases may have is outweighed by the abundant receivership case law that rejects such imputation and the fact that neither of those cases addressed the standing of an SEC receiver.

*Craemer v. Mahmood*, No. CV075011991, 2010 WL 4226757, at *3-4 (Conn. Super. Ct. Sept. 21, 2010).  This determination involves an application of substantive state law.  *See*, *e.g.*, *LaSala v. Lloyds TSB Bank, PLC*, 514 F. Supp. 2d 447, 481 (S.D.N.Y. 2007).

Here, the Receiver's claims fit squarely within Connecticut's adverse interest exception.  Under Connecticut law, "knowledge of an agent will not ordinarily be imputed to his principal where the agent is acting adversely to the latter's interest."  *Reider*, 47 Conn. Supp. at 209 (quoting *Mut. Assur. Co. v. Norwich Sav. Soc.*, 128 Conn. 510, 513 (1942)).  An agent can be said to be acting against his principal's interests where it can be shown "that the principal will not in fact receive and have the benefit of the agent's knowledge [or conduct]."  *Id.* at 209-10 (quoting *Resnik v. Morganstern*, 100 Conn. 38, 42 (1923)).

The Receiver alleges that Illarramendi drove the Receivership Entities into insolvency and deepened that insolvency through his commission of a Ponzi scheme.  Compl. ¶¶ 30-38.  At the same time, Illarramendi looted Receivership Property for his personal gain and for the personal gain of his associates and co-conspirators, including Defendant.  *Id.* at ¶¶ 3-5.  As a result, Illarramendi grossly abandoned the interests of the Receivership Entities, ultimately leaving them with hundreds of millions of dollars of liability.  *Id.* at ¶ 33.  Accordingly, the Receiver cannot be imputed with Illarramendi's knowledge or conduct under Connecticut law because he and his cronies, and not the Receivership Entities, were the sole beneficiaries of his bad acts.  This exception is particularly necessary where, as here, "the agent is acting in fraud of his principal."  *Reider*, 47 Conn.Supp. at 209-10 (citation omitted) (holding that adverse interest exception is particularly necessary in instances where agent commits fraud on his principal).

### b.   Montes Relies on Incomplete or Inapposite Law

Although Montes acknowledges that imputation is an issue governed by state law, he completely ignores Connecticut's adverse interest exception.  Def. Br. at 12 n.11.  Instead, to

support his argument that the Receivership Entities—and, hence, the Receiver—are imputed with Illarramendi's conduct, Montes cites to a single Connecticut case for the unremarkable proposition that a corporate entity is generally imputed with the knowledge and conduct of its agents.  Def. Br. at 12 (citing *Harp v. King*, 266 Conn. 747, 777-78 (Conn. 2003)).  That case, however, has limited influence in a case, such as here, where the agent engaged in a fraud on his principals for personal gain.

With limited options available to Montes under Connecticut law, Montes chiefly relies on *Wagoner* cases that apply New York's version of the adverse interest exception to divest would-be litigants of standing.  *See* Def. Br. at 13-14.  Notwithstanding the fact that these cases, unsurprisingly, concern the standing of bankruptcy trustees and not receivers, they are particularly inapposite here because they apply the wrong state law.  *See, e.g.*, *Lloyds TSB*, 514 F. Supp. 2d at 481 (noting under *Wagoner* analysis, cases applying New York's adverse interest exception are not persuasive when claims at bar are not subject to New York substantive law).

Connecticut's adverse interest exception is significantly broader than New York's adverse interest exception.  By way of example, in *Cobalt Multifamily Investors I, LLC v. Shapiro*, Judge Wood compared and contrasted the adverse interest exceptions under New York and Connecticut law under a *Wagoner* Rule analysis.  857 F. Supp. 419, 431-32 (S.D.N.Y. 2012).  In so doing, she noted that, "by contrast" to New York law, Connecticut "do[es] not consider an extension of a corporation's life as a result of fraud to be a material 'benefit' sufficient to preclude it from coming within the adverse interest exception to the in pari delicto defense."  *Id.* (contrasting *Reider* with *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 467, 938 N.E.2d 941 (2010)).  Accordingly, the cases Montes relies on have no bearing on the Receiver's standing.

       c.     Fact-Intensive Analyses Are Inappropriate at this
                Stage of the Litigation

At the very least, Montes's arguments under *Wagoner* are premature at this time. Just like the affirmative defense of *in pari delicto*, a *Wagoner* standing analysis "hinge[s] on certain fact-based considerations that cannot be addressed at the pleadings stage." *See, e.g.*, *Winnick*, 2006 WL 2212776, at *15 (refusing to conduct *Wagoner* standing analysis at pleading stage); *see also Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990) (recognizing fact-intensive nature of *in pari delicto* analyses identical to those required under *Wagoner*). Accordingly, Montes's Motion to Dismiss for lack of standing under the *Wagoner* Rule should be denied.

