```
              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

JOHN J. CARNEY                 :  No. 3:12CV-183 (SRU)
                               :  915 Lafayette Boulevard
           vs.                 :  Bridgeport, Connecticut
                               :
                               :  March 5, 2013
JUAN S. MONTES, ET AL          :

- - - - - - - - - - - - - - - - x
```

                     MOTION HEARING


B E F O R E:

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

     FOR THE PLAINTIFF:

          BAKER & HOSTETLER, LLP
               45 Rockefeller Plaza
               New York, New York  10111
          BY:  JONATHAN B. NEW, ESQ.
               ROBERTSON D. BECKERLEGGE, ESQ.

     FOR THE DEFENDANT:

          DEBEVOISE & PLIMPTON
               919 Third Avenue
               New York, New York  10022
          BY:  ELLIOT GREENFIELD, ESQ.
               MATTHEW E. FISHBEIN, ESQ.

          HURWITZ SAGARIN SLOSSBERG & KNUFF
               147 North Broad Street
               P. O. Box 112
               Milford, Connecticut  06460
          BY:  DAVID L. BELT, ESQ.

          ERIC J. SHAMES, ESQ.
               301 East 79th Street, Suite 32B
               New York, New York  10075

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917)703-0761

```
 1                    (2:10 O'CLOCK, P. M.)

 2              THE COURT:  Good afternoon.  We're here for the

 3     motion to dismiss the second amended complaint in Carney

 4     v. Montes.  Could I have appearances, please?

 5              MR. NEW:  Good afternoon, Your Honor.  Jonathan

 6     New and Rob Beckerlegge on behalf of John Carney in his

 7     capacity as the court appointed receiver.

 8              THE COURT:  Yes.

 9              MR. GREENFIELD:  Elliot Greenfield and Matt

10     Fishbein on behalf of the defendant, Juan Montes.

11              THE COURT:  Thank you.  Very good.  Okay.  Well,

12     we have an interesting issue here.  Where to start.

13              Why shouldn't I apply Scholes?

14              MR. GREENFIELD:  Thank you, Your Honor.  Scholes

15     is law out of the 11th Circuit, is not binding in the 2nd

16     Circuit, and it's actually contrary to the law of the 2nd

17     Circuit.

18              What Scholes holds, or at least the part of

19     Scholes that they are asking to adopt, that when a

20     receiver is appointed, he comes in with a clean slate.

21     He's unaffected by any of the prior wrongdoing of the

22     receivership entities and, therefore, has standing to

23     bring claims that the receivership entities themselves

24     could not have brought.

25              What the 2nd Circuit has held in Eberhard and
```

1    elsewhere is that a receiver has no greater rights or

2    powers then the receivership entities themselves have, and

3    the receiver can bring no claims, file no actions that the

4    receivership entities themselves could not have brought.

5         That's directly contrary, and what the 2nd

6    Circuit has held in the Wagoner case is that where

7    parties, where a representative of an estate is bringing

8    an action and stands in the shoes of a bankrupt entity or

9    receivership entities where the in pari delicto defense

10   would apply to the receivership entities, then that

11   representative does not have standing to bring these

12   claims.

13        THE COURT:  Well, the 2nd Circuit in Eberhard

14   agreed at least in part with Scholes, that is, the

15   standing to bring a fraudulent conveyance claim would turn

16   on whether he represents the transferor only or also

17   represents a creditor of the transferor.  Here, the other

18   part of Scholes is that -- this concept of tort creditor,

19   which obviously the receiver's relying on here.

20        MR. GREENFIELD:  So, the part of -- the issue

21   before Eberhard was whether or not the receiver in that

22   case represented only the mastermind of the fraudulent

23   scheme, did not represent the receivership entities, and

24   it was a transfer of assets of the mastermind's property

25   to a third party.  And the holding in Eberhard, which we

1    agree with, is that you can't use fraudulent transfer

2    statutes to set aside your own conveyance.  You have to

3    represent a creditor of the transferor.

4            THE COURT:  Right.

5            MR. GREENFIELD:  And in terms of the tort

6    creditor idea, that's one of the two bases of standing

7    that the receiver set forth the right and intent to bring

8    fraudulent transfer claims.  But what they are trying to

9    do here is, again, set aside their own transfer.

10           The allegations are that the receivership

11   entities made payments to Mr. Montes, and the receiver,

12   standing in the shoes of the receivership entities, is

13   seeking to recover to set aside that transfer.

14           THE COURT:  Right, but in what sense are the

15   receivership entities the transferor there, only in some

16   technical sense.  I think the claim here is that

17   Illaramendi is the one who perpetrated this wrong and

18   thereby harmed the receivership entities that should have

19   received the monies that he used to pay Montes.

20           MR. GREENFIELD:  Right.  Okay, well --

21           THE COURT:  That's the theory, right?

22           MR. GREENFIELD:  What the actual allegation is

23   that Illaramendi directed the receivership entities to

24   make these transfers, so that the money came from the

25   receivership entities.  Under --

```
 1              THE COURT:  Technically, right, yes, okay.
 2              MR. GREENFIELD:  But, regardless, it was
 3    receivership property, and they specifically allege that.
 4    Whether -- you know, who directed it or whether it matters
 5    that Illaramendi directed it, under the plain language of
 6    the CUFTA statute, the assets that are transferred have to
 7    be property of the debtor.  So under the tort creditor
 8    theory, the receivership entities are tort creditors of
 9    Illaramendi.  Okay?
10              Illaramendi is the tort debtor.  Under the plain
11    language of the statute, the property that's transferred
12    has to be Illaramendi's property for the receivership
13    entities to have standing.  All right?
14              THE COURT:  Okay.
15              MR. GREENFIELD:  The receivership entities can't
16    try to set aside a transfer of their own property,
17    regardless of who directed them.
18              THE COURT:  Okay.
19              MR. GREENFIELD:  Does that make sense?
20              THE COURT:  Well, I won't comment on whether it
21    makes sense.  I understand it.
22              MR. GREENFIELD:  If you just look in the CUFTA
23    statute at the definition of what a transfer is and the
24    definition of what the asset is, it explicitly says "Asset
25    is defined as property of the debtor."  And under the tort
```

creditor theory, Illaramendi is the tort debtor.

I understand that other courts either in the 7th Circuit applying Illinois law or elsewhere, may not have kind of gotten into that issue but the ultimate authority here is the text of the statute.  So --

THE COURT:  Okay.  Let me hear a response to that point.

MR. NEW:  Yes, Your Honor.  On the CUFTA point, Your Honor, or on the broader standing?

THE COURT:  Yes.  Well, this entire argument about who is the tort debtor and what the statute says and so forth.

MR. NEW:  Yes, Your Honor.  As Your Honor pointed out -- well, let me take a step back.  CUFTA is not -- it is a Uniform Fraudulent Transfer Act.  Similar acts have been passed in various states.  That's the whole point of the uniform act obviously, and so equivalent statutes have been interpreted by other courts in other districts following the Scholes analogy to find that, as laid out in Scholes, this is a situation where, due to the nature of the Ponzi scheme, the fraud here, wherein the entities are, to quote Judge Posner in a nice turn of phrase, "The evil zombies controlled by the tortfeasor," Mr. Illaramendi in this case, that when he transfers their funds without -- fraudulently, that they in effect at that

1   point become tort creditors.  They are victims of

2   Mr. Illaramendi's fraud.

3          Now, in terms of whether it's his property or

4   it's their property, I don't think that the statute can be

5   interpreted that way so as to go against what is clearly

6   well established receivership law that goes back as far as

7   the McCandless case in the Supreme Court, which was by

8   Justice Cardozo in 1935, where case after case after case,

9   including courts in the 2nd Circuit, district courts in

10  the 2nd Circuit have held that a receiver can recover

11  fraudulent transfers for the benefit of the estate and

12  they've applied fraudulent transfers, either common law or

13  in certain instances district courts have applied UFTA in

14  that jurisdiction.

15         And I would just quote from one of those cases,

16  Wing v. Hammons, which is out of the District of Utah,

17  where a defendant raised a similar argument and the Court

18  there said, this is 2009, "Against the weight of this

19  authority, the defendant has not pointed the Court to a

20  single Ponzi scheme receivership case that criticizes the

21  approach taken by Scholes."

22         And here, unless I'm mistaken, I don't believe

23  that there's any case that Mr. Montes cites that

24  criticizes the approach taken by Scholes or that

25  interprets any UFTA, let alone CUFTA, in the way that they

1    are suggesting here.

2            THE COURT:  Let me just think out loud for a

3    second.  Why isn't Montes the tort debtor here?  He's

4    alleged in effect to have participated in the scheme.

5            MR. GREENFIELD:  The way that --

6            THE COURT:  He's the one who's got the money of

7    the receivership entities that they claim should be

8    returned.  Why isn't he the tort debtor?

9            MR. GREENFIELD:  If I can answer, these terms

10   have very a specific definition under the CUFTA statute

11   and generally other UFTAs.  What CUFTA does is if

12   somebody, a person owes you money, and that person

13   transfers their assets to a third party, that allows the

14   creditor to set aside under certain circumstances the

15   transfer made from the debtor, who's also the transferor,

16   to the transferee.

17           So, in this case, Montes, Mr. Montes is the

18   transferee, and the receivership entities are the

19   transferors.  Right?  So, under the tort debtor theory,

20   right, the receivership entities are the tort creditors,

21   Mr. Illaramendi is the tort debtor because he is in their

22   debt from allegedly having harmed them.

23           THE COURT:  Why isn't Montes similarly in their

24   debt for having harmed them?

25           MR. GREENFIELD:  Because the transfer that's

1    been made has to be a transfer made from the tort debtor.

2    That's the framework of the CUFTA statute.

3         THE COURT:  Well, that's the traditional you're

4    trying to avoid paying a financial creditor, but when one

5    thinks about a tort creditor or a tort debtor in the way

6    that Scholes talks about it, why wouldn't the two

7    allegedly conspiring wrongdoers both be potential tort

8    debtors?

9         Put differently, why should Montes be able to

10   benefit from the fact that the nature of this tort had

11   Illaramendi directing what was going to happen and he

12   ended up with the cash?

13        MR. GREENFIELD:  Your Honor, it's not about

14   Mr. Montes benefiting or not.  It's a matter of who's the

15   proper plaintiff to bring these lawsuits, and the argument

16   is it's not the receiver.  In the plain language of the

17   statute, it's not the receiver.  There's nothing that

18   would stop a creditor or investor who believes that he was

19   harmed by Mr. Montes and has a cognizable claim against

20   him from bringing it.  It was just about who was the

21   proper party.

22        THE COURT:  Well, of course, but we're here to

23   decide in part whether the receiver is a proper party

24   under this tort creditor debtor theory.  And as I hear you

25   describe that theory, the wrongdoer who ends up with the

```
 1    money can't be the tort debtor and that's what I'm not

 2    understanding.  Not the financial debtor.  Obviously --

 3    look, if I owe you money and you're coming after me and I

 4    sign my house over to my wife, you know, classic case --

 5              MR. GREENFIELD:  I understand, Your Honor.

 6              THE COURT:  -- that's easy.  But we've got a

 7    more complicated situation here.

 8              MR. GREENFIELD:  They could have alleged, but I

 9    don't think they did, but they could have a theory that

10    Mr. Montes himself is the tort debtor.  What that would

11    allow them to do under the statute is set aside a transfer

12    that Mr. Montes made to somebody else, whether it's

13    just -- that's not the transfer they are trying to

14    recover.  They are taking something which is not a

15    fraudulent transfer and they are trying to kind of wedge

16    it into that framework but it doesn't fit.

17              THE COURT:  The allegations, as I understand

18    them, have Illaramendi and Montes working together.

19              MR. GREENFIELD:  And the allegation is

20    Mr. Montes was paid a bribe by the receivership entities

21    at Mr. Illaramendi's direction.

22              THE COURT:  Sure, it wasn't by accident.  If

23    this was true --

24              MR. GREENFIELD:  Right.

25              THE COURT:  -- Montes understood the money he
```

 1      was receiving was a bribe from Illaramendi.