**C.**    **The Receiver Has Standing to Assert Claims Under CUFTA**[17]

      **1.**    **Because the Receivership Entities Are Creditors, the Receiver Has Standing to Assert the CUFTA Claims on Their Behalf**

Montes next challenges the Receiver's statutory standing to bring claims under CUFTA on behalf of the Receivership Entities. Specifically, he argues that the Receiver lacks standing to bring these claims because the Receivership Entities were not "creditors" for purposes of CUFTA but rather the "transferors" with respect to the Fraudulent Payments. Def. Br. at 15-21. Montes is wrong.

CUFTA defines a "creditor" as someone with a "claim" or "right to a payment." Conn. Gen. Stat. § 52-522b. As explained above, the Receiver adequately alleges that the Receivership Entities were harmed by the Fraudulent Transfers. Compl. ¶¶ 25-29, 66-109; *see Scholes*, 56 F.3d at 753-55. This injury makes the Receivership Entities and, hence, the Receiver a creditor for purposes of seeking avoidance and recovery of those transfers. *See Scholes*, 56 F.3d at 754; *Olympia Mortg.*, 2011 WL 2414685, at *7; *Collins*, 2010 WL 1141158, at *33. In other words,

---

[17] Defendant has only moved to dismiss the Receiver's avoidance counts on grounds of standing. Accordingly, Defendant does not contest that the Receiver has adequately pleaded all of the other elements required to sustain an avoidance action under CUFTA.

the Receivership Entities are "tort creditors" with respect to the money Illarramendi and Montes looted.[18]  *See Zayed*, 2011 WL 2160276, at *5 (holding that "because the Receivership Entities were also victims of the fraud and are, like the defrauded investors, tort creditors of [the] Ponzi scheme, the Receiver has standing to assert fraudulent transfer and unjust enrichment claims on behalf of the Entities."); *Collins*, 2010 WL 1141158, at *33 (holding that receivership entities operated in furtherance of Ponzi scheme are creditors for purposes of Uniform Fraudulent Transfer Act ("UFTA")); *Wing v. Hammons*, No. 2:08-CV-00620, 2009 WL 1362389, at *2-3 (D. Utah May 14, 2009) (receivership entities were "*tort creditor*[s] by virtue of the fact that the entities, once freed from the Ponzi operator's control, became entitled to the return of the payments made in furtherance of the operator's scheme.") (emphasis in original); *Goldberg v. Chong*, No. 07-20931-CIV, 2007 WL 2028792, at *4 (S.D. Fla. July 11, 2007) (holding that because, under *Scholes*, receivership entities have "claim" to transfers unlawfully diverted by Ponzi operator, they are creditors under Florida's UFTA).

In the context of a Ponzi scheme, the Receiver represents the Receivership Entities as defrauded creditors of Illarramendi, and thus has standing to bring the Fraudulent Transfer Actions.  *See*, *e.g.*, *Eberhard*, 530 F.3d at 131 (creditors have standing to bring fraudulent transfer claims under UFTA and common law).  Moreover, because the Receiver brings the Fraudulent Transfer Actions to "maximize the value of the corporations for the benefit of their investors and creditors," there can be no "legal . . . [or] practical objection" to the Receiver's standing to bring these claims.  *Scholes*, 56 F.3d at 755.  Indeed every case with similar fact patterns as those present here and in *Scholes* has held that receivers have standing to bring fraudulent transfer actions on behalf of the now-liberated corporate entities to recover transfers

---

[18] The operator of the Ponzi scheme in this case, Illarramendi, is the "tort debtor" or transferor under the analysis in *Scholes*.  56 F.3d at 154; *see also Hammons*, 2009 WL 1362389, at *2.

made by former management in furtherance of a Ponzi scheme.[19]  *See Hammons*, 2009 WL 1362389, at *2 ("Against the weight of this authority, [the defendant] has not pointed to a single Ponzi scheme receivership case that criticizes the approach taken in *Scholes*.").

Unsurprisingly, Montes does not cite to any authority that counters the holding in *Scholes* and the other cases supporting the Receiver's standing to bring avoidance actions.  Instead, Montes contends that to the extent the Receiver is a "tort creditor," as *Scholes* holds, the Receiver can only avoid property that belonged to Illarramendi and *not* Receivership Property. Def. Br. at 19-20.  But no court, and certainly not *Scholes* or its progeny, has so held.  Again, *Scholes* stands for the proposition that an equity receiver has standing to bring state law avoidance actions on behalf of entities that were used in a Ponzi scheme to recover assets that the former corporate wrongdoers looted while they held their entities captive as their "robotic tools." 56 F.3d at 753-54.  Montes's bald assertions to the contrary are of no moment.