 2              MR. GREENFIELD:  Right.

 3              THE COURT:  And most bribes don't happen

 4      without an implicit understanding that it's a bribe.

 5              MR. GREENFIELD:  Right.

 6              THE COURT:  Okay?  We'll start from that

 7      premise.

 8              MR. GREENFIELD:  Right.

 9              THE COURT:  All right.  So what we have here is

10      the Illaramendi-Montes conspiracy, if you want to call it

11      a conspiracy.  And why can't one member of that conspiracy

12      escape being a tort debtor under the theory that's being

13      asserted here?

14              And I understand you have some arguments that

15      the theory, it shouldn't be applied at all, but if the

16      theory works, why isn't Montes potentially a tort debtor?

17              MR. GREENFIELD:  I think that it, you know, you

18      could make the same argument that if Illaramendi harmed

19      the receivership, the plaintiffs can argue that Mr. Montes

20      harmed the receivership, and as a result, they can say

21      that.  But again, under CUFTA, and the statute has

22      specific limitations to it, even if we do consider

23      Mr. Montes a tort debtor, that would allow them to set

24      aside a transfer if Mr. Montes made a transfer to some

25      other third party.  It doesn't allow -- or you can't, they

1       have can't set aside -- regardless of who the tort debtor

2       is, the key here is that the property was receivership

3       property.  It is specifically alleged that each of the

4       payments represents an interest in the receivership

5       property.

6               THE COURT:  I understand, but if the two of them

7       get together, Illaramendi and Montes get together and they

8       have a meeting and say, you know what, this is what we'll

9       do, Illaramendi says I'll cause one of these entities to

10      make this transfer and you'll end up with some of that

11      money.  You'll get that benefit, I'll get this other

12      benefit, we'll both be happy.  In a meaningful sense

13      Montes is causing it by agreeing to accept a bribe, isn't

14      he?

15              MR. GREENFIELD:  Again, I just don't -- even if

16      we accept the premise that Mr. Montes is a tort debtor, it

17      still doesn't fit within the CUFTA statute, because we're

18      not talking about a transfer that Mr. Montes made to some

19      other party.  All right?  The framework would be that the

20      receivership entities are owed something by Mr. Montes.

21      Right?  They are tort creditors, he's a tort debtor.  And

22      what CUFTA would then allow you to do is set aside a

23      transfer made by the debtor.  The assets that are

24      transferred have to be property of the debtor.  That's the

25      definition of assets in the statute.

1          So the issue is not, you know, should Mr.

2    Montes get away with this, assuming that the allegations

3    are true.  The question is can they themselves bring that

4    lawsuit or does it have to be a creditor of the

5    receivership entities.  And the law says it has to be a

6    creditor of the receivership entities.

7          Any of the investors or other creditors from the

8    receivership entities could bring -- they are trying to --

9    they are owed money by the receivership entities.  They

10   are trying to recover that money, and if the receivership

11   entities made transfers to third parties, it would be the

12   investors or creditors who could bring a claim under CUFTA

13   to recover that transfer, because you have a transfer from

14   the debtor to a third party.

15         CUFTA is a limited statute.  It doesn't allow

16   them to come into court and say Mr. Montes did something

17   wrong and has property that we believe belongs to the

18   receivership entities and, therefore, it fits under CUFTA.

19   It's a much narrower statute than that.

20         There are other are, presumably other laws that

21   they could --

22         THE COURT:  All right, but now you're really

23   arguing 12(b)6 and not standing.

24         MR. GREENFIELD:  No, it's a question of who has

25   standing, and this is straight from Eberhard.  If the

```
1    party -- you can't sit in the shoes, stand in the shoes of

2    the party who made the transfer and say I have standing to

3    recover that transfer, all right?

4         It has, you only have standing under CUFTA, as

5    explained in Eberhard -- in Eberhard, as explained, it's

6    the New York creditor's and debtor's law, it's distinct

7    from this law -- and Eberhard says that it has to be a

8    creditor of whoever made the transfer.  And in that case

9    it was a transfer by the mastermind, Mr. Eberhard, to a

10   third party.  The receiver stood in the shoes of

11   Mr. Everhard and it's the exact same scenario that we have

12   here.

13        The question the Court asks in that case, well,

14   if this money really belongs to the receivership estates,

15   you know, why are we preventing the receiver from getting

16   the money back.  As the 2nd Circuit regularly pointed out,

17   the question is who has standing under the state

18   statute.

19             THE COURT:  Well --

20             MR. GREENFIELD:  I would point out that --

21             THE COURT:  In Eberhard they are referring back

22   to the Shiv case, and the 2nd Circuit says the receiver in

23   Shiv had standing, quote, "for the benefit of those

24   defrauded," unquote, because he was their receiver, so --

25   but what we have here is an argument that the receiver is
```

1    the receiver from the defrauded; i.e., the receivership

2    entities are those entities who have suffered this fraud,

3    the fraud perpetrated by Illaramendi and Montes.

4            MR. GREENFIELD:  Right.

5            THE COURT:  So help me understand how Eberhard

6    helps you out.

7            MR. GREENFIELD:  What Eberhard says, and we

8    agree with, is that the receivers have standing, the

9    receiver has standing to assert any claim that the

10   receivership entities themselves could have asserted.

11   Right?  And Eberhard then looks at the fraudulent transfer

12   statute and says if you look at the language of this

13   statute, a party does not have standing to set aside its

14   own transfer.  That's almost a quote from Eberhard.  A

15   party does not have standing under a fraudulent transfer

16   statute to set aside its own transfer.

17            And that's exactly what we're saying here.  The

18   receiver, the receiver in action here and collecting

19   whatever assets of the receivership entities they can,

20   they ultimately benefit, the investors and creditors, but

21   it doesn't give them standing to sue on their behalf.

22   That's the key distinction here, is whoever ultimately

23   benefits is a very different question than on whose behalf

24   they have standing to bring claims.  And the 2nd Circuit

25   in Eberhard is clear that the receiver stands in the shoes

1    of the receivership entities and can only file, can only

2    bring the claims that the receivership entities could have

3    brought.

4            THE COURT:  Okay.  Well, this argument seems to

5    me to be a statutory, principally a statutory argument

6    under CUFTA.

7            MR. GREENFIELD:  Yes.

8            THE COURT:  And I'll give Mr. New a chance now

9    if he wants to respond because it's not clear to me that

10   it applies to the other causes of action.

11           MR. GREENFIELD:  Absolutely.  The argument

12   for --

13           THE COURT:  Let's -- yeah.

14           MR. GREENFIELD:  -- standing under CUFTA is just

15   for that one claim.  You know --

16           THE COURT:  Right.

17           MR. GREENFIELD:  -- I think you don't even need

18   to reach this issue under the statute of limitations and

19   under Wagoner but we can get to that.

20           THE COURT:  Sure.  All right.

21           MR. NEW:  Your Honor, I will get to the

22   statutory issue, but first I just want to respond --

23           THE COURT:  Sure.

24           MR. NEW:  -- a little bit to the reliance on

25   Eberhard.  Frankly we read Eberhard very similarly to how

1    you just suggested, which is Eberhard actually supports

2    the position that the receiver here in this case is

3    taking.  And just to focus on what the distinction, the

4    Court in Eberhard was making was a distinction between a

5    receiver over the wrongdoer and just the wrongdoer, who

6    was the receiver in that case, and the receiver over the

7    entities who were wronged.

8            And the 2nd Circuit agreed with the reasoning in

9    Scholes and the follow-up to Scholes, the Troelstrup

10   case, and it held that in a situation where there is a

11   receiver who is representing just the wrongdoer, then he

12   is the transferor, and so there is no standing under the

13   statute.  But that then sort of flipped that around.  What

14   that really means is, well, if he's the transferor in that

15   situation, then the entities are the creditor because he's

16   transferring their funds but he's misappropriating them

17   for himself before he transfers them.  And I think that's

18   the central premise of the Scholes analysis and these

19   other cases, which is that in this situation where the

20   receiver has come in and now the entities have regained

21   their separate legal statute, separate and apart from the

22   wrongdoer, if you look at what actually happened, the

23   transferor, the wrongdoer, in this case Mr. Illaramendi,

24   he basically misappropriated those funds for himself.

25   They were as if they were his own and then he transferred

1    them out, and now the receiver, the entities are saying

2    actually no, that's not true.  You committed a tort

3    against us by transferring that money and we're entitled,

4    under CUFTA and under other statutes or other common law

5    causes of action, to recover that money, to bring it back

6    into the receivership estate.

7           When CUFTA was passed, it was like all the other

8    UFTAs.  While it is a statutory provision, needs to be

9    interpreted on its own, it was meant to codify the common

10   law, and there are cases in Connecticut that recognize the

11   fact that CUFTA is an extension and a codification of

12   common law fraudulent transfer law.

13          So, all of these cases that came before CUFTA,

14   as I mention, going back to the Supreme Court in

15   McCandless that have recognized a receiver's right to

16   bring fraudulent conveyance actions to set aside

17   fraudulent transfers, that's all background to how CUFTA

18   should be interpreted.

19          And on the specific issue of what is the

20   property of the debtor, I think the analysis under Scholes

21   would be that in this circumstance, where Mr. Illaramendi

22   has wrongfully taken those funds for his own benefit and

23   transferred them to himself or to third, third parties or

24   whatever, that those are transfers that can be clawed back

25   under CUFTA, that in that situation, the creditor is the

1    receivership entities and the debtor who made the transfer

2    of the funds is Mr. Illaramendi.

3            And that is the lens through which CUFTA needs

4    to be interpreted under these circumstances.  Otherwise,

5    there really would be -- it would do harm to, in the years

6    and years of established precedent that fraudulent

7    conveyance actions are setting aside fraudulent transfers,

8    is something that a receiver is empowered and is expected

9    in some sense to bring in order to represent the interests

10   of the investors.

11           And I think -- on that note, Your Honor, I think

12   it's also worth noting that this isn't simply, Mr. Carney

13   is not simply an equity receiver, he is an SEC receiver.

14   And if you consider the provisions of the 34 Act under

15   which the Court is empowered to appoint a receiver to use

16   its equitable powers, that statutory provision

17   specifically says that the Court is to -- is enabled and

18   empowered to use all equitable remedies for the benefit of

19   investors.

20           So, again, it goes to the role and the nature

21   and the standing of the receiver to bring these types of

22   actions.  And I think when you bring all that to bear,

23   Your Honor, I think the reasoning of all of the courts

24   that have addressed this under the various CUFTAs, that

25   that reasoning still stands.  And, you know, to interpret

1    the CUFTA in a different way as to preclude the receiver's

2    standing in this case, if would be basically going against

3    every other case that has looked at this issue under the

4    various UFTAs.

5         MR. GREENFIELD:  May I just briefly respond to

6    that?  You know, Mr. New and the receiver are making

7    policy arguments as to why they believe that, you know,

8    it's an important thing for receivers to be able to bring

9    these types of claims, but you know, what they are

10   avoiding is the actual text of the statute, which have

11   requirements, and the requirements are that it has to be a

12   creditor of the transferor to bring the claim and the

13   transfer has to be property of the transferor.

14        There's nothing in the complaint -- the

15   complaint alleges this is -- expressly alleges that this

16   was property of the receivership entities that was

17   transferred directly to Mr. Montes.  It does not allege,

18   as Mr. New just said, that Mr. Illaramendi took this for

19   himself and then transferred it to Mr. Montes.

20        THE COURT:  Your argument is pretty simple.

21   It's that the wrongful act here is theft as opposed to

22   fraudulent transfer within the meaning of the statute.

23        MR. GREENFIELD:  Right.  And they have, I

24   believe, brought their claims against Mr. Illaramendi.