      **2.**      **The Receiver's Alter Ego Allegations Do Not Preclude the Receivership Entities' Creditor Status or Affect the Receiver's Standing**

*Scholes* likewise disposes of Defendant's alter ego argument.  That the Receiver has alleged the Receivership Entities functioned as Illarramendi's alter egos, for the purpose of establishing that such entities belonged in the Receivership, does not affect the Receiver's standing.  As *Scholes* stated, "the fact that the corporations were alter egos of [defendant] would not affect the receiver's standing to bring these fraudulent conveyance suites.  The corporations existed and were abused."  56 F.3d at 758; *see also Nixon*, 2012 WL 3839402, at *5 (declining to dismiss Receiver's action for lack of standing because corporation was "alter ego" of principal).

---

[19] The fraudulent transfer actions in *Scholes* were brought under an "old" Illinois statute.  56 F.3d at 753.  This is an issue of first impression under CUFTA and Connecticut's common law.  Nevertheless, courts in this Circuit and elsewhere uniformly apply the holding in *Scholes* to claims under other states' avoidance statutes or under the common law.  *See*, *e.g.*, *Donell v. Kowell*, 533 F.3d 762, 770-78 (9th Cir. 2008) (UFTA claims); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (same).

Although Illarramendi exerted his influence over the Receivership Entities, making them the aforementioned "evil zombies," they still maintained their own separate legal status, with all the attendant rights and duties, as discussed previously. *See Scholes,* 56 F.3d at 754. Once the Court removed him from power and appointed the Receiver, the Receivership Entities retained their individual legal status and maintained creditor claims. The Receivership Entities' creditor status is for the benefit of the innocent investors, rather than the wrongdoer himself.

Defendant's citations on this point are unavailing. *See* Def. Br. at 1. None of the cited cases involved Ponzi schemes or receiverships, or address in any way the arguments presented in *Scholes*. In both *In re B.J. McAdams, Inc.* and *In re Distrigas Corp.*, the concern motivating the Courts' decisions was that allowance of the claims at issue would result in funds going back to the wrongdoers behind the company rather than true creditors. *See In re B.J. McAdams, Inc.*, 66 F.3d 931, 937-38 (8th Cir. 1995); *In re Distrigas Corp.*, 75 B.R. 770, 774 (Bankr. D. Mass. 1987). Here, due to the appointment of the Receiver and the mandates of the Receivership Order, any money recovered by the Receiver will accrue to the benefit of the wronged investors and creditors under the Court's direction, rather than any wrongdoer. Furthermore, the unpublished opinion cited by Montes, *Hernandez v. Clearview Construction*, merely demonstrates the uncontroversial point that interchangeable use of two companies by their principal and commingling of their funds can support a claim for piercing the corporate veil, and does not impact this analysis. No. CV085013763, 2011 WL 3587383, at *4-5 (Conn. Super. Ct. July 19, 2011).

## II.   THE CAUSES OF ACTION ARE TIMELY AND SUFFICIENTLY ALLEGED

### A.   <u>The Receiver's CUFTA Claim Is Timely Based on the Discovery Rule</u>

On February 3, 2012, one year after the appointment of the Receiver, the Receiver filed

the original Complaint against the Defendant, which was subsequently amended twice.[20]   The

First Cause of Action in the Complaint is a fraudulent transfer claim against Defendant under

CUFTA Section 52-552(e)(a)(1) to recover various bribe payments made to Montes related to

the Permuta Transactions and the Harewood Transaction.   Defendant argues that this claim is

time-barred because it accrued more than four years before this lawsuit was commenced.

Defendant's argument, however, is based on a flawed interpretation of the statute of limitations

applicable to claims under CUFTA.   As the Defendant acknowledges, Connecticut law permits

fraudulent transfer claims based on actual intent to be brought within one year of when the

transfer "was or could have reasonably been discovered by the claimant."   Conn. Gen. Stat. § 52-

552j.

Under CUFTA's discovery rule, the Complaint was in fact filed within the applicable

period, particularly considering that the Receiver could not have actually discovered the

transactions related to Montes's fraudulent activity on the very first day of the Receiver's

appointment in this matter, nor could the transactions have been reasonably discovered before

the Receiver's appointment.   A number of courts, including courts in this Circuit, have held that

the statute of limitations in actions brought by a receiver on behalf of an entity that has been

defrauded by its agent begins to run on the day a receiver is appointed, at the very earliest.[21]   *See*

*Michelsen v. Penney*, 135 F. 2d 409, 415-16 (2d Cir. 1943) (stating that cause of action accrues

only upon discovery of facts and that statute of limitations began to run, at earliest, from date of

---

[20] There is no dispute that the Amended Complaints related back in time to the original complaint.