25        But the -- I also want to point the Court to two

```
 1    cases we cite in our brief.  The Epperson case and the

 2    Cadle Co. cases are both District of Connecticut cases,

 3    and both of them look at the very specific language of

 4    CUFTA and found that the allegations didn't meet the

 5    language of CUFTA.

 6              In, in the Cadle Company v. Jones, which is 2004

 7    Westlaw 2049321, the Court found that certain CUFTA claims

 8    fail because the property at issue did not meet the

 9    specific requirements of CUFTA and because the transfer at

10    issue is not made by the debtor.  So, Federal Courts, when

11    they look at this Connecticut statute do look at the

12    precise language of it and ask if the allegations do fit

13    within that framework.

14              THE COURT:  Okay.  Well, let's get beyond CUFTA

15    and look at standing for some of these other claims.

16              Why should Wagoner be extended to a

17    non-bankruptcy context?

18              MR. NEW:  Well -- Your Honor is addressing me?

19              THE COURT:  I don't care who goes first.

20              MR. NEW:  Well, given the nature of the

21    question, I think I should go first.  The question was,

22    Your Honor, why shouldn't Wagoner be extended beyond --

23              THE COURT:  Why should it.

24              MR. NEW:  Why should it, okay.  Well, then I

25    will defer --
```

1           (Laughter)

2           MR. NEW:  It shouldn't, respectfully.

3           MR. GREENFIELD:  The basis of Wagoner is that

4    the -- the entity I referred to as the receivership

5    entities are barred from suing themselves by the in pari

6    delicto doctrine and a receiver trustee who stands in the

7    shoes of those entities doesn't have standing.  Okay?  In

8    this case, the first part is clearly met.  The

9    receivership entities are alleged to have paid bribes to

10   Mr. Montes --

11           THE COURT:  Well, not really.  Don't they allege

12   that they were the vehicle through which Illaramendi paid

13   the bribes?

14           MR. GREENFIELD:  The allegation -- well, anyway,

15   Illaramendi's wrongdoing would be imputed to the

16   receivership entities.

17           THE COURT:  Not if the zombies are now freed

18   from their trance.

19           MR. GREENFIELD:  Right, but we're not in the 7th

20   Circuit and no 2nd Circuit court has ever adopted that

21   aspect of Scholes.  Under the Wagoner rule, the -- and the

22   courts in the Southern District of New York have

23   recognized that there's this tension between Scholes and

24   Wagoner, and what Scholes says is the receiver comes in

25   and gets a clean slate, but the Wagoner rule says no,

1    that's not the case.  You stand in the shoes of the

2    receivership entities.

3            THE COURT:  The bankruptcy trustee stands in the

4    shoes --

5            MR. GREENFIELD:  The bankruptcy trustee stands

6    in the shoes of the bankrupt entity and cannot bring any

7    claims that they could not have brought themselves.  And

8    the bankrupt entities are barred by the doctrine of in

9    pari delicto and then the trustee, we would argue the

10   receiver also, has no standing to sue.

11           THE COURT:  So, the import of that rule is that

12   the receiver can collect legitimate debts but not collect

13   monies that are obtained by somebody as a result of

14   wrongdoing, so that's the bottom line.  In other words,

15   the receiver can marshal assets but can't seek to undo

16   wrongdoing done by the very acts that gave rise to the

17   receivership in the first place.

18           MR. GREENFIELD:  I think --

19           THE COURT:  Is that --

20           MR. GREENFIELD:  -- they are not allowed to

21   bring claims against third parties who are alleged to have

22   engaged in wrongdoing in which the receivership entities

23   participated.  The reason for this --

24           THE COURT:  And if the statute says otherwise,

25   how does that affect standing?

1          MR. GREENFIELD:  There's -- in the case of --
2     get back to the fraudulent transfer but if -- some courts
3     in the 2nd Circuit and I think not the 2nd Circuit itself
4     but some courts in the 2nd Circuit have held that where
5     there's express authority in a statute to bring a claim,
6     then the Wagoner rule wouldn't apply to that so in the
7     bankruptcy --
8          THE COURT:  Right, Congress can create standing.
9          MR. GREENFIELD:  Right.  So in the bankruptcy
10    context there's sections of the bankruptcy code that
11    expressly allege -- expressly authorize a bankruptcy
12    trustee to fraudulently transfer things on behalf of
13    creditors.
14          THE COURT:  548.
15          MR. GREENFIELD:  548, 544.
16          THE COURT:  Right.
17          MR. GREENFIELD:  So the, you know, the receiver
18    doesn't get the benefit of that.  The receiver is not
19    subject to a bankruptcy code.  The receiver has no
20    authority, going back to Eberhard, to bring lawsuits on
21    behalf of anyone else except for the receivership
22    entities, so there's no authority for the receiver,
23    statutory or otherwise, to bring claims on behalf of the
24    creditors.  And the same limitation is in the --
25          THE COURT:  Fair enough, but the -- isn't a

1   receiver in this context doing something somewhat

2   different than a bankruptcy trustee is doing?

3           MR. GREENFIELD:  As relevant to the <u>Wagoner</u> -- I

4   don't believe so.  The <u>Wagoner</u> rule applies where you have

5   a representative who's suing, stands in the shoes of

6   bankrupt entities, the entities are subject to in pari

7   delicto defense and the 2nd Circuit has imposed this

8   ruling of standing.  And I think it's important to

9   understand, the Wagoner rule is not about cutting off

10  liability and allowing people to go free.  Again, the

11  Wagoner rule is aimed at the question of who is the proper

12  plaintiff to bring these claims.  So the reason Wagoner

13  has standing to begin with --

14          THE COURT:  But the issue becomes, doesn't it,

15  whether the receivership entities were harmed by the

16  wrongdoing.  If they are harmed by the wrongdoing, then

17  there is constitutional standing.  Your argument is if

18  they participated in the wrongdoing, in pari delicto will

19  prevent them from having a valid claim, and in those

20  circumstances the 2nd Circuit says, well, as a prudential

21  matter, we're going to say forget about it, you don't have

22  standing.

23          Aren't we into a heavily fact based

24  determination at that point?  How can you say on the

25  pleadings, at the pleading stage that the receivership

1    entities participated in a manner that prevents them,

2    under the doctrine of in pari delicto, from having a valid

3    claim?

4             MR. GREENFIELD:  Because we're talking about the

5    payment of bribes, and it doesn't matter for the Wagoner

6    analysis whether you want to say that Illaramendi is the

7    one who paid the bribes or the receivership entities paid

8    the bribes.  I think the allegations are that the

9    receivership entities did that, but, in any case,

10   Illaramendi's wrongdoing is imputed to the receivership

11   entities.  He's their agent and his actions are imputed to

12   them.  The Receiver himself has made that exact argument

13   in a motion before Judge Arterton to expand the

14   receivership entities to include additional entities call

15   the HVP funds.

16            He said that because of Illaramendi -- I can

17   quote you --

18            (Pause)

19            MR. GREENFIELD:  The Receiver said "It's an

20   inescapable fact that Illaramendi used the entities he

21   created to execute the fraudulent scheme and, therefore,

22   charged and imputed the culpability intent, knowledge and

23   action of their agents, including Illaramendi."

24            That's the argument that the Receiver made to

25   Judge Arterton in their motion to expand the receivership,

1    which by the way was granted on Friday.  So they can't

2    come into this courtroom and take the exact opposite

3    position that now Illaramendi's wrongdoing should not be

4    imputed to the receivership entities.

5         The receivership entities are imputed with

6    Illaramendi's wrongdoing, they are subject to the in pari

7    delicto doctrine.  There are cases going back hundreds of

8    years in the Supreme Court and the Connecticut Supreme

9    Court, holding that, you know, in pari delicto bars the

10   payer of the bribe from trying to go to court and having

11   the court help them recover the monies.

12        THE COURT:  Do I know, based upon the second

13   amended complaint, that every one of the receivership

14   entities paid bribes?

15        MR. GREENFIELD:  No, they specify, and

16   there's --

17        THE COURT:  So, if fewer than all of them paid

18   bribes, why doesn't the Receiver have standing, at least

19   with respect to those that didn't pay the bribes and as to

20   whom Illaramendi's misconduct cannot be imputed?

21        MR. GREENFIELD:  Because the Receiver has also

22   alleged in this complaint, and has made the same argument

23   in the same motion to expand the receivership, facts that

24   are basically show that all of the receivership entities

25   were alter egos of each other.

1          He goes into great detail about the commingling

2    of funds, the --

3          THE COURT:  Alter ego is an incredibly fact

4    intensive determination.  So what you're trying to have

5    this court do is basically decide factual issues at the

6    motion to dismiss stage.  I have to draw all reasonable

7    inferences in favor of the plaintiff here.

8          MR. GREENFIELD:  Understood.  I believe that in

9    most cases that's true.  Here, the allegations in the

10   complaint itself, which we can take for true, we'd have to

11   take as true at this stage, are sufficient to show that

12   the receivership entities are alter egos of each other.

13         THE COURT:  All right, let's assume that they

14   are.  How does that help you with respect to the standing

15   of the entities that did not make bribes?

16         MR. GREENFIELD:  So we're going back to, are

17   they then a creditor under --

18         THE COURT:  No, no.  I'm talking about general

19   standing now, not CUFTA.  If receivership entities that

20   did not make bribes want to bring claims against Montes

21   for the return of monies wrongfully given Montes by

22   Illaramendi, why do -- they may or may not have a valid

23   claim -- 12(b)6, summary judgment, trial -- but why can't

24   they bring that claim?

25         MR. GREENFIELD:  If they are all alter egos of

```
1    each other, they are not separate entities, and you can't

2    say that some of them have standing and others don't, they

3    cease to have any separate corporate existence.  They are

4    treated as one entity.  And in terms of --

5             THE COURT:  And I have to assume that at this

6    point, why?

7             MR. GREENFIELD:  First of all, I think the

8    allegations in the complaint, I'm confident the

9    allegations in the complaint are sufficient to show that

10   these entities are alter egos of each other.

11            But, secondly, again, they've argued that

12   themselves, if you -- I mean we have, if you look at our

13   briefing, we have a series of bullet points that quote the

14   motions that they filed to extend the receivership.

15            And if you read these, it makes clear, they are

16   arguing that all of the receivership entities are alter

17   egos of one another, and there's the principle of estoppel

18   that says they can't make that motion in Judge Arterton's

19   court, have that motion granted on that basis, come into

20   here, into this court, and say, no, they are not alter

21   egos, this wrongdoing is not imputed.  They can't have it

22   both ways.  So there's a legal --

23            THE COURT:  Has any court decided that issue?

24            MR. GREENFIELD:  Decided which issue?

25            THE COURT:  Whether they are alter egos of each
```

1    other?  In other words, what you're saying is they make an

2    allegation in Judge Arterton's court and they make a

3    different allegation in this court.  Well, they could make

4    an allegation in Count One and make a different allegation

5    in Count Two because parties are permitted to plead in the

6    alternative.  So help me understand why making an

7    allegation in Judge Arterton's court bars me as a matter

8    of law from considering an allegation made in this court.

9         MR. GREENFIELD:  I'm not talking about an

10   allegation.  They have put forward a factual position, a

11   legal position, in Judge Arterton's court in a motion.

12   Under the doctrine of judicial estoppel, they cannot go

13   and make an argument, after having gained the benefit from

14   making that argument before Judge Arterton because she

15   granted the motion, and they cannot come into another

16   court and take a factually inconsistent position.  That's

17   in Wight v. Bank of America, one of the cases that we're

18   relying on for other things, makes that clear.

19        THE COURT:  So, alternative pleading is

20   barred -- once you win a motion, then your alternative is

21   out the door?  Is that the holding?

22        MR. GREENFIELD:  I'm not, it's not a matter of

23   alternative pleading.  It's a matter of taking a position,

24   getting relief from the court based on that position and

25   then taking the opposite position in a subsequent, in a

1    separate litigation.

2         THE COURT:  So, if I deny a motion to dismiss,

3    then the plaintiff has to choose among its theories at

4    that point, because I've now relied upon allegations to

5    grant relief; i.e., the denial of the motion to dismiss.

6         MR. GREENFIELD:  Could you say that again?

7         THE COURT:  The plaintiff comes in, has two

8    alternative theories.  Motion to dismiss Count One.