[21] Defendant attempts to distinguish certain of these cases on the basis that they rely on an "adverse domination" theory, which, Defendant claims, is not recognized under Connecticut law.   However, Connecticut does recognize the adverse interest doctrine as explained in part I(B)(3), *supra* at pg. 22, which is essentially the same as the adverse domination theory.   In any event, as noted in *Janvey I*, the adverse domination theory is a "helpful conceptual factor" to assess the reasonableness of a delay in discovering transfers, but not a dispositive inquiry where a legislature has specifically provided for a discovery rule.   793 F. Supp. at 832 ("the Court is not constrained to use solely adverse domination as a tool to allow a claim to proceed" where Texas legislature provided for a discovery rule).

appointment of Receiver); *Joslin v. Grossman*, 107 F. Supp. 2d 150, 154-55 (D. Conn. 2000) (stating that statute of limitations for fraud began to run on date of actual discovery of transaction, which was more than two years after appointment of Receiver); *Janvey v. Democratic Senatorial Campaign Comm., Inc*., 793 F. Supp. 2d 825 (N.D. Tex. 2011) ("*Janvey I*"); *Wing v. Dockstader*, No. 2:08 cv 776, 2010 WL 5020959, at *3 (D. Utah Dec. 3, 2010); *Quilling v. Cristell*, No. Civ. A. 304CV252, 2006 WL 316981, at *6 (W.D.N.C Feb. 9, 2006).

The Supreme Court "long ago recognized that something different was needed in the case of fraud, where a defendant's deceptive conduct may prevent a plaintiff from even knowing that he or she has been defrauded." *Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784, 1793 (2010). Thus, in keeping with that fundamental observation, CUFTA expressly incorporates a discovery rule in cases of actual fraud. Defendant erroneously argues against the very purpose of the CUFTA discovery rule by stating that "because Illarramendi's knowledge of the alleged Payments is imputed to the Receivership Entities as of the time they were executed, the discovery period applicable to the Receiver's fraudulent transfer claim . . . lapsed . . . ." Def. Br. at 26.

Defendant's novel imputation argument ignores the great weight of contrary authority applying the discovery rule in the Receivership context. *See, e.g., Janvey II*, 2012 WL 5207460, at *2 ("[w]hen the receiver acts to protect innocent creditors . . . he can maintain and defend actions done in fraud of creditors even though the corporation would not be permitted to do so."); *Dockstader*, 2010 WL 5020959, at *3; *see also Michelsen*, 135 F. 2d at 416 ("Then defendant's domination of the bank ceased and notice of defendant's wrongs for the first time became imputable to the bank."). Moreover, for the reasons set forth above, the Receiver is not imputed with Illarramendi's wrongful conduct. Defendant provides no other basis for finding

29

that the creditors or the Receiver had actual knowledge of the fraudulent transfers alleged in the complaint prior to his appointment.  Under Defendant's interpretation, a receiver would never have the benefit of the CUFTA discovery rule.

Defendant cites to *Armstrong v. McAlpin*, as though it supports the imputation of knowledge of the fraud to the defrauded entities for purposes of defeating the statute of limitations.  699 F.2d 79 (2d Cir. 1983).  In fact, *McAlpin* does no such thing.  In *McAlpin*, the Second Circuit affirmed the District Court's finding that by exercising reasonable diligence, shareholders of the company under receivership could have discovered the alleged fraudulent conduct more than two years before the receiver commenced his action in 1976.  *Id*. at 88.  In making its determination, the Court noted overwhelming evidence of the shareholders' constructive knowledge.  First, a "well-publicized" enforcement action brought by the SEC more than two years prior to the Receiver's complaint "set forth in considerable detail many of the wrongs" for which the Receiver sought recovery.  *Id*.  Additionally, "most of [the Receiver's] allegations of pre-1970 wrongdoing were simply lifted from an accounting firm's "audit report," which was made public when the SEC filed its enforcement action in 1973.  *Id*.  Because the causes of action of the shareholders had expired prior to the commencement of the Receiver's complaint, the Court stated that the Receiver could not revive those claims: "a receiver…can assert only those claims which that person could have asserted….defenses such as the statute of limitations, which might have been interposed against persons represented by a receiver may be interposed against the receiver."  *Id*. at 89 (internal citations omitted).

There is no analogy to *McAlpin* here.  Tellingly, the Defendant does not even raise the argument that the Receiver or any innocent shareholder, investor, or creditor could have

reasonably discovered Illarramendi's fraudulent transfers to the Defendant prior to the Receiver's appointment.