9    Denied.  Having relied upon the allegations in Count One

10    and granted the relief of denying the motion to dismiss,

11    Count Two has to fall out because now there's judicial

12    estoppel against Count Two.

13         MR. GREENFIELD:  That's a single pleading.  I

14    agree you're allowed to plead in the alternative.

15         THE COURT:  So the distinction is you can't do

16    it in two different pleadings.

17         MR. GREENFIELD:  Right.  If they got Count Two

18    past your motion to dismiss based on putting forward a

19    certain argument, they can't go to another court or in the

20    same court in different litigation and make the exact

21    opposite factual position.

22         THE COURT:  Are they allegations or are they

23    determinations of fact?  Did Judge Arterton make a

24    determination of fact in her proceeding?

25         MR. GREENFIELD:  This was just granted on

1    Friday, so I only know what I've seen on the docket,

2    but --

3              THE COURT:  But here's my point.  If they took,

4    if they took a position, they made -- we're going to

5    allege, Judge Arterton, we're going to allege that all

6    these entities are alter egos of each other.  Well, okay.

7    In that case I'll go ahead and allow you to expand it and

8    we'll see what the facts show.

9              All right.  And then they come down here and you

10   say now they can not do anything other than --

11             MR. GREENFIELD:  Well -- sorry.

12             THE COURT:  -- assert that they are alter egos

13   and I'll not sure that's the case.  If they can say in

14   Count One they are all alter egos and then in Count Two,

15   even if they are not all alter egos, then these three are

16   not bound or they are not, they are not -- they do have

17   standing because they are not participating in the

18   wrongdoing, what's wrong with that?

19             MR. GREENFIELD:  I think it's a different

20   scenario.  In their motion to expand the receivership, the

21   single argument they made was Illaramendi, who's used all

22   of these entities in a single unitary fraudulent

23   enterprise, he commingled funds, he disregarded all

24   corporate formalities, everything you need to find that

25   they are all alter egos.

1          THE COURT:  So we'll call that Count One.

2          MR. GREENFIELD:  And they make similar

3    allegations in the complaint here, which we also take as

4    true.

5          THE COURT:  Okay.

6          MR. GREENFIELD:  They –– having made that

7    argument, and the judge having accepted that argument,

8    because that's the only argument they made, they are then

9    blocked by judicial estoppel from going into a subsequent

10   court and advancing an inconsistent position.

11         THE COURT:  But we're at the pleading stage.

12   Why can't they plead in Count One we're all alter egos and

13   plead in Count Two, if they choose to do that, these four

14   are not alter egos.  Even though they won on the basis

15   they made an allegation that they are all alter egos?

16         MR. GREENFIELD:  It's a just a difference

17   situation.  In a single pleading you can say they are

18   alter egos and even if they are not, whatever, right?  And

19   you're allowed to plead in the alternative.  But if you

20   gained a benefit, if you've had your arguments adopted in

21   one court ––

22         THE COURT:  You lose, you lose that right.

23         MR. GREENFIELD:  You lose the ability to ––

24         THE COURT:  To plead in the alternative.

25         MR. GREENFIELD:  Yes.

1          THE COURT:  Okay.  Do you have cases that say if

2     you win in one court, you can't plead in the alternative

3     in the other?

4          MR. GREENFIELD:  This is a statement of the law

5     from the Wight v. Bank of America case.  It says "A party

6     invoking judicial estoppel must show that, one, his

7     adversary advanced an inconsistent factual position in

8     prior proceeding, and two, the prior inconsistent position

9     was adopted by the first court in some manner."

10         THE COURT:  Okay.  So the facts, the factual

11    position was adopted.  Did Judge Arterton hold, factually

12    or legally, that all of the receivership entities are

13    alter egos of each other?  If they are, judicial estoppel

14    will apply.  If she did not make that finding, then how do

15    you satisfy the test you just read?

16         MR. GREENFIELD:  You know, I think that because

17    in that motion, it has a certain set of factual positions.

18    Right?

19         THE COURT:  Correct.

20         MR. GREENFIELD:  All of the facts that underlie

21    an alter ego finding --

22         THE COURT:  Correct.

23         MR. GREENFIELD:  Therefore --

24         THE COURT:  If she didn't adopt it, if she

25    didn't say I am granting the application to expand the

1    receivership because I find, because I determine, because

2    I hold, that all of these entities are alter egos of each

3    other, if she simply was presented with that and granted

4    the motion without determining, holding, adopting,

5    finding, that they are all alter egos, why does judicial

6    estoppel apply?

7            In other words, they made an argument.  She may

8    or may not have adopted it.  I haven't heard you yet say

9    that she adopted their position.

10           MR. GREENFIELD:  I think you can implicitly find

11   that she must have adopted that position.  That's the only

12   argument they made.

13           THE COURT:  Look at it this way.  If I granted

14   your motion today, I have not, unless I say so, adopted

15   everything you say in your motion.  In fact, I may well

16   disagree with much of it.  That's the problem I have.  I

17   don't know, you didn't haven't told me yet that Judge

18   Arterton did anything that makes judicial estoppel against

19   the plaintiff here apply.  That's the problem.

20           The fact they made an argument begs the question

21   whether it was accepted.  So that's my problem.  I mean if

22   you can show me that she said in her order, you know what,

23   he's right, they are alter egos and, therefore, I'm going

24   to do this, then they are in trouble here.

25           MR. GREENFIELD:  I don't think we have that

record here.  I would read it as implicitly adopting that
but --

THE COURT:  Trust me, judges frequently don't
adopt everything in a motion even when they grant it.

Okay.  Well, let's get back to -- the question
that started this little whirlpool had to do with whether
all of the receivership entities are tainted by Mr.
Illaramendi's wrongdoing.  So, Mr. New, let hear you on
that.

MR. NEW:  Yes, Your Honor.  First of all, I
don't want to distract but just to answer -- chime in on
the colloquy just now.  The factual circumstances
surrounding Judge Arterton's order are that the receiver
moved to expand the receivership.  It was actually opposed
by the Highview Point funds who have separate and
independent directors who were challenging that.  They
deny that they were alter egos.  Ultimately there was a
settlement in which -- Judge Arterton approved, in which,
among various different conditions, one of them was that
the funds then would consent to coming into the
receivership and Judge Arterton then just granted the
order, with no explanation, no findings of fact, no
conclusions of law.  So there is no finding there.  For
what it's worth, Your Honor, there is no finding by Judge
Arterton or adoption of any of the factual positions of

1    any of the parties.

2            With regard to this alter ego analysis, one of

3    the questions I think Your Honor asked at the beginning,

4    was whether any court has ever addressed this before.  And

5    this allegation actually was raised in Scholes, and Judge

6    Posner said -- and this is on page 758, I believe -- "The

7    fact that the corporations were alter egos of the

8    corporate wrongdoer would not affect the receiver's

9    standing to bring these fraudulent conveyance suits.  The

10   corporations existed and were abused."

11           So, I think if you apply the same reasoning that

12   Scholes applies to the nature of the relationship between

13   the wrongdoer and the corporate entities, whether they

14   were alter egos of each other when they were being abused

15   does not mean they are now, when they have their separate

16   existence back, that they should then be considered to be

17   alter egos of each other.

18           And this goes back to the first question that

19   Your Honor posed which is why Wagoner should or should not

20   be expanded, and again, obviously the Receiver believes it

21   shouldn't be expanded to include this context, and that's

22   because Wagoner -- we agree with, with Mr. Montes that the

23   receiver is not bound by the bankruptcy code and that

24   actually means that Wagoner should not apply to the

25   receiver.

1          The reason that <u>Wagoner</u> adopted this prudential

2     standing limitation is that it interpreted the bankruptcy

3     code to say that a bankruptcy trustee stands in the shoes

4     of the entity prior to entering into insolvency.  And so

5     the bankruptcy trustee, just like the debtor in

6     possession, is considered to be a successor interest, a

7     continuation of the insolvent entity.  And that's -- the

8     code set it up that way so that in a typical situation,

9     not a fraud situation, an entity corporation entering into

10    bankruptcy would not be in a better position than it would

11    be before a bankruptcy.  And that's how the code is

12    structured.  It's a debtor in possession statute and the

13    bankruptcy trustee is a successor in interest to the

14    entity and, therefore, suffers from the same infirmities

15    such as an in pari delicto defense.

16          The receiver is fundamentally different, Your

17    Honor.  I think as we've said in our papers and as the

18    Clark Treatise states and as various courts have

19    interpreted, the receiver is effectively an arm of the

20    court, and the receivership, the property comes into the

21    custody and control of the court.  It's no longer under

22    the independent control of the entity itself or his

23    successor in interest.  And the receiver administers that

24    property on behalf of the court.

25          And that's why Judge Posner in analyzing under

1    Scholes was able to say that when a receiver is appointed

2    over the entities, the wrongdoer is removed and the

3    entities are freed from their zombie-like status.  It's

4    the freedom from the equity receivership.  And because of

5    all that, Wagoner should not apply here.  There shouldn't

6    be the same implementation principles and there's no

7    effect to the bankruptcy code in terms of what limits the

8    receivers stand in.

9         Wagoner also has a second part, this has to do

10   with the application of New York law, and we haven't

11   gotten there yet, Your Honor, but as we stated in our

12   briefs, we believe that Connecticut law of in pari delicto

13   is different from New York law --

14        THE COURT:  We can talk about that in a minute.

15   Let me press you a little bit.  You just used the term

16   "equity receiver."  Isn't Mr. Carney really a statutory

17   receiver who is authorized by statute to use equitable

18   powers?

19        MR. NEW:  It is an interesting question, Your

20   Honor.  I think it is a combination of statute and equity,

21   because the way he was appointed is pursuant to statutory

22   authority under the 34 Act that allows the SEC in

23   enforcement actions to seek equitable remedies and for the

24   judge to then use all equitable remedies for the benefit

25   of the investors.  So there is a specific statutory grant

```
1     of authority to the court in that circumstance.  But --

2              THE COURT:  Right, but correct me if I'm wrong,

3     the authority by which Carney was appointed a receiver was

4     the statute.

5              MR. NEW:  That is correct, Your Honor.

6              THE COURT:  So he draws his authority and he has

7     whatever authority the statute gives him.

8              MR. NEW:  Yes and no, Your Honor.  I think that

9     under receivership, general receivership law, the way that

10    it's viewed is that the authority granted to the receiver

11    is governed actually by the receivership order.  So the

12    court, guided by the statute --

13             THE COURT:  Well, the court may have granted

14    less than all of the authority set forth in the statute.

15    But the set of authority, if you will, the universe of

16    authority available to Carney is defined in the statute

17    and presumably, had Judge Arterton wanted to, she could

18    authorize the receiver to exercise fewer than all of the

19    statutory authority set forth in the statute.  Is that

20    fair?

21             MR. NEW:  I think it is fair, although I think

22    in this context I'm not sure exactly what the statutory

23    authority is.  It's in the context of a securities fraud

24    statute or security regulatory statute, 34 Act, but the

25    actual provision doesn't set forth the powers and duties
```

1    of a receiver.  It simply says all equitable remedies.

2          THE COURT:  Yes, no, no, fair enough.  But

3    here's what I'm trying to get at.  Judge Arterton didn't

4    say I've got an interesting case here, I need for

5    equitable reasons, given my common law equitable powers, I

6    need to pull a receiver in to assist the court here.

7    Rather, she looked at the statute and said the statute

8    authorizes this.  I'm going to, consistent with the

9    statute, appoint a receiver and that receiver has the

10   authority set forth in the statute, which, as you note, is

11   to exercise all equitable authority, receivers in effect,

12   right?

13         MR. NEW:  I think that's a fair

14   characterization, Your Honor, yes.

15         THE COURT:  So, isn't this -- and this is really

16   a question for both of you -- isn't the standing question

17   here, doesn't it turn on what the Bankruptcy Act

18   authorizes bankruptcy trustees to do versus what the 34

19   Act authorizes SEC receivers to do?

20         In other words, whatever a common law receiver

21   might or might not be limited in doing, isn't the answer

22   here going to be set forth in whatever authority Congress

23   granted SEC receivers in the Act?