The Receiver was appointed on February 3, 2011, and the initial Montes complaint was filed within one year of the appointment of the Receiver, on February 3, 2012. SEC Action, Dkt. No. 66. It is inconceivable that the innocent victims of the fraud committed by Illarramendi could have discovered the extent of the elaborate scheme or that Illarramendi was secretly paying bribes to the Defendant prior to the appointment of the Receiver. Once the Receiver was appointed, the Receiver and his counsel promptly began the arduous task of unraveling the thousands of transactions involved in this Fraudulent Scheme. Many of the transactions related to the fraud remained unknown to the Receiver long past his appointment date because of the complicated nature of the Fraudulent Scheme. The transfers to Montes's were not uncovered until well after February 3, 2011. Compl. ¶ 118. Nevertheless, out of an abundance of caution, the Receiver filed the Complaint against Montes based on the information available one year from the date of the Receiver's appointment. Therefore, each allegation of a fraudulent transfer in the Complaint is timely based on the discovery rule.

### B.     The Complaint Sufficiently States a Claim for Aiding and Abetting Breach of Fiduciary Duty and Conspiracy to Breach Fiduciary Duty

Contrary to the Defendant's assertions, the Receiver has more than amply stated a claim for participation in and aiding and abetting breach of fiduciary duty and for conspiracy to breach fiduciary duty. As an initial matter, all of Montes's wrongdoing is relevant to the Receiver's aiding and abetting and conspiracy claims, rather than just his conduct during the three years prior to the filing of the Complaint, as Defendant argues. Def. Br. at 28. Montes admits that the Harewood Transaction and Movilway Transfer are timely. *Id.* Therefore, the Court can look to the entire course of conduct to determine whether the Complaint states a claim. *See Berry v.*

*Gormley*, No. CV010383382, 2002 WL 31818247, at *5 (Conn. Super. Ct. Nov. 26, 2002).

Montes provides no tenable reason to limit the Receiver's proof of these claims to a subset of

facts solely based on the three year time frame.   Montes engaged in a continuing course of

conduct that harmed the Receivership Entities through his repeated negotiation and receipt of

bribes beginning in 2006 and not ending until shortly before the Fraudulent Scheme's collapse.

Compl. ¶¶ 14; 140-43.  He continued his tortious conduct throughout that period, as described

below and in the Complaint, by aiding and abetting Illarramendi's breach of fiduciary duty and

through his participation in the conspiracy to breach Illarramendi's fiduciary duty.  All of these

acts together are proper for the Court to evaluate the sufficiency of the causes of action alleged.[22]

### 1.    The Receiver Has Sufficiently Alleged Montes's Culpability for Participation in and Aiding and Abetting Breach of Fiduciary Duty

"The elements of aiding and abetting a breach of fiduciary duty are: (1) a breach of duty

by the party who owes a fiduciary duty; (2) knowledge by the aider that the fiduciary is

breaching, and (3) provision by the alleged aider of substantial assistance in wrongdoing by the

aider."  *Katcher v. 3V Capital Partners LP*, No. X05CV085008383S, 2011 WL 1105724, at *14

(Conn. Super. Ct. Feb. 1, 2011).

Defendant does not dispute that the Receiver has properly alleged the first element, a

breach by Illarramendi of his fiduciary duty, nor could he seriously contest that fact.   The

Complaint incorporates by reference the allegations of malfeasance and breach of fiduciary duty

by Illarramendi contained in the complaint against him.  Compl. ¶ 1 n.3.

---

[22] Montes's citation to *Assegai v. Bloomfield* is inapposite here.  308 F. Supp. 2d 65 (D. Conn. 2004).  In *Assegai*, the Court declined to toll the statute of limitations for a series of separate acts that the plaintiff claimed were part of a conspiracy.  Here,  Montes does not argue that the aiding and abetting or conspiracy claims are outside of the statute of limitations.  Montes contends that the Receiver can only base the aiding and abetting and conspiracy to breach fiduciary duty causes of action on the Harewood Transaction and the Movilway Transfer and that the allegations concerning those transactions are insufficient on their own to survive a motion to dismiss.

The second element, knowledge, merely requires the defendant be "generally aware" of his role in the overall illegal or tortious activity at the time of the assistance. *See Efthinmiou v. Smith*, 268 Conn. 499, 505 (2004). "In order to be generally aware, an aider or abettor must have actual knowledge of the underlying tort or act with reckless indifference to the possibility that the underlying tort is occurring." *Short v. Conn. Comm. Bank N.A.*, N. 3:09-cv-1955, 2012 WL 1057302, at *12 (D. Conn. Mar. 28, 2012). The underlying tort, which Montes knew of or acted with reckless indifference to is Illarramendi's breach of his fiduciary duty. Montes's knowledge of the Fraudulent Scheme's details or even its existence is not necessary. Montes knew Illarramendi paid bribes to him and others as part of the Permuta Transactions, in return for his assistance. *See, e.g.*, Compl. ¶¶ 77, 82-83. He knew of or was recklessly indifferent to the breach of fiduciary duty Illarramendi committed through each and every bribe paid to Montes and to other PDVSA officials at Montes's direction. *See, e.g.*, *id*. at ¶ 80.