24         MR. NEW:  But I think the basic analysis -- I

25   agree with your basic framework, Your Honor, which is that

```
1    bankruptcy trustees are governed by the limits, and in
2    some cases the expansions, of the bankruptcy code, whereas
3    an SEC receiver is not.  I think an SEC receiver is
4    appointed pursuant to the Act, and so the Act, therefore,
5    if you're looking for a statutory basis to describe his
6    duties, I think that is fair.  Again, I guess what I'm not
7    sure where that leads is that the only specific
8    delineation under the 34 Act is that, is a reference to
9    all equitable remedies, which brings you back to sort of
10   the common law of equity.
11           THE COURT:  You may be right.  It may simply be
12   completely derivative, I don't know, but I'm just thinking
13   out loud and it seems to me that it may be worth looking
14   at these two statutes to see if there's some distinction
15   there.  But --
16           MR. GREENFIELD:  Could I respond to what Mr. New
17   said earlier about the Scholes case --
18           THE COURT:  Sure.
19           MR. GREENFIELD:  -- and whether a receiver
20   should be subject to the Wagoner rule?
21           First of all, Scholes is not the 2nd Circuit
22   law.  It's contrary to Wagoner.  It's two different
23   approaches.  One receiver comes in with a clean slate; the
24   other, the receiver lacks standing to sue based on the
25   wrongdoing, the prior wrongdoing of the entities.
```

1          The 2nd Circuit has not itself ruled on whether

2     Wagoner applies to receiver.  The only two other courts

3     that have looked at this issue both found that it does,

4     both in the Southern District of New York.

5          In Cobalt Multifamily Investors, Judge Wood held

6     a receiver who occupies a position sufficiently analogous

7     to a bankruptcy trustee has to be subject to the standing

8     limitation set forth in Wagoner and its progeny.

9          THE COURT:  AKRO is the other one.  I was ABOUT

10    to ask him about Cobalt and AKRO.

11         MR. GREENFIELD:  I would be interested in

12    hearing his response, when I'm done.

13         In AKRO, Judge Preska held the same thing, based

14    on the fact that the receiver, like the trustee, can only

15    stand in the shoes of the bankrupt entity.

16         I think what's important to note here is that

17    the reasoning that those two courts followed is the exact

18    same reasoning that the 2nd Circuit itself has followed in

19    finding that the Wagoner rule applied to others, other

20    than bankruptcy trustees who were suing in a

21    representative capacity.

22         In The Mediators, the 2nd Circuit held that

23    Wagoner rule applied to a creditor's committee because a

24    creditor's committee, quote, "While not a trustee in

25    bankruptcy, is in a position analogous to a trustee

1      because he is suing on behalf of the debtor."

2           THE COURT:  Let me ask you this.  Has the 2nd

3      Circuit expanded Wagoner to a context outside of

4      bankruptcy?

5           MR. GREENFIELD:  I don't believe that that's

6      come before the 2nd Circuit to this point.  But the

7      creditor's committee is not subject to the bankruptcy

8      code.  It's a creature of the bankruptcy code but it's not

9      subject to Section 541 which is the section that the

10     receiver points to as distinguishing receivers from the

11     trustee, as the trustee is a successor in interest to the

12     assets of the bankruptcy estate.  That doesn't apply to

13     the creditor's committee.

14          The creditor's committee does not succeed to the

15     assets and yet the 2nd Circuit still held, because it's

16     suing on behalf of the debtor, the Wagoner rule applies,

17     and --

18          THE COURT:  Does any circuit other than the 2nd

19     Circuit hold to the Wagoner rule?

20          MR. GREENFIELD:  No.

21          THE COURT:  And so the Wagoner rule was put in

22     place how many decades ago?

23          MR. GREENFIELD:  1991.

24          THE COURT:  Ninety-one.

25          MR. GREENFIELD:  It's been consistently referred

1    to in numerous decisions for about 20 years.

2              I think it might help for me to make one further

3    point about the Wagoner rule, which is that its entire

4    purpose is to allocate standing.  It's not about cutting

5    off liability.  So what the 2nd Circuit did was said,

6    look, in these types of situations we have a

7    representative standing in the shoes of some sort of

8    bankruptcy entity or receivership entities, you have two

9    possible plaintiffs, you have the creditors, you have the

10   investigators --

11             THE COURT:  Let me ask you from a theoretical

12   point of view, why is standing the correct vehicle to

13   accomplish that?  What Wagoner says basically is there's

14   an in pari delicto defense that's going to apply.  Is

15   there any other context in which the court says, you know

16   what, the defense here is so clear, you can't even bring

17   the lawsuit.  I'm not aware of any.

18             I suppose there's some absolute immunity cases

19   in which the court drifts into discussions of lacks

20   jurisdiction or there's no case or controversy, but I

21   understand standing to be the authority to bring the

22   claim.  The fact that there might be a defense is not a

23   standing issue but it's a merits issue.

24             MR. GREENFIELD:  I think I agree with you and

25   that's exactly where I was going with this.  This is

1    not -- we use the word standing, this is a prudential

2    standing moniker which says the 2nd Circuit is not saying

3    you don't have standing under Article 3.  This is just a

4    self imposed rule by the 2nd Circuit on courts within the

5    2nd Circuit that is used to -- where there's multiple

6    potential plaintiffs out there, the Federal Court uses

7    that to decide who is the proper plaintiffs for bringing a

8    claim.

9         So, the Supreme Court in Gladstone Realtors v.

10   Village of Bellwood, it's 441 US 91, at 99 to 100, the

11   Supreme Court says The judiciary uses prudential

12   principles, quote, "to limit access to the Federal Courts

13   to those litigants best suited to assert a particular

14   claim."

15        The 2nd Circuit is not saying necessarily that

16   in pari delicto is going to bar the claim, although you

17   can read it that way.  What the 2nd Circuit is saying is

18   that, as between these two potential plaintiffs, you have

19   a representative of the wrongdoer and you have these

20   innocent creditors and investors.  The 2nd Circuit says we

21   want to make it a rule of standing so it takes effect at

22   the outset that the proper plaintiffs to bring this claim

23   are the investors and creditors and not the

24   representatives.

25             THE COURT:  Yes, well, Wagoner itself doesn't

1    really talk about prudential standing.  It talks about

2    Article 3 standing.  It says because, quote, Because

3    standing is a jurisdictional -- excuse me.  "Because

4    standing is jurisdictional under Article 3, United States

5    Constitution, citation omitted, it is a threshold issue in

6    all cases."

7            It then goes onto say that, that the 2nd Circuit

8    is not permitted to make any assessment of the legal

9    sufficiency of the claim presented though it -- it can

10   make a determination of question of the trustee standing.

11   If it was merely saying this is prudential and there's no

12   legal sufficiency here, and so we're going to make it

13   matter of prudential standing, I don't think they would

14   have cited Article 3 or talked about what authority they

15   had in that arbitration case to rule on the merits.

16           MR. GREENFIELD:  Subsequent cases have referred

17   to it as a prudential limit of standing.

18           THE COURT:  I'm just quoting from Wagoner,

19   sorry.

20           MR. GREENFIELD:  Okay.  I believe there's

21   subsequent 2nd Circuit cases, the Wagoner -- doesn't talk

22   about the Wagoner rule either.  Subsequent cases that

23   referred to it as the Wagoner rule and referred to it as

24   prudential limit on standing.

25           THE COURT:  Well, yes, they almost have to to

1    make sense, don't they?

2              MR. GREENFIELD:  The 2nd Circuit is the

3    authority, so I go by whatever they say.

4              THE COURT:  Yes, well, I try to as well.

5              MR. GREENFIELD:  That's what I want to say about

6    that.  In terms of -- I'll make one final note.  In terms

7    of in pari delicto, this law to be different in

8    Connecticut, the only difference --

9              THE COURT:  Well, go ahead.  Go ahead.

10             MR. GREENFIELD:  The only difference that

11   receivers pointed to, it relates to the scope of the

12   adverse interest exception which, you know, goes back to

13   the question of in pari delicto that you talked about

14   earlier.

15             THE COURT:  Sure.  All right, let me hear from

16   Mr. New about Cobalt and AKRO.

17             MR. NEW:  Yes, Your Honor.  Quite clearly,

18   Cobalt and AKRO are not what they are made out to be.  In

19   Cobalt, the receiver did not raise this issue at all.  The

20   receiver basically conceded that Wagoner applied.  I have

21   looked at the underlying memorandum in the order of the

22   magistrate judge that Judge Wood was then reviewing, and

23   this whole argument occurs in a footnote.  And it starts

24   out by saying, quote, "The receiver does not argue that

25   the cited bankruptcy precedent is inapplicable to this

1  case, even though he's acting as a receiver under the

2  federal security statutes rather than as a bankruptcy

3  trustee.  We, accordingly, do not accept that question

4  except to mention that a viable argument might be pressed.

5  Unlike a bankruptcy trustee, which is statutorily limited

6  to pursuing claims only for the debtor, except for limited

7  circumstances, the receiver would be judicially authorized

8  in appropriate cases to pursue claims on behalf of the

9  investors."

10      So, it's an issue that was not raised by the

11  parties, it wasn't briefed.  It was sua sponte raised by a

12  magistrate judge, Judge Wood.  Along those lines, when she

13  was reviewing the magistrate judge, the board's

14  recommendation, she commented again that it was not an

15  issue that was being raised by the parties.  She addressed

16  this again, I believe in a footnote, saying the magistrate

17  judge thinks this is a viable argument, I have some

18  questions about that.

19      So this issue was never briefed, it was never

20  argued.  The courts did not feel the need to address it

21  except in passing in what's purely dicta.

22      So, Cobalt is not a case that really salvages

23  any sort of even pervasive precedent that Wagoner should

24  apply to a receiver.  And AKRO isn't really even a

25  receivership case, Your Honor.  In AKRO, the plaintiff

1    bringing the claim was a foreign liquidator appointed, I

2    believe, in the Czech Republic and he made the call to a

3    receiver, but it was an issue really of foreign law as to

4    what exactly his powers were.  And if you read through the

5    cases, it seems like that receiver under Czech law is

6    really closer to a bankruptcy trustee than he is to a

7    traditional equity receiver.

8            I'll point out, Your Honor, that there are other

9    cases in the district, in the 2nd Circuit, district court

10   cases such as Fannie Mae v. Olympia Mortgage Corp. and

11   Armstrong v. Collins, where receivers have been held to

12   have standing to pursue fraudulent conveyance claims,

13   there's no mention of Wagoner, there was no discussion of

14   it.  But again, standing was allowed in those

15   circumstances.

16           And I think Eberhard itself, if you can read

17   anything into silence, which is always a dangerous thing

18   to do, it's notable that Eberhard adopts the reasoning in

19   Scholes to reach its conclusion, never once mentions

20   Wagoner or in pari delicto or any of the other potential

21   infirmities of the position.

22           So I think it's fair to say, Your Honor, that

23   the 2nd Circuit is basically a clean slate when it comes

24   to whether or not Wagoner applies to receivers, and I

25   think that the weight of the case law, both from outside

1    the circuit and inside the circuit, suggest that Wagoner

2    should not be intended to apply to receivers.

3         If Your Honor wants to move onto the adverse

4    interest exception, but --

5         MR. GREENFIELD:  Could I respond to that,

6    please?