Furthermore, Montes knew that the Harewood securities PDVSA held had significantly underperformed, and that the purpose of the Harewood transaction was to clean PDVSA's books at the expense of the Receivership Entities and their investors. *Id.* at ¶ 103. As described in the Complaint, he also negotiated a ten percent kickback of the purported SOF investment and, therefore knew that Illarramendi breached his fiduciary duties when he overpaid for the Harewood shares and paid $5.5 million in bribes to PDVSA officials. *Id.*

The email addresses, under fake names, were set up and used by Illarramendi and Montes for the express purpose of negotiating bribes. *Id.* at ¶ 104. Given the secrecy with which he and Illarramendi conducted their negotiations over bribe payments, and Montes's concern regarding such secrecy, it is readily apparent that Montes knew he was participating in tortious activity. Defendant attempts to argue these emails "in no way suggest that Montes was aware that his

alleged conduct related to Harewood constituted a breach of Illarramendi's fiduciary duties . . . ." Def. Br. at 29.  For this statement to be plausible, it would have to mean that Montes had no idea paying bribes was improper or illegal, or that somehow Illarramendi was allowed to do so.

Finally, the Complaint has properly alleged the substantial assistance Montes provided. In return for the bribes, Montes provided his approval for the Permuta Transactions and facilitated those transactions.  Compl. ¶¶ 77, 82, 93.  He directly negotiated the Harewood deal, with the terms significantly benefitting himself and PDVSA, at the expense of the Receivership Entities and their investors.  *Id*. at ¶¶ 102-104.  Moreover, Montes actively negotiated specific bribe payment percentages for himself and others and provided offshore routing instructions to Illarramendi in order to facilitate the bribes.  *Id.*

### 2.    Conspiracy to Breach Fiduciary Duty Has Been Properly Alleged

Again, contrary to Defendant's arguments, the Receiver has more than properly pleaded the elements of conspiracy to breach a fiduciary duty.  "The [elements] of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff."  *Katcher*, 2011 WL 1105724, at *15 (citation omitted).  The Receiver has properly alleged each element of conspiracy.

"[T]he purpose of a civil conspiracy claim is to impose civil liability for damages on those who agree to join in a tortfeasor's conduct and, thereby, become liable for the ensuing damage, simply by virtue of their agreement to engage in the wrongdoing."  *OneBeacon Prof'l Partners, Inc. v. Ironshore Holdings (U.S.), Inc.*, No. HHDX04CV085019642S, 2009 WL 765666, at *7 (Conn. Super. Ct. Feb. 27, 2009) (quoting *Macomber v. Travelers Prop. and Cas. Corp.*, 277 Conn. 617, 637 (Conn. 2006)).  The Complaint properly alleges that Montes and

Illarramendi conspired to transfer Receivership assets to Montes and others in the form of bribes and kickbacks.  Compl. ¶¶ 4, 14, 74, 96, 104, 148, 150.  The breach of fiduciary duty at issue is not the Fraudulent Scheme itself, but Illarramendi's looting of the Receivership Entities and deepening their insolvency through the Permuta and Harewood Transactions and Movilway Transfer and payment of bribes to PDVSA officials, including Montes.  The conspiracy stretched over several years, with Illarramendi repeatedly diverting assets to Montes, in violation of Illarramendi's fiduciary duties, in order to personally benefit Montes.  *Id*. at ¶¶ 14, 148.  Montes knew that Illarramendi was not authorized to pay bribes, and that doing so would violate his duties to the Receivership Entities.  *Id*. at ¶¶ 86, 96.

The Defendant's pleading insufficiency argument focuses on merely a single sentence in the conspiracy to breach fiduciary duty count, conveniently ignoring the numerous other supporting factual allegations made throughout the Complaint.[23]  Def. Br. at 30; *see, e.g.*, Compl. ¶¶ 66, 70, 74, 77, 83, 102, 104, 107, 109.

### C.   The Complaint Sufficiently States a Claim for Unjust Enrichment

#### 1.   The Unjust Enrichment Count Is Timely

A number of courts in Connecticut have determined that the statute of limitations for unjust enrichment is six years.  *Mahon v. Chi. Title Ins. Co*., No. 3:09CV00690, 2012 WL 3544883, at *2 (D. Conn. Aug. 16, 2012); *Gianetti v. Blue Cross & Blue Shield of Conn., Inc.,* No. 3:07cv01561, 2008 WL 1994895, at *8 n.4 (D. Conn. May 6, 2008); *Generation Partners, LP v. Mandell,* No. FSTCV095010537S, 2011 WL 3671966, at *3 (Conn. Super. Ct. July 22, 2011).  Under a six-year statute of limitations, the Receiver's unjust enrichment claims related to