7         THE COURT:  Sure, go ahead.

8         MR. GREENFIELD:  Okay.  Well, first of all, in

9    the Cobalt Multifamily Investors case, the finding that

10   the Wagoner rule applies to receiver is not dicta, if

11   that's what Mr. New said.  The magistrate had noted it

12   might be a viable argument as to whether it applies to a

13   receiver.  Judge Wood did not accept that, and she

14   mentions that, "Although the report is correct in saying

15   that a receiver's main purpose may be to protect the

16   interest of investors, that fact alone does not

17   necessarily grant the receiver standing to assert claims

18   held by investors but not otherwise held by the entity in

19   receivership."  So the judge does accept the fact that

20   Wagoner applies to receiver and it's not dicta.

21        In terms of the other cases that Mr. New has

22   pointed to, the Olympia --

23        THE COURT:  Well, that point, the quote you just

24   read I think stands for the proposition that the receiver

25   doesn't have standing to raise claims of creditors, but it

```
 1    would have the standing to raise the claims of the

 2    receivership entities.  Is that essentially what you just

 3    said?

 4              MR. GREENFIELD:  It basically says that if, if

 5    the receiver standing in the shoes of the receivership

 6    entities alleged to have engaged in wrongdoing, and that's

 7    what the lawsuit is about.  The holding here is that the

 8    Wagoner rule applies to that.  She's noting that, kind of

 9    referring to a line from the magistrate's report, that it

10    may be that the receiver has the beneficial purpose of,

11    you know, protecting the ultimate interests of the

12    investors but that's a separate question, which I think is

13    what you're pointing out.

14              THE COURT:  Okay.

15              MR. GREENFIELD:  The cases that Mr. New points

16    to, Olympia Mortgage and Armstrong, none of these cases

17    implicated Wagoner at all because none of them involved

18    allegations of wrongdoing by the defendant.  These are

19    cases where there was some kind of a fraudulent scheme and

20    transfers were made to innocent third parties, in some

21    cases charities.  And so, the Wagoner rule wouldn't be

22    implicated there because the defendant is not alleged to

23    have engaged in the wrongdoing of the receivership

24    entities.  So that's why none of the parties raised it and

25    the judge didn't mention it.
```

1          There's no case --

2          THE COURT:  Well, what matters is whether the

3   receivership entities engaged in wrongdoing.  Certainly it

4   can't be the rule that you can only collect from innocent

5   parties and not from wrongdoers.

6          MR. GREENFIELD:  That is the rule, in fact.  The

7   Wagoner rule says that -- I'll say trustee, to be less

8   controversial -- but a trustee cannot bring lawsuits

9   against third parties for wrongdoing in which the

10  receivership entities participated.

11         THE COURT:  That's what I'm saying.  The

12  receivership entities participated.  That's the key,

13  whether the receivership is barred because of its unclean

14  hands, in pari delicto, whatever, from claiming against

15  anybody else.

16         MR. GREENFIELD:  But it's a lawsuit against the

17  third party for engaging in that wrongdoing with the

18  receivership entities.

19         THE COURT:  Of course, but the reason the claim

20  would be barred is because of the, what the receivership

21  did, the receivership entity did, not because of what --

22  because your claim is against somebody who's bad as

23  opposed to somebody who's not bad.

24         MR. GREENFIELD:  I think that's the difference

25  between unclean hands and in pari delicto.  The in pari

```
1    delicto defense is only if both parties are equally at
2    fault, they both engaged in the wrongdoing together.  I
3    think that's the implication of the claim of the Wagoner
4    rule.
5            And I would guess, and I haven't done an
6    empirical study, that in many cases of fraudulent
7    transfer, the defendant is -- it will not have engaged in
8    the wrongdoing.  It's only in kind of exceptional cases,
9    where here, they are kind of trying to take this bribe
10   payment and fit it into the framework of a fraudulent
11   transfer, or where parties are taking the typical Wagoner
12   type of claim of professional servicers who aided and
13   abetted, and they say, oh, whatever fees we paid those
14   professionals, we're calling that a fraudulent transfer.
15   So it's only intended for kind of exceptional cases that
16   fraudulent transfers are going to implicate the Wagoner
17   rule.
18           THE COURT:  All right.  And what's the
19   theoretical foundation of in pari delicto?  We don't want
20   a wrongdoer benefiting from that wrongdoing, right?
21           MR. GREENFIELD:  No.  Honestly, I respectfully
22   disagree.
23           THE COURT:  Okay.
24           MR. GREENFIELD:  I think that's unclean hands.
25   If you're -- in pari delicto is where two wrongdoers have
```

```
1     a dispute between themselves about their wrongdoing, such

2     as the payer of a bribe and the receiver of a bribe.

3     Those two cannot go into court, the court is not here to

4     settle disputes between wrongdoers.  So it would not apply

5     if only one of the parties is a wrongdoer.

6               THE COURT:  No, I understand that, but --

7               MR. GREENFIELD:  So, if the defendant in a

8     fraudulent transfer claim is an innocent party, in pari

9     delicto is not implicated and the Wagoner rule is also not

10    implicated.

11              THE COURT:  And so why does in pari delicto even

12    make sense in the receivership context?  We have a

13    receiver now who didn't engage in wrongdoing.  I

14    understand the argument about only being able to bring the

15    claims that the receivership entity could bring, but why

16    does it make sense to bar a receiver from obtaining a

17    bribe from someone that the receivership entity's paid a

18    bribe to?

19              MR. GREENFIELD:  It makes sense because you have

20    two potential plaintiffs.  You have the investors,

21    creditors or you have the representative of the guilty

22    party.  The 2nd Circuit looked at that situation and says,

23    and said we don't want competing lawsuits.  We think

24    between these two, it should be the investors that bring

25    the lawsuit.
```

1          THE COURT:  Don't want competing lawsuits.  Why

2     in that context should we not have competing lawsuits when

3     we have them all the other times?

4          MR. GREENFIELD:  It's the 2nd Circuit's

5     determination that, you know, one is standing, is standing

6     in the shoes of a guilty entity and the other is the true

7     party in interest, and they are the ones who were

8     ultimately wrong.  They are the true parties in interest.

9     They can decide to, you know, bring claims when it makes

10    economic sense to do so.

11         THE COURT:  And how do they have standing?  Who

12    are they and how do they have standing?

13         MR. GREENFIELD:  Investors are creditors of the

14    entity.  So if the --

15         THE COURT:  So in bankruptcy they could --

16         MR. GREENFIELD:  The creditors, right.  The

17    creditors can bring a claim.  If the bankrupt entity made

18    a transfer to some -- well, in a bankrupt entity -- in the

19    bankruptcy context, the trustee has standing to sue on

20    behalf of the creditors.

21         THE COURT:  In the bankruptcy it's easy.  What

22    about if there's no bankruptcy?

23         MR. GREENFIELD:  In the receivership context,

24    you have a fraudulent scheme, you have investors; in this

25    case invested hundreds of millions of dollars according to

1  the allegations in the Illaramendi's funds.

2       THE COURT:  Right.

3       MR. GREENFIELD:  They are the ultimate

4  beneficiaries and they can, they can say, okay, the

5  receivership entities made a transfer to a third party and

6  we want to try to go to court and void that transfer.  Or,

7  in other words, it doesn't have to be a fraudulent

8  transfer.  There's a certain accounting firm that helped

9  the fraudulent entity cook its books for years and

10  appeared to be a solid organization.  We invested money.

11  We have a claim against them as well.  And they can bring

12  a lawsuit against the accounting firm or the law firm or a

13  broker who knew it was a fraud and steered money into it.

14       So I mean, it's what's been held in the Madoff

15  litigation, all sorts of Ponzi schemes.  In Madoff, it was

16  a --

17       THE COURT:  So, your argument is any creditor of

18  one of the receivership entities can sue Mr. Montes.

19       MR. GREENFIELD:  It would depend on what claim

20  they want to bring, but in terms of the fraudulent

21  transfer statute, we would argue that, yes, it would have

22  to be a creditor and the receivership entities who would

23  seek to a void that.  I think it would be barred by the

24  statute of limitations in any case, which I'd be happy to

25  address when you're, when we get there.  But --

1          THE COURT:  So in this case --

2          MR. GREENFIELD:  Going back to Wagoner --

3          THE COURT:  In this case, if the receiver

4    doesn't have standing, then Mr. Montes walks because he

5    hasn't been sued by any of the creditors.

6          MR. GREENFIELD:  You know, I haven't analyzed

7    every potential claim that a creditor could bring and it's

8    possible that a creditor could come into court and say,

9    okay, we have a cognizable claim against Mr. Montes, we

10   want to bring it.  But, you know, since we're talking

11   about a legal issue, whether or not they could or not, you

12   know, depends on what claim that they would bring.  Do

13   they have standing.  Is it within the statute of

14   limitations.

15          But going to the Wagoner rule, the idea is to

16   make that decision at the outset.  All right?  It should

17   be a rule of standing, because before we go through, you

18   know, a year of litigation, and then decide, okay, you

19   know, you're barred by in pari delicto or some other

20   defense, at the outset the investors know that they are

21   the party that had standing to bring claims.  The fact

22   that they haven't might be because there's no real claim

23   here to be brought.

24          THE COURT:  And let me ask both of you, aside

25   from the standing context, are there cases that say that a

1    receiver is barred or a bankruptcy trustee is barred by in

2    pari delicto from bringing a claim?  I mean has it come up

3    in a context other than Wagoner and standing?  As a

4    defense, as traditionally a defense.

5         MR. GREENFIELD:  It's an affirmative defense and

6    there is law in the 2nd Circuit, Wagoner aside, that says

7    when an affirmative defense appears on the face of the

8    complaint, you can grant a motion to dismiss on that

9    basis.

10        THE COURT:  No, no, fair enough, but here's my

11   question.  Pre Wagoner, before this became a standing

12   issue, somebody has alleged in pari delicto as a defense

13   to a claim, such as this, and was there a holding

14   anybody's aware of that says, well, that defense is no

15   good because the receiver stands in the shoes of the

16   wrongdoer, the other wrongdoer, and therefore, can't bring

17   the claim.

18        Because it seems to me that by definition, a

19   receiver is not one who has acted in pari delicto.  A

20   receiver is brought in because there has been wrongdoing

21   and it seems very odd to apply that defense to preclude a

22   receiver from collecting money from a wrongdoer.

23        MR. GREENFIELD:  Two things on that.  First, the

24   receiver, although, you know, I'm not saying Mr. Carney

25   engaged in any wrongdoing, obviously but even when he's

1    appointed, 2nd Circuit law says he stands in the shoes of

2    the receivership entities, he's got no greater rights or

3    powers than anyone else has, but --

4              THE COURT:  Right.  That's Wagoner.

5              MR. GREENFIELD:  No, that's not Wagoner.  This

6    is just Eberhard.  Eberhard says he stands in the shoes --

7              THE COURT:  What about pre Wagoner?  Any cases

8    pre Wagoner?

9              MR. GREENFIELD:  I am not familiar with the law

10   going back pre Wagoner.  I would be happy to look into

11   that for you.

12             THE COURT:  Well, I can look into it.  I just

13   didn't know.

14             MR. NEW:  Your Honor, off the top of my head

15   there are a couple cases that come to mind pre Wagoner

16   that I think are still good law.  Although they may not

17   directly address the issue, I think if you look at the

18   reasoning I think it applies.  And the first is the

19   McCandless case which I mentioned from 1935 and there,

20   Justice Cardozo said "There is no occasion to consider

21   whether the corporation itself has gained a sense of new

22   shareholders that would be permitted to disaffirm the

23   fraud and maintain a suit in equity for appropriate

24   relief.  It's enough that the receiver has the requisite

25   capacity."  And it goes onto explain how the assets of the

company are now in the custody of the court of equity and
that the receiver can pursue those claims.

And then if you come forward to the Lang cases
here in the 2nd Circuit, Southern District, in the
District Court case, it's Lank v. New York Stock Exchange,
405 FSupp 1031 from 1975, the Court there said, "Although
as a general rule a receiver is of course subject to the
same defenses as the corporation, there is ample authority
for giving a receiver power to sue where the corporation
could not, in a case where the corporation would be denied
recovery because of officers' participation or involvement
in wrongdoing."

Now, Lank was subsequently overturned on other
grounds at the 2nd Circuit, but in passing, the 2nd
Circuit did note, quote, "However, the fact that a
receiver could sue a transferee to recover fraudulent
transfer from the corporation, even though the corporation
itself could not, is of no moment here."