---

[23] The Defendant's reliance on *Deming v. Nationwide Mut. Ins. Co.* is also misplaced.  No. X02CV0301778827S, 2003 WL 21718378 (Conn. Super. Ct. July, 14, 2003). *Deming* is distinguishable, as that case turned on the lack of supporting allegations in the complaint, unlike here, where the complaint contains numerous allegations of Montes's role and participation in the conspiracy.  *Id.*

both the Permuta and Harewood Transactions remain viable.  Even taking Defendant's argument as true, at the very least, the statute of limitations for unjust enrichment would be the statute of limitations applicable to the comparable legal claim in the present action, which would be CUFTA's four year period plus the one year discovery rule.  *See* Def. Br. at 24; *Dowling v. Finley Assoc., Inc*., 248 Conn. 364, 367-68 (1999) ("Where a party seeks equitable relief pursuant to a cause of action that would also allow that party to seek legal relief, concurrent legal and equitable jurisdiction exists, and the statute of limitations that would be applicable to bar the legal claim also applies to bar the equitable claim").

Regardless, as acknowledged by the Defendant, because the right of recovery under the doctrine of unjust enrichment is equitable in nature, a court may provide a remedy even though the governing statute of limitations has expired.  Def. Br. at 24; *Piazza v. First Am. Title Ins. Co.,* Civ. No. 3:06CV00765, 2007 WL 988713, at *2 (D. Conn. Mar. 30, 2007); *Rossman v. Morasco*, 115 Conn. App. 234, 256-57 (Conn. App. Ct. 2009); *Gagne v. Vaccaro,* 255 Conn. 390, 409 (2001).  In the present case, the court has a compelling equitable reason to permit the unjust enrichment claim to stand based on the illegal conduct of Montes, which deprived the victims of Illarramendi's fraud of money they invested.  Montes should not be permitted to retain a windfall and thus compound the injury to Illarramendi's victims.

## 2.     The Complaint States Sufficient Facts for a Cause of Action for Unjust Enrichment

The Complaint sufficiently sets out the three basic requirements of unjust enrichment: "(1) the defendant was benefited, (2) the defendant unjustly failed to pay the plaintiff for the benefits, and (3) the failure of payment was to the plaintiff's detriment." *Gagne,* 255 Conn. at 409.  While Montes does not dispute the adequacy of the allegations with respect to the unjust enrichment claims related to the Permuta Transactions, Montes contends that the Complaint does

not state a claim for unjust enrichment with respect to the Harewood Transaction and Movilway Transfer because it does not list any benefit received by Montes.  As conceded by the Receiver in the Complaint, the Movilway Transfer is not included among the transfers that the Receiver is seeking to avoid in this action.  Compl. ¶ 107.  With respect to the Harewood Transaction, the Complaint states that Illarramendi caused a Receivership Entity to make a $5.5 million bribe payment for the benefit of Montes and others.  *Id.* at ¶¶ 101-04, 106.  The Receiver has alleged the known facts based on his investigation to date.  However, more facts regarding these transactions, and possibly others, will likely be uncovered through discovery.  Montes is on notice that the Receiver seeks to recover these transfers.  He should not be permitted to retain the benefits of these illegal payments while the investors remain empty handed.  The Complaint sufficiently alleges unjust enrichment with respect to the Permuta Transactions as well as the Harewood Transaction.  *Id.* at ¶¶ 66-106.

### D.   The Complaint Sufficiently States a Claim for Money Had and Received, Constructive Trust and an Accounting

#### 1.   Money Had and Received Is Timely and Sufficiently Alleged

Defendant concedes that money had and received is "the equivalent of the more modern action for unjust enrichment."  Def. Br. at 25.  Accordingly, it also has a six year statute of limitations.  *See Mahon*, 2012 WL 3544883, at *3 (statute of limitations for money had and received is six years).  Defendant has presented no authority to the contrary.  Connecticut law also makes clear that money had and received is a separate cause of action from unjust enrichment.  *Town of Stratford v. Castater*, No. CV106011629S, 2011 WL 1288675, at *5 (Conn. Super. Ct. Mar.15, 2011) (finding that unjust enrichment and money had and received are "similarly broad and flexible," but have "different requirements" under Connecticut law); *Koch v. Stop & Shop Co., Inc.*, No. CV020561277S, 2003 WL 553280, at *5 (Conn. Super. Ct. Feb.

11, 2003) (permitting unjust enrichment claim and money had and received claim to proceed in same action on same facts).

The Complaint sufficiently alleges a claim for money had and received.  An action for the recovery of money had and received lies for the recovery of money "which [in equity and good conscience] ought to be paid over to the plaintiff."  *New Haven Secs.*, *Inc. v. Drazen*, 38 Conn. Supp. 578, 581 (1982); *see also Town of Stratford,* 2011 WL 1288675, at *3 ("The real ground of recovery is the equitable right of the plaintiff to the money.").  The Defendant argues the Complaint does not allege that Montes received payments from the Harewood Transaction and Movilway Transfer.  Def. Br. at 31.  However, as explained above with respect to unjust enrichment, the Complaint repeatedly details instances where Defendant was paid money that must be returned to the Receivership Entities.  Compl. ¶¶ 101-04, 106-07.