So it seems as if the 2nd Circuit, although
reversed on other grounds, acknowledges that the 2nd
Circuit is setting forth the law, which is that if a
corporation could be denied recovery because of an
officer's participation or involvement in wrongdoing,
nevertheless the receiver could pursue to set aside those
fraudulent transfers.  So I think this has been addressed

1    pre Wagoner, those cases are still good law, their

2    reasoning is still good law and, you know, I would point

3    out that Scholes, as much as it's not a 2nd Circuit case,

4    as much as, you know, it's not binding precedent, it rests

5    and relies on these same precedents -- specifically

6    McCandless, for example, in reaching its conclusions.

7         So I think the answer to your question, Your

8    Honor, is yes, there are pre Wagoner cases that address

9    this issue and they find that a receiver is not barred.

10        MR. GREENFIELD:  Your Honor, the Lang case that

11   Mr. New just discussed is a Southern District case, but

12   it's discussing a receiver that was appointed in

13   Delaware under a Delaware state statute, and it's got

14   nothing to do with the rights and powers of a federal

15   receiver who is appointed by a Federal Court.  His rights

16   of powers are determined under federal law, as is set

17   forth in the Eberhard case --

18        THE COURT:  How does federal law restrict the

19   receiver here beyond what the Delaware receiver was

20   entitled to do?

21        MR. GREENFIELD:  Because in that case, under

22   Delaware state statute the receiver was able to bring

23   lawsuits on behalf of creditors and --

24        THE COURT:  Eberhard clearly says it cannot do

25   that, and the receivers --

1          THE COURT:  But the point that was cited, I

2     didn't understand to be related to creditors, it sounded

3     to me it was more going to whether the receiver was barred

4     by the wrongdoing of a corporation in seeking to obtain

5     funds from another wrongdoer.  Maybe I misheard him.

6          MR. GREENFIELD:  I interpreted it differently.

7          THE COURT:  I'll take a look at it.  I haven't

8     read that case, so --

9          MR. GREENFIELD:  I understand that Your Honor

10    has difficulty with the Wagoner decision and admittedly

11    you're not alone, exclusive to the 2nd Circuit.  A number

12    of other other circuits have criticized it.  Judges within

13    the 2nd Circuit, District Court judges and bankruptcy

14    court judges, have criticized it.  But the 2nd Circuit has

15    considered the very issues that you're raising and that's

16    their decision about how -- that it should be a matter of

17    standing, that we don't have to find that the trustee

18    himself did wrong but he's standing in the shoes of

19    entities that did.

20         THE COURT:  All right.  And you're citing for

21    that proposition -- Wagoner and Eberhard?

22         MR. GREENFIELD:  Yes.

23         THE COURT:  All right, I just want to make sure

24    I have the universe of cases there.

25         Okay.  Anything else on standing or 12(b)6?  I

1    guess the scope of the CUFTA you wanted to get into.

2            MR. NEW:  I'm sorry, Your Honor?

3            THE COURT:  Did you want to raise the exceptions

4    to the state -- the CUFTA statute, you wanted to raise the

5    adverse interest exception, is that --

6            MR. NEW:  It is a continuation of the Wagoner

7    argument, Your Honor, which is that, if Your Honor were to

8    decide that Wagoner does apply to receiver, nevertheless,

9    our position is that there is an exception, the adverse

10   interest exception that we pled sufficiently in the

11   complaint.  And in the Cobalt case, actually in a

12   different position, Judge Wood recognized that there is a

13   difference between Connecticut law in the adverse

14   inference exception and the New York law, that the

15   Connecticut law is more liberal and in particular, it

16   recognizes that where in a case of corporate looting such

17   as this one, where the wrongdoer's act merely prolong the

18   life of the company artificially to complete insolvency or

19   allow looting of the company, that is a harm that is

20   working adversely to the interests of the company, and in

21   that circumstance, the wrongdoers will not be imputed to

22   the company and will not be imputed to a bankruptcy

23   trustee.

24           And in Cobalt, in fact, while it was dismissed

25   under Wagoner grounds, claims were brought under New York

1    law against certain defendants, she allowed the ones under

2    Connecticut law to proceed on that basis.  And we cite in

3    our brief the Reider case, which is a candy case, which

4    lays out, recognizes the adverse inference exception and

5    lays it out.  And we sufficiently pleaded on our case that

6    Mr. Illaramendi was working adversely with the interests

7    of the entities.

8         The 2nd Circuit in cases like the Wight case,

9    W-I-G-H-T, recognized that as an exception to Wagoner.

10   They also recognized in Wight that that is a -- the

11   adverse interest exception, if adequately pled, given

12   that's at the pleading stage and that all inferences are

13   inferred in favor of the plaintiff, that the case should

14   proceed.

15        And, you know, to the extent that there are

16   other issues, they can be raised, if they are fact based

17   they can be raised as the case goes forward, but on the

18   face of the complaint, as it is here, we allege the

19   wrongdoer, Mr. Illaramendi, was acting adverse to the

20   interests of the entity, then, even if the Wagoner rule

21   were to apply, which we do not believe it should,

22   nevertheless the receiver would have standing to pursue

23   those claims against Mr. Montes.

24             THE COURT:  Okay.

25             MR. GREENFIELD:  Under the adverse interest

1    exception, with respect to the Permutas first, with

2    respect to the Permutas, it's not a question did

3    Mr. Illaramendi act adversely generally to the

4    receivership interest.  The question is, as to the

5    specific acts that we're looking to impute to the

6    receivership entities, was he acting adversely.  For the

7    three Permuta transactions, the allegations show that the

8    receivership at least profited from them.

9            THE COURT:  Does that end the inquiry, or can

10   they be harmed if they would have profited more had he not

11   siphoned off moneys for the bribes?

12           MR. GREENFIELD:  According to the allegations of

13   the complaint, you can't separate out the payments to

14   Mr. Montes from the overall transaction because they say

15   without these particular bribes, the entire transaction

16   could not have occurred.  It was a necessary precondition

17   to these transactions going forward that these payments

18   were made.  So the obvious thing there, there is no

19   transaction or a transaction is done and they made a net

20   profit from it.

21           THE COURT:  Net after the bribe.

22           MR. GREENFIELD:  Yes.

23           THE COURT:  All right.

24           MR. GREENFIELD:  And this is not an issue of

25   artificially continuing the life of the corporation.

1    These are -- it's kind of the deepening insolvency theory

2    and as part of that, it requires that there be an influx

3    of capital, but additional creditor liability.

4         So you're extending the life, but artificially

5    because there's -- the entity is also saddled with an

6    increased amount of debt.  These were one up transactions.

7    The receivership entities profited and there's no

8    allegation of increased creditor liability.

9         But even more than that, the adverse interest

10   exception does not apply because of the sole actions,

11   which says Mr. Illaramendi exercised unfettered control

12   over the receivership entities, controlled and dominated

13   their actions.  As a matter of law, you can't find that

14   his actions were adverse to these entities.  They were his

15   instrumentalities.

16        THE COURT:  Okay.  I'd be interested in hearing

17   about the statute of limitations issues.  I don't think I

18   need too much argument on the question of whether

19   constructive trust and accounting constitute causes of

20   action.  But the statute of limitations I'd be interested

21   in hearing about.

22        MR. GREENFIELD:  Thank you, Your Honor.

23        The important point to understand with the

24   statute of limitations is that the allegations in this

25   complaint relate to, first, the three Permutas and they

1    took place in 2006 and 2007, and the payments happened at

2    the same time, more than four years before this complaint

3    was filed.  And then there are a few allegations relating

4    to the Harewood transaction in 2010.  And our argument on

5    the statute of limitations is that the, any claim based on

6    the Permuta payment is time barred, and that's really the

7    core of the complaint.

8              THE COURT:  But weren't there allegations that

9    the parties undertook to keep those, keep the bribery

10   aspects of those transactions secret and used code names,

11   and why shouldn't I interpret those allegations broadly

12   enough to suggest that there was in effect a coverup or an

13   attempt to prevent someone from discovering the cause of

14   action?

15             MR. GREENFIELD:  Under Connecticut law, you have

16   a -- it's a statute of repose.  It's not a statute of

17   limitation, it's a statute of repose.  And the statute of

18   repose means the limitations period begins to run at the

19   occurrence of the act complained of, not when injury was

20   caused or the injury was discovered or when a cause of

21   action occurs.  It begins to run right at the transfer.

22             THE COURT:  And it can be tolled under

23   Connecticut law.

24             MR. GREENFIELD:  The tolling under Connecticut

25   law is an extremely narrow doctrine.  And in most cases,

1    once the limitations period runs, liability is permanently

2    cut off and there's not a built-in discovery rule --

3              THE COURT:  I agree with that.

4              MR. GREENFIELD:  -- under Connecticut law.

5              THE COURT:  Yes.  If you have a car accident and

6    you wait three and-a-half years, you're out of luck.  But

7    I think in a lot of situations in which conduct of this

8    sort is found to have been disguised sufficiently to give

9    rise to a tolling argument.

10             MR. GREENFIELD:  Let me read to you from

11   Connecticut Insurance Guarantee Association v. Yocum.  It

12   describes, said that The statute of repose, quote,

13   "operates to cut off all liability regardless of when the

14   claim arose, who knew or had reason to know about it or

15   any other factor traditionally associated with a statute

16   of limitations."

17             And there's not, as there is in other states, a

18   general like fraudulent conveyance tolling of the statute

19   of limitations except in extremely narrow circumstances,

20   which has not been alleged here.

21             THE COURT:  Okay.

22             MR. NEW:  Your Honor, I'm not going to get too

23   much into the facts.  I do disagree with the

24   characterization of the transactions, their effect on the

25   Permuta entities, the Harewood transaction, and also the

1    Movilway transfer, although we're not seeking to recover

2    because we have already recovered on it, is relevant to

3    the causes of action in this case.

4            But with the statute of limitations, I guess I'm

5    a little confused as to why statute of repose is even

6    relevant here.  The question for the Court on the Permutas

7    with regard to CUFTA is whether or not the discovery rule

8    under CUFTA applies so as to allow a receiver to bring a

9    claim on behalf of these defrauded entities.

10           The Legislature of Connecticut made a decision

11   that when it came to CUFTA, there would be a discovery

12   rule, and that discovery rule allowed for an innocent

13   person to bring a claim within one year of discovery of

14   the fraud, and that's what's happened here.  You know,

15   once the receiver was put in place, he then began his

16   investigation.

17           As Your Honor noted, these bribe payments were

18   concealed in some fashion, so it was not immediately

19   evident to the receiver or anyone else coming in what

20   exactly happened in those transactions.  And also, it took

21   time for the receiver to unravel all of the transactions

22   in this case.  Nevertheless, within one year of the date

23   of appointment, he brought this claim against Mr. Montes.

24   And that falls squarely under the discovery rule contained

25   in CUFTA and there's no really no reason to go into

1    whether or not the CUFTA statute is a statute of repose or

2    is a Statute of Limitations.  There is a discovery rule

3    and that's the issue for the court here.

4         And in similar circumstance in other districts

5    where an UFTA has contained a discovery rule and the

6    receiver has come in and brought claims under that state's

7    uniform fraudulent transfer act, it has been interpreted

8    to allow the receiver to bring a claim within the period

9    brought by the discovery rule.  And that should apply here

10   as well.

11        Mr. Greenfield didn't address the other statute

12   of limitations issues.  There's a question with regard to

13   unjust enrichment, as Your Honor is aware, whether it's a

14   three year or a six year or something other.

15        I think unless the Court has questions, I rest on

16   my papers but our position is that there is case law that

17   suggests it's normally six years, but in any event, the

18   other, the overarching precedent is that in equitable

19   remedy, you look at the statute of limitations for the

20   corresponding legal remedy, legal cause of action -- or

21   not remedy, legal cause of action.

22        Here, the unjust enrichment is equivalent to the

23   fraudulent transfer claim we're bringing, and so we ask

24   that that statute of limitations apply or the Court, in

25   the course of its equitable powers, to allow those claims

to be brought here because of all of the equities

involved, because of the nature of the fraud, because of

the concealment, and for all those other reasons, we think

that the unjust enrichment claims and the other equitable

claims are timely.