### 2.      Constructive Trust Is a Proper Cause of Action

In his Sixth Cause of Action, the Receiver seeks the imposition of a constructive trust with respect to any transfer of funds, assets or property from the Receivership Entities to the Defendant.  The Defendant incorrectly argues that the imposition of a constructive trust is a remedy not a cause of action.  The Defendant relies primarily on a footnote found in *Macomber*, 261 Conn. at 623 n.3, and cases that cite to this same footnote.  However, as Connecticut courts have noted, there is a split of authority regarding the issue and no appellate authority "clarifying the *Macomber* footnote."  *Heimbrock v. Heimbrock*, No. CV085004975S, 2009 WL 1662469, at *8 (Conn. Super. Ct. 2009).  In fact, Connecticut courts "both before and after *Macomber*" have recognized constructive trust claims.  *Id.*

While there may be a split in authority following *Macomber* regarding the assertion of a constructive trust claim, numerous courts have stated that an independent claim for constructive trust is a substantive cause of action in Connecticut.  *See, e.g.*, *id*. at *6-8; *Stancil v. Kuhlor*, No.

CV054004890, 2007 WL 155159, at *3 (Conn. Super. Ct. Jan. 2, 2007); *Colodonato v. Hanson*, No. CV044004755S, 2006 WL 2556349, at *3 (Conn. Super. Ct. Aug. 11, 2006).  Similarly, a constructive trust claim is appropriate here because of the wrongful benefit Montes received when the assets of the Receivership Entities were diverted as a result of fraudulent transfers, unjust enrichment, and breaches of fiduciary duty.

### 3.      An Accounting Is a Proper Cause of Action

In the Seventh Cause of Action, the Receiver seeks an accounting from Montes of the assets that have been wrongfully diverted from the Receivership Entities.  The Defendant argues that an accounting is not a cause of action but a remedy.  The Defendant is incorrect. Accounting can be either a cause of action or a remedy.  *See* 1 Am. Jur. 2d Accounts and Accounting § 52 (2012).  Accounting is defined "as an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due."  *Mankert v. Elmatco Prods., Inc.,* 84 Conn. App. 456, 460 (Conn. App. 2004) (internal citation omitted).  Accounting is properly asserted as a cause of action where "the facts create a reasonable doubt whether adequate relief may be obtained at law."  *Id.*  Further, "[t]o support an action of accounting, *one* of several conditions must exist.  There must be a fiduciary relationship, *or* the existence of a mutual and/or complicated accounts, or a need of discovery, *or* some other special ground of equitable jurisdiction such as fraud."  *Id.*  (internal citation omitted).  Connecticut courts have frequently recognized a cause of action for accounting.  *Id.*; *see also KITO Grp. Ltd. v. RF Int'l, Ltd.*, No. CV096000710S, 2011 WL 3338247, at *3 (Conn. Super. Ct. July 11, 2011); *Klein v. Bratt*, No. FSTCV055000502S, 2009 WL 5184192, at *7 (Conn. Super. Ct. Nov. 25, 2009); *Those Certain Underwriters at Lloyd's, London v. Cooperman*, No. X03CV034022302S, 2006 WL 3316847, at *11 (Conn. Super. Ct. Oct. 27, 2006).  The Receiver's request for an accounting

is essential in this case because there are likely transactions that Montes benefitted from that remain concealed from the Receiver due to the secretive acts taken by Montes and Illarramendi.

### 4.    A Constructive Trust and an Accounting Are at the Least Remedies

The Receiver's demand for a constructive trust and an accounting are entirely appropriate.  While some Connecticut courts consider the imposition of a constructive trust and a request for an accounting to be a remedy, rather than causes of action, even in those instances, the proper course of action is to consider the requests as requests for relief instead of dismissing the causes of action.  *See Cendant Corp. v. Shelton*, 474 F.Supp.2d 377, 383 (D. Conn. 2007); *see also Romero v. Gewirtz*, No. FSTCV095013109S, 2011 WL 4953481, at *3 (Conn. Super. Ct. Sept. 28, 2011) ("while plaintiffs cannot maintain a separate count for a constructive trust, they still will be able to obtain the equitable remedy of a constructive trust via their unjust enrichment count").

### CONCLUSION

In light of the foregoing, the Receiver respectfully requests that this Court deny the Defendant's Motion to Dismiss in its entirety.

Date:  November 16, 2012

/s/ Jonathan B. New
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, NY 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
Jonathan B. New
Email: jnew@bakerlaw.com
Robertson D. Beckerlegge
Email: rbeckerlegge@bakerlaw.com

*Attorneys for Receiver John J. Carney, Esq.*