THE COURT:  And what about the breach of

fiduciary duty claims?

MR. NEW:  Yes, Your Honor.  Those claims,

obviously the statute of limitations there does not go

back as far as to cover the Permuta transactions and so we

have based those claims, at least for statute of

limitations purposes, on Mr. Montes' concerted action with

Mr. Illaramendi in connection with the Harewood

transaction, which it is alleged, contrary to what

Mr. Montes has suggested, that there were bribe payments

made in connection with that transaction, that Mr. Montes

directed that those transfers be made, negotiated a

percentage for himself, and although at this point we have

not been able to identify specifically any allegations in

the complaint, how that money ended up in Mr. Montes'

hands, I think that at this stage of the pleadings, the

inference to be drawn is that those bribe payments that

were sent out to the receivership entities by

Mr. Illaramendi ended up at least in part with Mr. Montes.

So, with regard to Harewood and Movilway, those

1     breaches of fiduciary duty occurred within the statutory

2     period, but the claim itself, the elements of the claim,

3     are supported by all the evidence in this case.  They

4     weren't isolated transactions.  None of these were

5     isolated transactions.

6          The relationship between Mr. Illaramendi and

7     Mr. Montes and the knowledge Mr. Montes had about

8     Mr. Illaramendi's breaches of fiduciary duty, his

9     assistance to Mr. Illaramendi, that spans all the way back

10    to the beginning of their relationship and all that is

11    relevant and would be relevant evidence to go to the

12    knowledge and intent of Mr. Montes in connection with

13    those causes of action.

14          So under a 12(b)6 analysis, Your Honor, we would

15    ask the Court to consider all that conduct.  But when it

16    comes to the statute of limitations issue, we agree that

17    it's limited to Harewood and Movilway and those occurred

18    within the statute of limitations period and so the claim

19    is timely.

20          MR. GREENFIELD:  Okay.  Well, first I'll go in

21    the same order going back to the CUFTA claim.  There's no

22    authority in Connecticut for the idea that a receiver gets

23    his own discovery period.  The discovery period, since the

24    receiver stands in the shoes of the receivership entities,

25    the receivership entities knew about these transfers at

1    the time they made them, so the relevant time period is an

2    additional four years.

3              Citing cases from other states as to whether or

4    not the receiver gets a fresh time period, whether some

5    sort of tolling of their statute of limitations, aren't

6    relevant to Connecticut.  Those states have adopted a

7    doctrine called Adverse Domination Doctrine, meaning that

8    while the receivership entities were dominated by the

9    mastermind, the statute of limitations is tolled during

10   that period of time.  But as the receiver admits, no

11   Connecticut court has ever adopted the Adverse Domination

12   Doctrine in Connecticut.

13             As to -- and I would say that it runs counter to

14   the whole idea of a statute of repose, because the purpose

15   of a statute of repose is to provide finality as to

16   potential liability.  And when a, when the limitation

17   period expires, liability is permanently cut off.  If

18   subsequently there's the appointment of a receiver and a

19   receiver learns about something, they can't revive

20   liability that's been extinguished under Connecticut law.

21             As to the aiding and abetting the conspiracy,

22   breach of fiduciary duties, they appear to agree that it

23   would be based only on the Harewood transaction and

24   allegations of the Movilway transfer, which has already

25   been settled with Movilway.  In the Harewood transaction,

there's no allegation that they actually received any

money.  The only thing that's alleged is the negotiation

of a bribe payment, not that he actually received it, and

that's insufficient to state a claim for aiding and

abetting and breach of fiduciary duty.  That requires that

Mr. Montes had to know that Mr. Illaramendi owed a

fiduciary duty to his receivership entities and that at

least even the promise of a bribe payment was a breach of

that duty.

There's no allegations in the complaint to

suggest that Mr. Montes had any knowledge about, you know,

this structure of 20 or 30 receivership entities, what

Mr. Illaramendi's relationship was to any particular

receivership entity, that he had a fiduciary duty to any

of the receivership entities, and there's no allegation

that he even knew where this money would come from.

In the context of the Permuta transfers, the

allegation is that money was paid to a third party,

entities controlled by Moris Beracha, another defendant in

these cases, and paid to Mr. Montes indirectly.  So

Mr. Montes under those circumstances would not know was

the money coming from any receivership entities, from

Mr. Illaramendi personally, from some third source, so I

don't believe that there's enough factual allegations from

which you can infer that Mr. Montes was aware that his

1    receipt of bribes would be a breach of Mr. Illaramendi's

2    fiduciary duty.

3            And there are no cases where the recipient of a

4    bribe is even charged with aiding and abetting breach of

5    fiduciary duty with the payer.  Okay?  The opposite

6    happens all the time, where if I pay someone money knowing

7    that I'm asking them to do something that breaches their

8    duty to someone else, I can be found to have aided and

9    abetted that.  There's no cases where someone simply

10   receives a bribe, aids and abets the payer's breach of a

11   fiduciary duty.

12           On the unjust enrichment and money had received

13   claims, those are also governed by the same three year

14   statute of limitations that applies to torts in

15   Connecticut.  Unless there's a specific statute of

16   limitations that says there's something different, torts

17   are governed by three year statute of limitations and

18   contracts are governed by six.

19           And so if you look at the cases where unjust

20   enrichment is based on a claim of unjust enrichment is

21   based on a contract, courts have applied six years; where

22   it's based in torts, it's three years.  Same is true for

23   money that is received, which is kind of a form of unjust

24   enrichment.

25           And those two claims are for -- have to be based

only on this Harewood transaction, there's no allegation
that Mr. Montes actually received any money from this
Harewood transaction, and both unjust enrichment and money
having received, there are a number of elements but among
them is that money was actually received, there is an
enrichment.

THE COURT:  So, that's cured by an amended
complaint which says on information and belief he received
funds.

MR. GREENFIELD:  They can amend that but they
amended their complaint twice already, once after we had
made the specific argument.

THE COURT:  Well, sure, but they are being
careful.  They can't point to where the money came in, but
what they are saying is an inference arises from the
combination of allegations they made.  If that combination
in fact the Court finds is not sufficient to give rise to
that inference, then presumably they are in a position to
say on information and belief.  They've said he negotiated
a cut of the bribe.  One doesn't usually negotiate a cut,
a commission of sorts, and not get paid or not at least
expect to get paid.

MR. GREENFIELD:  This transaction, I believe the
payment is alleged to have been made right around the same
time that Mr. Montes is alleged to have left Venezuela, so

1    I'm not sure that they can allege upon information and

2    belief they have received payment, or I think they would

3    have if they could have.  We pointed out this issue and

4    they amended a lot about their complaint but they still

5    have not -- are not bringing a fraudulent transfer claim

6    against him for that transfer.

7              THE COURT:  The way to figure out if they can do

8    it is to give them leave to do it, and either they'll do

9    it or they won't.

10             MR. GREENFIELD:  Yes, I agree you should dismiss

11   the complaint and give them leave to amend.  That would be

12   a good compromise position.

13             So I think I've covered all of the claims with

14   respect to that.

15             THE COURT:  Okay.  Well, you know, I think I've

16   had my questions answered.  I don't know if any either of

17   you have anything further you have want to argue.

18             MR. NEW:  Nothing for the plaintiffs, Your

19   Honor.  Thank you.

20             MR. GREENFIELD:  Nothing further.

21             THE COURT:  All right.  Thank you both.  Very

22   interesting, as I said.

23             MR. GREENFIELD:  I'm sorry, one thing, Your

24   Honor.  It appears that you are not ruling from the bench

25   today so I wanted to address the discovery stay.  We, as

1    Your Honor remember, had a telephone conference back I

2    think January 4th.  At the time we had a motion to stay

3    discovery so while we were going to have this hearing at

4    the end of January, said okay, no discovery until the oral

5    argument.  If I don't rule from the bench we can revisit

6    the issue of a further stay of discovery.

7          And so we would ask, we did have our 26(f)

8    conference, we submitted a 26(f) report and we set out

9    generally a case schedule except that we disagree on when

10   discovery should start based on our position that we

11   should not engage in discovery while we have a pending

12   motion to dismiss that's dispositive of the action.

13         And I hope that you believe at this point that

14   at least our position is not completely unfounded in the

15   law, which is the standard, and you know, discovery in

16   this case is going to be hugely expensive and very

17   burdensome for Mr. Montes.  We're just asking for a modest

18   extension without prejudging how long you want to think

19   through these issues, which are interesting and

20   complicated, that, you know, 14 days or 21 days or

21   something after you enter an order to decide these

22   motions, should any aspect of the case remain.

23         MR. NEW:  Not to rehash, obviously we oppose a

24   stay.  This case has been pending for over a year.

25   There's been no discovery at all.  The case management

```
1    plan I think that we propose, that we agreed on unless
2    there was a stay, suggested that discovery is to begin,
3    may begin but it doesn't have to begin, on April 1st,
4    which is not yet upon us.
5         We also believe that this would not be
6    particularly burdensome discovery for Mr. Montes.  In
7    fact, the burden would be almost entirely borne by the
8    receiver.  In light of the fact that in the initial
9    disclosure that we've exchanged, it appears that
10   Mr. Montes doesn't really have very many documents, which
11   to is to be expected because he's an individual, whereas
12   the receiver has voluminous amounts of documents he's
13   going to have to respond to requests.
14        But we are willing to take on that burden.  We
15   want to move this case forward.  We believe that, based on
16   what you heard today and our papers, Your Honor will
17   hopefully you'll deny the motion to dismiss in its
18   entirety, but there clearly are something here that's
19   going to go forward from this day forward.
20        And so we don't see any reason to further delay
21   this.  We think it's been delayed enough, but ultimately
22   any further delay harms the investors and the victims of
23   this fraud who are seeking to recover funds.  And for that
24   reason, the interests of the investors, we would like to
25   proceed in this case.
```

1          And there has been -- in the other cases pending

2     before Your Honor, there has been no discovery stay that's

3     been requested or granted.  This would be the only case so

4     far, although the Beracha case, we have not yet had a case

5     management conference because there are jurisdictional

6     issues.

7          MR. GREENFIELD:  Just two small points.  I won't

8     belabor this, but in the 26(f) report that we submitted,

9     we agreed to the April 1st date only in the instance that

10    you did rule from the bench.  Our position was different,

11    if Your Honor did not rule from the bench, we would

12    request a stay.

13         In terms of the burden, Mr. Montes is an

14    outsider to the receivership entities.  There's -- it's

15    not just the burden of turning over documents but the

16    burden of requesting, receiving, understanding these

17    documents, taking depositions.  They are listed in their

18    initial disclosures -- I don't know how many names of

19    people that they plan to rely on or that they might rely

20    on, but there's pages and pages of names.

21         So there's a huge burden on Mr. Montes in

22    collecting these documents, many are in Spanish

23    presumably, we have to translate them, but that's very

24    burdensome.

25         And we're not asking for, you know, a

1    substantial, hopefully, delay.  Just until this motion is

2    decided, and I believe that's a relatively modest request.

3    I don't believe there's any grounds for prejudice to the

4    receiver in that modest request.

5         THE COURT:  All right.  Well, let's do this.

6    Let's say that discovery can be propounded beginning on

7    April 15th.  That will give me something of a deadline to

8    try to get a ruling out by then.  So, I don't expect to

9    have a ruling by April 1st but I think I could well have

10   one by April 15.

11        MR. NEW:  Your Honor, we're fine with that.  If

12   that is how we're going to proceed, would the Court like

13   us to submit a revised case management plan to reflect

14   that?

15        THE COURT:  It's not necessary.

16        MR. NEW:  Thank you.

17        THE COURT:  All right.  Okay, well, thank you

18   all.  We'll stand in recess.

19        (Whereupon the above matter was adjourned at 4:05

20   o'clock, p. m.)

21

22

23

24

25

C E R T I F I C A T E


        I, Susan E. Catucci, RMR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.




        /S/ Susan E. Catucci
        _____

            Susan E. Catucci, RMR
            Official Court Reporter
            915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
            Tel: (917) 703-0761